## NOTICE:   SLIP OPINION
### (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| JOHN DOES 1, 2, 4, 5, | DIVISION ONE |
| Appellants/Cross Respondents, | No. 83700-1-I |
| JANE DOE 1 and JOHN DOE 3, | PUBLISHED OPINION |
| Plaintiffs, | |
| v. | |
| SEATTLE POLICE DEPARTMENT and the SEATTLE POLICE DEPARTMENT OFFICE OF POLICE ACCOUNTABILITY, | |
| Respondents, | |
| and | |
| SAM SUEOKA, | |
| Respondent/Cross Appellant, | |
| JEROME DRESCHER, ANNE BLOCK, and CHRISTI LANDES, | |
| Respondents. | |

DWYER, J. — "There are rights of constitutional stature whose exercise a State may not condition by the exaction of a price." Garrity v. State of New Jersey, 385 U.S. 493, 500, 87 S. Ct. 616, 17 L. Ed. 2d 562 (1967). Among these are the rights guaranteed by the First Amendment to our federal constitution. Garrity, 385 U.S. at 500. Police officers "are not relegated to a watered-down version of [such] rights." Garrity, 385 U.S. at 500.

No. 83700-1-I/2

In this Public Records Act litigation, the trial court failed to heed this pronouncement. Accordingly, we reverse the trial court's order requiring disclosure of certain unredacted records. We affirm the ancillary orders of the trial court and remand the matter for further proceedings.

I

Soon after the United States Supreme Court pronounced that police officers are not condemned to a "watered-down version" of core constitutional rights, the voters of our state passed by popular initiative the predecessor to Washington's Public Records Act[1] (PRA). See Progressive Animal Welfare Soc'y v. Univ. of Wash., 125 Wn.2d 243, 250-52, 884 P.2d 592 (1994) (PAWS) (noting approval of the public disclosure act in November 1972). Thus, since the day of the enactment of our state's public records law, police officers in Washington have been entitled to the same federal constitutional protections as are all other Washingtonians. It is by adherence to this principle that we decide this case.

We are presented today with the question of whether the Seattle Police Department (SPD) and the City of Seattle (the City) may disclose in investigatory records the identities of current or former Seattle police officers who were investigated regarding potential unlawful or unprofessional conduct during the events of January 6, 2021, in Washington, D.C. John Does 1, 2, 4, and 5 (the Does) sought judicial declaratory and injunctive relief after being informed that SPD, their employer, intended to publicly disclose the unredacted investigatory

---

[1] Ch. 42.56 RCW.

2

records in response to several PRA requests. Investigators have determined that allegations against the Does of unlawful or unprofessional conduct were "not sustained." The Does contend that their identities should thus not be disclosed in the requested records, which include transcripts of interviews in which they were compelled to disclose and discuss their political beliefs and affiliations.

The trial court denied the Does' motion for a preliminary injunction, concluding that the exceptions to permitted disclosure set forth in the PRA are inapplicable. The Does appealed from the trial court's order. In addition, Sam Sueoka, a member of the public who filed a records request to obtain copies of the investigatory records, cross appealed, asserting that the trial court erred by permitting the Does to proceed pseudonymously in this litigation.

The United States Supreme Court has recognized a First Amendment right to privacy that protects against state action compelling disclosure of political beliefs and associations. Thus, only if the state actor (here, the City) demonstrates a compelling interest in disclosure, and that interest is sufficiently related to the disclosure, can the state actor lawfully disclose the Does' identities in the investigatory records. Because there is here established no compelling state interest in disclosing the Does' identities, the trial court erred by denying the Does' motion for a preliminary injunction.

The trial court properly concluded, however, that the Does should be permitted to use pseudonyms in litigating this action. Because the Does assert a First Amendment privacy right, it is federal constitutional law—not state law—that controls their request to litigate pseudonymously. Pursuant to federal First

3

No. 83700-1-I/4

Amendment open courts jurisprudence, plaintiffs may litigate using pseudonyms in circumstances wherein the injury sought to be prevented by prevailing in the lawsuit would necessarily be incurred as a result of the compelled disclosure of the plaintiffs' identities, required as a condition of commencing the very lawsuit in which vindication of the constitutional right is sought. Accordingly, the Does may remain anonymous in this action.

II

The Does are current or former SPD officers[2] who attended former President Donald Trump's "Stop the Steal" political rally on January 6, 2021 in Washington, D.C. Upon returning to Washington State, the Does received complaints from SPD's Office of Police Accountability (the OPA) alleging that they might have violated the law or SPD policies during their attendance at the rally.

The Does thereafter submitted to OPA interviews in which they were "ordered to answer all questions asked, truthfully and completely," and informed that "failure to do so may result in discipline up to and including termination." In addition to inquiring regarding the Does' whereabouts and activities on January 6, the OPA also inquired regarding their political beliefs and associations, including whether they attended the rally "to articulate [their] political views," whether they were "affiliated with any political groups," and "[their] impressions of, and reactions to, the content of the Rally." Because the Does were under

---

[2] John Doe 1 resigned from SPD in December 2021 "as a direct result of the pressure" from the investigation and "public backlash arising" therefrom, as well as his concern "over retribution" from the incident.

4

No. 83700-1-I/5

standing orders to do so, they answered these questions "truthfully and as completely as possible."

Sueoka and other members of the public submitted records requests pursuant to the PRA, chapter 42.56 RCW, seeking disclosure of the investigatory records pertaining to police officers who participated in the events of January 6, 2021, in our nation's capital. In response to the records requests, SPD informed the Does that it intended to disclose both records regarding its ongoing investigation and the Does' personnel files.

On February 23, 2021, the Does filed a complaint for declaratory relief and preliminary and permanent injunction in the trial court.[3] They concurrently filed a motion for permission to proceed pseudonymously and a motion for a temporary restraining order (TRO) and order to show cause why the preliminary injunction should not issue.

On February 24, 2021, the trial court granted the Does' motion for a TRO, enjoining production of the requested records until a show cause hearing was held. On March 9, 2021, the trial court granted the Does' motion to proceed pseudonymously, ruling that the order would "remain in effect at least until the merits of Plaintiffs' PRA claims are resolved."

Following the show cause hearing, held on March 10, 2021, the trial court denied the Does' motion for a preliminary injunction. The Does sought review of the trial court's ruling in this court, and review was granted. Sueoka thereafter

---

[3] The complaint was filed by Jane and John Does, 1 through 6. Jane Doe 1 and John Doe 3 are not parties in this appeal. While litigation was ongoing in the trial court, the OPA determined that Jane Doe 1 and John Doe 3 had violated both the law and SPD policies on January 6, 2021, and their employment by SPD was terminated.

5

moved to transfer the cause to our Supreme Court. Then, on June 28, 2021, the OPA concluded its investigation. The OPA determined that allegations that the presently-litigating Does had violated the law or SPD policies or had engaged in unprofessional conduct were "not sustained."

On August 4, 2021, our Supreme Court granted Sueoka's motion to transfer the cause to that court. However, following oral argument on November 9, 2021, the court determined that, "in light of changed circumstances," review of the preliminary injunction was moot. The court dismissed review of the matter and remanded the cause to the trial court for further proceedings.

The trial court proceedings at issue herein then commenced. On January 5, 2022, Sueoka filed a "motion to change the case title and bar the use of pseudonyms." On January 12, 2022, the Does filed an additional motion for a preliminary injunction, again requesting that the trial court redact their identities in any disclosed records.[4]

Following a January 28, 2022 hearing, the trial court again denied the Does' motion for a preliminary injunction, ruling that the Does had not "met their burden of proof that they have a privacy right that falls within an exemption under the [PRA]." The court additionally concluded that the record contains "insufficient evidence" that disclosure will cause the Does to "experience a level of harassment that will result in a chilling effect on their First Amendment rights."

---

[4] Jane Doe 1 and John Doe 3 were no longer parties at that point in the litigation. Accordingly, the motion was filed by the "Represented Doe Plaintiffs," who are the same individuals as the Does in this appeal.

No. 83700-1-I/7

The trial court also denied Sueoka's motion to preclude the Does from proceeding in pseudonym.

The Does appeal from the trial court's order denying their motion for a preliminary injunction. Sueoka cross appeals, asserting that the trial court erred by denying his "motion to change the case title and bar the use of pseudonyms." Sueoka also requests that we change the case title and bar the use of pseudonyms in this appeal.

III

The Does assert that the trial court erred by determining that they were unlikely to succeed on the merits of their claim that their identities are exempt from disclosure in the requested records and, accordingly, denying their motion for a preliminary injunction precluding such disclosure. We agree. The First Amendment, made applicable to the states though the due process clause of the Fourteenth Amendment, Gitlow v. New York, 268 U.S. 652, 45 S. Ct. 625, 69 L. Ed. 1138 (1925), confers a right to privacy in one's political beliefs and associations that may be impinged only on the basis of a subordinating state interest that is compelling.

Our Supreme Court's decisional authority, the profusion of legislatively enacted exceptions to disclosure, and the policy underlying the PRA indicate that there is no compelling state interest in disclosing to the public the identities of public employees against whom unsustained allegations of wrongdoing have been made. Therefore, we hold that the trial court erred by denying the Does'

7

request for a preliminary injunction precluding disclosure of their names and

other identifying information in the requested records.

A

1

The party seeking an injunction pursuant to the PRA has the burden of

proof. Lyft, Inc. v. City of Seattle, 190 Wn.2d 769, 791, 418 P.3d 102 (2018).

When a party seeks a preliminary injunction or a TRO, "the trial court need not

resolve the merits of the issues." Seattle Children's Hosp. v. King County, 16

Wn. App. 2d 365, 373, 483 P.3d 785 (2020). "Instead, the trial court considers

only the *likelihood* that the moving party ultimately will prevail at a trial on the

merits." SEIU Healthcare 775NW v. Dep't of Soc. & Health Servs., 193 Wn. App.

377, 392-93, 377 P.3d 214 (2016).

We stand in the same position as the trial court when, as here, "the record

consists of only affidavits, memoranda of law, and other documentary evidence,

and where the trial court has not seen or heard testimony requiring it to assess

the witnesses' credibility or competency." Bainbridge Island Police Guild v. City

of Puyallup, 172 Wn.2d 398, 407, 259 P.3d 190 (2011). "Whether requested

records are exempt from disclosure presents a legal question that is reviewed de

novo." Wash. Pub. Emps. Ass'n v. Wash. State Ctr. for Childhood Deafness &

Hearing Loss, 194 Wn.2d 484, 493, 450 P.3d 601 (2019).

2

"The PRA ensures the sovereignty of the people and the accountability of

the governmental agencies that serve them by providing full access to

8

information concerning the conduct of government." Predisik v. Spokane Sch.

Dist. No. 81, 182 Wn.2d 896, 903, 346 P.3d 737 (2015). Its basic purpose "is to

provide a mechanism by which the public can be assured that its public officials

are honest and impartial in the conduct of their public offices." Cowles Publ'g Co.

v. State Patrol, 109 Wn.2d 712, 719, 748 P.2d 597 (1988). To that end, the act

requires state and local agencies to "make available for public inspection and

copying all public records," unless the record falls within a specific exemption in

the PRA or an "other statute which exempts or prohibits disclosure of specific

information or records." RCW 42.56.070(1).

We have interpreted the "other statute" provision to incorporate

exemptions set forth not only in other legislative enactments, but also those

deriving from the state or federal constitutions. Wash. Fed'n of State Emps.,

Council 28 v. State, 22 Wn. App. 2d 392, 511 P.3d 119 (2022), review granted,

200 Wn.2d 1012, 519 P.3d 585 (2022); see also White v. Clark County, 188 Wn.

App. 622, 354 P.3d 38 (2015). Although our Supreme Court has not directly held

that RCW 42.56.070(1)'s "other statute" provision incorporates constitutional

protections against disclosure, the court has acknowledged that such an

argument "has force." Yakima County v. Yakima Herald-Republic, 170 Wn.2d

775, 808, 246 P.3d 768 (2011) (addressing the argument that provisions of the

United States Constitution qualify as "other statutes").

Moreover, the high court has recognized that, even absent legislative

incorporation of constitutional guarantees in the PRA, Washington courts must

nevertheless protect such rights. Seattle Times Co. v. Serko, 170 Wn.2d 581,

9

No. 83700-1-I/10

594-96, 243 P.3d 919 (2010). In the context of fair trial rights, the court explained that while "[t]here is no specific exemption under the PRA that mentions the protection of an individual's constitutional fair trial rights, . . . courts have an independent obligation to secure such rights." Seattle Times Co., 170 Wn.2d at 595. Indeed, because "the constitution supersedes contrary statutory laws, even those enacted by initiative," "the PRA must give way to constitutional mandates." Freedom Found. v. Gregoire, 178 Wn.2d 686, 695, 310 P.3d 1252 (2013).

In addition to setting forth exemptions to the mandate for disclosure of public records, the PRA includes an injunction provision stating that disclosure may be enjoined only when "examination would clearly not be in the public interest and would substantially and irreparably damage any person, or would substantially and irreparably damage vital governmental functions." RCW 42.56.540. Based on this statutory provision, our Supreme Court has held that "finding an exemption applies under the PRA does not ipso facto support issuing an injunction." Lyft, 190 Wn.2d at 786. Rather, for the disclosure of records to be precluded *due to a statutory exemption*, the court has held that the PRA's standard for injunctive relief must also be met. Morgan v. City of Federal Way, 166 Wn.2d 747, 756-57, 213 P.3d 596 (2009); see also Soter v. Cowles Publ'g Co., 162 Wn.2d 716, 757, 174 P.3d 60 (2007) (plurality opinion) ("[T]o impose the injunction contemplated by RCW 42.56.540, the trial court must find that a specific exemption applies *and* that disclosure would not be in the public interest

10

No. 83700-1-I/11

and would substantially and irreparably damage a person or a vital government interest.").

3

Our analysis of the issues presented relies on the holdings of our nation's highest court establishing that the First Amendment to the United States Constitution confers a privacy right in an individual's political beliefs and associations. Accordingly, we must explore the decisional authority establishing the contours of that right.

The United States Supreme Court has recognized "political freedom of the individual" to be "a fundamental principle of a democratic society." Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S. Ct. 1203, 1 L. Ed. 2d 1311 (1957). "Our form of government," the Court explained, "is built on the premise that every citizen shall have the right to engage in political expression and association," a right "enshrined in the First Amendment." Sweezy, 354 U.S. at 250. Indeed, "[i]n the political realm . . . thought and action are presumptively immune from inquisition by political authority." Sweezy, 354 U.S. at 266.[5] Thus, the federal constitution protects not only the right of individuals to engage in political expression and association, but also to maintain their privacy in so doing.

Indeed, the Court has "repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by

---

[5] See also Gibson v. Florida Legis. Investigation Comm., 372 U.S. 539, 570, 83 S. Ct. 889, 9 L. Ed. 2d 929 (1963) (Douglas, J., concurring) ("'The First Amendment in its respect for the conscience of the individual honors the sanctity of thought and belief. To think as one chooses, to believe what one wishes are important aspects of the constitutional right to be let alone.'") (quoting Pub. Utils. Comm'n of Dist. of Columbia v. Pollak, 343 U.S. 451, 468, 72 S. Ct. 813, 96 L. Ed. 1068 (1952) (Douglas, J., dissenting))).

11

No. 83700-1-I/12

the First Amendment." Buckley v. Valeo, 424 U.S. 1, 64, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976) (citing Gibson v. Florida Legis. Investigation Comm., 372 U.S. 539, 83 S. Ct. 889, 9 L. Ed. 2d 929 (1963); Nat'l Ass'n for Advancement of Colored People v. Button, 371 U.S. 415, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963); Bates v. City of Little Rock, 361 U.S. 516, 80 S. Ct. 412, 4 L. Ed. 2d 480 (1960); Shelton v. Tucker, 364 U.S. 479, 81 S. Ct. 247, 5 L. Ed. 2d 231 (1960); Nat'l Ass'n for Advancement of Colored People v. Alabama, 357 U.S. 449, 78 S. Ct. 1163, 2 L. Ed. 2d 1488 (1958) (NAACP)); see also Doe v. Reed, 561 U.S. 186, 232, 130 S. Ct. 2811, 177 L. Ed. 2d 493 (2010) (Thomas, J., dissenting) ("This Court has long recognized the 'vital relationship between' political association 'and privacy in one's associations,' and held that '[t]he Constitution protects against the compelled disclosure of political associations and beliefs.'" (alteration in original) (citation omitted) (quoting NAACP, 357 U.S. at 462; Brown v. Socialist Workers '74 Campaign Comm. (Ohio), 459 U.S. 87, 91, 103 S. Ct. 416, 74 L. Ed. 2d 250 (1982))). Thus, the Court has recognized a "pervasive right of privacy against government intrusion" that is "implicit in the First Amendment." Gibson, 372 U.S. at 569-70 (Douglas, J., concurring). This "tradition of anonymity in the advocacy of political causes . . . is perhaps best exemplified by the secret ballot, the hard-won right to vote one's conscience without fear of retaliation." McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 343, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995); see also Sweezy, 354 U.S. at 266 ("It cannot require argument that inquiry would be barred to ascertain whether a citizen had voted for one or the other of the two major parties either in a state or national election.").

12

No. 83700-1-I/13

The Supreme Court's jurisprudence regarding this constitutional right to privacy evolved in response to legislative investigations seeking to compel the disclosure of individuals' political beliefs.  In the 1950s, the Court considered the constitutional limits of legislatures' authority to inquire into belief and activity deemed to be subversive to federal or state governments.  Uphaus v. Wyman, 360 U.S. 72, 79 S. Ct. 1040, 3 L. Ed. 2d 1090 (1959); Watkins v. United States, 354 U.S. 178, 77 S. Ct. 1173, 1 L. Ed. 2d 1273 (1957); Sweezy, 354 U.S. 234; Wieman v. Updegraff, 344 U.S. 183, 73 S. Ct. 215, 97 L. Ed. 216 (1952).  This "new kind of [legislative] inquiry unknown in prior periods of American history . . . involved a broad-scale intrusion into the lives and affairs of private citizens," Watkins, 354 U.S. at 195, thus requiring the Court to ensure that such inquiry did not "unjustifiably encroach upon an individual's right to privacy."  Watkins, 354 U.S. at 198-99.  In considering this "collision of the investigatory function with constitutionally protected rights of speech and assembly," Uphaus, 360 U.S. at 83 (Brennan, J., dissenting), the Court recognized the state interest in "self-preservation, 'the ultimate value of any society.'"  Uphaus, 360 U.S. at 80 (quoting Dennis v. United States, 341 U.S. 494, 509, 71 S. Ct. 857, 95 L. Ed. 1137 (1951)).  However, the Court rejected any notion that exposure itself was a valid state interest:

> We have no doubt that there is no congressional power to expose for the sake of exposure.  The public is, of course, entitled to be informed concerning the workings of its government.  That cannot be inflated into a general power to expose where the predominant result can only be an invasion of the private rights of individuals.

13

No. 83700-1-I/14

<u>Watkins</u>, 354 U.S. at 200 (footnote omitted); <u>see also</u> <u>Uphaus</u>, 360 U.S. at 82

(Brennan, J., dissenting) (recognizing the "investigatory objective" therein to be

"the impermissible one of exposure for exposure's sake").

The <u>Watkins</u> Court recognized the governmental intrusion resulting from

such legislative inquiry, as well as the "disastrous" consequences that may ensue

as a result of compelled disclosure of the individual's political beliefs.

> The mere summoning of a witness and compelling him to testify,
> against his will, about his beliefs, expressions or associations is a
> measure of governmental interference.  And when those forced
> revelations concern matters that are unorthodox, unpopular, or
> even hateful to the general public, the reaction in the life of the
> witness may be disastrous.

354 U.S. at 197; <u>see also</u> <u>Uphaus</u>, 360 U.S. at 84 (Brennan, J., dissenting) ("[I]n

an era of mass communications and mass opinion, and of international tensions

and domestic anxiety, exposure and group identification by the state of those

holding unpopular and dissident views are fraught with such serious

consequences for the individual as inevitably to inhibit seriously the expression of

views which the Constitution intended to make free.").

However, it is not only those individuals compelled to disclose their beliefs

who may be impacted.  To the contrary, the Court recognized an additional "more

subtle and immeasurable effect upon those who tend to adhere to the most

orthodox and uncontroversial views and associations in order to avoid a similar

fate at some future time."  <u>Watkins</u>, 354 U.S. at 197-98.  Moreover, that the injury

was not inflicted solely by government actors did not nullify the constitutional

infirmity; rather, that the "impact [was] partly the result of non-governmental

14

No. 83700-1-I/15

activity by private persons [could not] relieve the investigators of their responsibility for initiating the reaction." Watkins, 354 U.S. at 198.

The Supreme Court further defined this constitutional privacy interest in response to legislative action seeking to compel the disclosure of organizational membership. NAACP, 357 U.S. 449; Bates, 361 U.S. 516; Shelton, 364 U.S. 479; Gibson, 372 U.S. 539. In 1958, the Court considered whether Alabama could, consistent with our federal constitution, compel the NAACP to disclose its membership list to the Alabama Attorney General. NAACP, 357 U.S. at 451. "It is beyond debate," the Court held, "that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." NAACP, 357 U.S. at 460. Although the state itself had "taken no direct action" in the challenged contempt judgment, the Court recognized that "abridgement of [First Amendment] rights, even though unintended, may inevitably follow from varied forms of governmental action." NAACP, 357 U.S. at 461. Indeed, "[t]he governmental action challenged may appear to be totally unrelated to protected liberties." NAACP, 357 U.S. at 461. Nevertheless, the Court held, the State could require disclosure of the membership lists only if there existed a "'subordinating interest of the State [that is] compelling.'" NAACP, 357 U.S. at 463 (quoting Sweezy, 354 U.S. at 265); see also Bates, 361 U.S. at 524 ("Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating

15

No. 83700-1-I/16

interest which is compelling."). The Court concluded that it discerned no such state interest. NAACP, 357 U.S. at 464.

The Court again considered whether the First Amendment, incorporated through the due process clause, precluded the compelled disclosure of NAACP membership lists in Bates, 361 U.S. 516. There, the organization asserted the rights of its "'members and contributors to participate in the activities of the NAACP, anonymously, a right which has been recognized as the basic right of every American citizen since the founding of this country.'" Bates, 361 U.S. at 521. Again, the Court recognized that it was not simply a "heavy-handed frontal attack" against which First Amendment freedoms are protected, but "also from being stifled by more subtle governmental interference." Bates, 361 U.S. at 523. In concurrence, Justices Black and Douglas recognized that mere exposure by the government can impinge these constitutional protections. Bates, 361 U.S. at 528 (Black & Douglas, JJ., concurring). "First Amendment rights," the Justices recognized, "are beyond abridgement either by legislation that directly restrains their exercise or by suppression or impairment through harassment, humiliation, *or exposure by government.*" Bates, 361 U.S. at 528 (Black & Douglas, JJ., concurring) (emphasis added). As in NAACP, the Bates Court discerned no sufficient state interest to compel the disclosure of the membership lists. 361 U.S. at 525.

That same year, the Court addressed the constitutionality of an Arkansas statute requiring public school teachers to disclose, as a condition of employment, all organizations with which they had been associated in the

16

No. 83700-1-I/17

previous five years. <u>Shelton</u>, 364 U.S. 479. Recognizing the State's undoubtedly legitimate interest in investigating the fitness and competency of its teachers, the Court nevertheless observed that the statute's "scope of inquiry" was "completely unlimited." <u>Shelton</u>, 364 U.S. at 485, 488. Significantly, the statute would have required "a teacher to reveal the church to which he belongs, or to which he has given financial support. It [would have required] him to disclose his political party, and every political organization to which he may have contributed over a five-year period." <u>Shelton</u>, 364 U.S. at 488. This "comprehensive interference with associational freedom," the Court held, "goes far beyond what might be justified in the exercise of the State's legitimate inquiry into the fitness and competency of its teachers." <u>Shelton</u>, 364 U.S. at 490.

As in <u>NAACP</u>, the Supreme Court in <u>Shelton</u> again recognized that exposure by the State could impinge constitutional privacy rights. Because the Arkansas statute nowhere required confidentiality of the information involuntarily disclosed to the government, the Court considered that the teachers' religious, political, and other associational ties could additionally be disclosed to the public. <u>Shelton</u>, 364 U.S. at 486-87. The Court was clear that such an intrusion into the teachers' privacy would further impinge their constitutional rights. Such "[p]ublic exposure, bringing with it the possibility of public pressures upon school boards to discharge teachers who belong to unpopular or minority organizations, would simply operate to widen and aggravate the impairment of constitutional liberty." <u>Shelton</u>, 364 U.S. at 486-87.

17

No. 83700-1-I/18

Four Justices dissented in Shelton, disagreeing with the majority's holding that, under the circumstances presented, the extent of constitutional infringement resulting from compelled disclosure was sufficient to override the countervailing legitimate state interest.[6]  Nevertheless, even the dissenting opinions in Shelton recognized both the existence of a constitutional privacy interest and the potential for public exposure of associational ties to impinge upon those rights. For instance, Justice Frankfurter, distinguishing NAACP and Bates due to the absence of a legitimate state interest presented in those cases, recognized "that an interest in privacy, in non-disclosure, may under appropriate circumstances claim constitutional protection."  Shelton, 364 U.S. at 490 (Frankfurter, J., dissenting).  Similarly, Justice Harlan suggested that public disclosure of the teachers' associational ties, beyond simply the compelled disclosure to their school boards, might impinge their liberty rights: "I need hardly say that if it turns out that this statute is abused, either by an unwarranted publicizing of the required associational disclosures or otherwise, we would have a different kind of case than those presently before us."  Shelton, 364 U.S. at 499 (Harlan, J., dissenting).

Three years later, the Court was "called upon once again to resolve a conflict between individual rights of free speech and association and governmental interest in conducting legislative investigations."  Gibson, 372 U.S.

---

[6] See Shelton, 364 U.S. at 496 (Frankfurter, J., dissenting) (concluding that "the disclosure of teachers' associations to their school boards" is not "without more, such a restriction upon their liberty . . . as to overbalance the State's interest in asking the question"); Shelton, 364 U.S. at 497 (Harlan, J., dissenting) (concluding that the statute's disclosure requirement "cannot be said to transgress the constitutional limits of a State's conceded authority to determine the qualifications of those serving it as teachers").

at 543. There, a Florida legislative committee sought to subpoena NAACP membership lists, presumably to investigate suspected communist involvement. Gibson, 372 U.S. at 540-41. The Supreme Court again affirmed that such an investigation, "which intrudes into the area of constitutionally protected rights of speech, press, association and petition," is lawful only when the State can "convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest." Gibson, 372 U.S. at 546. The Court held that "all legitimate organizations are the beneficiaries of these protections," but noted that the protections "are all the more essential . . . where the challenged privacy is that of persons espousing beliefs already unpopular with their neighbors." Gibson, 372 U.S. at 556-57. In such circumstances, "the deterrent and 'chilling' effect on the free exercise of constitutionally enshrined rights of free speech, expression, and association is consequently the more immediate and substantial." Gibson, 372 U.S. at 557.

In the decades that have followed, the Supreme Court has continued to hold that First Amendment rights may be impinged when the government compels disclosure of political beliefs and associations. In 1982, the Court again affirmed that "[t]he Constitution protects against the compelled disclosure of political associations and beliefs." Brown, 459 U.S. at 91. "Such disclosures," the Court recognized, "'can seriously infringe on privacy of association and belief guaranteed by the First Amendment.'" Brown, 459 U.S. at 91 (quoting Buckley, 424 U.S. at 64). Again, the Court held that only by demonstrating a compelling interest can the State lawfully impinge such rights:

No. 83700-1-I/20

> The right to privacy in one's political associations and beliefs will yield only to a "'subordinating interest of the State [that is] compelling,'" NAACP[, 357 U.S. at 463] (quoting Sweezy[, 354 U.S. at 265]) (opinion concurring in result), and then only if there is a "substantial relation between the information sought and [an] overriding and compelling state interest." Gibson[, 372 U.S. at 546].

Brown, 459 U.S. at 91-92 (some alterations in original).

Over a decade later, in declaring unconstitutional an Ohio statute prohibiting the distribution of anonymous campaign literature, the Supreme Court once again "embraced [the] respected tradition of anonymity in the advocacy of political causes." McIntyre, 514 U.S. at 343 (citing Talley v. California, 362 U.S. 60, 80 S. Ct. 536, 4 L. Ed. 2d 559 (1960)); see also Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton, 536 U.S. 150, 122 S. Ct. 2080, 153 L. Ed. 2d 205 (2002) (recognizing a right to anonymity in declaring unconstitutional an ordinance requiring individuals to obtain and display a permit to engage in door-to-door advocacy). In McIntyre, the Court recognized the constitutional significance of "core political speech," describing the speech involved therein— the "handing out [of] leaflets in the advocacy of a politically controversial viewpoint"—as "the essence of First Amendment expression." 514 U.S. at 347. Acknowledging that the reasons for anonymity could be many,[7,8] the Court held that the freedom to remain anonymous, whether in "the literary realm" or "in the field of political rhetoric," "is an aspect of the freedom of speech protected by the

---

[7] "The decision in favor of anonymity," the Court noted, "may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." McIntyre, 514 U.S. at 341-42.

[8] "Even the Federalist Papers, written in favor of the adoption of our Constitution, were published under fictitious names. It is plain that anonymity has sometimes been assumed for the most constructive purposes." Talley, 362 U.S. at 65.

20

First Amendment." McIntyre, 514 U.S. at 342-43. For Justice Stevens, writing in

McIntyre, the value of anonymity in political speech could not be overstated:

> Under our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent. Anonymity is a shield from the tyranny of the majority. See generally J. Mill, On Liberty and Considerations on Representative Government 1, 3-4 (R. McCallum ed. 1947). It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society.

514 U.S. at 357.

For nearly a century, the rights afforded by the First Amendment have

been protected against intrusion by the States as an "inseparable aspect of the

'liberty' assured by the Due Process Clause of the Fourteenth Amendment,

which embraces freedom of speech." NAACP, 357 U.S. at 460; see Gitlow, 268

U.S. 652. During this time, the Supreme Court has repeatedly recognized that

encompassed within this liberty interest is the right of individuals to privacy in

their political beliefs and associations, wherein "thought and action are

presumptively immune from inquisition by political authority." Sweezy, 354 U.S.

at 266 (Frankfurter, J., concurring). This privacy interest "yield[s] only to a

'subordinating interest of the State [that is] compelling,' and then only if there is a

'substantial relation between the information sought and [an] overriding and

compelling state interest.'" Brown, 459 U.S. at 91-92 (second and third

alterations in original) (citation and internal quotation marks omitted) (quoting

Sweezy, 354 U.S. at 265; Gibson, 372 U.S. at 546).

21

It is with cognizance of these principles that we consider whether SPD and the City may disclose the Does' identities in the investigatory records at issue.

B

The Does assert that the disclosure of their identities in the requested records will violate their First Amendment right to political anonymity.[9]  They contend that the trial court erred by determining that no constitutional privacy interest is implicated in this situation.  We agree.

Both the Does' attendance at the January 6 rally and their compelled statements to investigators implicate the First Amendment.  Exposure by the government of this information, through disclosure of the unredacted requested records, would impinge the Does' constitutional right to anonymity in their political beliefs and associations.

Pursuant to United States Supreme Court decisional authority, the State must demonstrate that disclosure of the unredacted requested records would further a compelling state interest and that such disclosure is narrowly tailored to achieve that state interest.  Because no compelling state interest exists to justify disclosure of the unredacted records, the Does are entitled to an injunction prohibiting exposure by the government of their identities.

---

[9] The parties' initial appellate briefing primarily concerns whether the Does are entitled to a preliminary injunction pursuant to statutory exemptions set forth in the PRA.  However, the Does additionally contended that disclosure would violate their First Amendment rights.  Following oral argument, the parties submitted supplemental briefing addressing this issue more thoroughly.  Because the answer to the Does' request for a remedy is found in First Amendment jurisprudence, we need not address the parties' arguments regarding PRA statutory exemptions to disclosure.

No. 83700-1-I/23

1

The Does assert that disclosure of their identities in the requested records, both with regard to their attendance at the January 6 rally and their statements made to investigators concerning their political views and affiliations, will violate their First Amendment right to privacy. They aver that the trial court erred in two respects. First, the Does contend that the trial court erroneously concluded that, because the January 6 rally was a public event, the Does had no right to privacy in attending that event. Second, they argue that the trial court erred by concluding that they had not demonstrated a sufficient probability of a "chilling effect" on their constitutional rights to be entitled to the relief sought.

Sueoka contends, on the other hand, that the Does' attendance at the January 6 rally is not protected by a constitutional privacy right. He further contends that, even if disclosure of the Does' identities in the requested records implicates a First Amendment right, the Does relinquished that right by cooperating with the OPA's investigation. Finally, Sueoka asserts that the trial court properly determined that the Does have not shown a sufficient probability of harm to establish a constitutional right to privacy.

The Does' contentions, consistent as they are with United States Supreme Court decisional authority, are the more persuasive. We conclude that the Does have a First Amendment privacy right in their identities in the requested records.

(a)

The First Amendment to the United States Constitution, as incorporated through the due process clause of the Fourteenth Amendment, "protects against

23

No. 83700-1-I/24

the compelled disclosure of political associations and beliefs." Brown, 459 U.S. at 91; see also Buckley, 424 U.S. at 64 (noting that the Court had "repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment"). Even when the State takes "no direct action" to abridge an individual's First Amendment rights, those rights may be impinged by "varied forms of governmental action" that "may appear to be totally unrelated to protected liberties." NAACP, 357 U.S. at 461. In other words, it is not solely a "heavy-handed frontal attack" by government that may abridge an individual's First Amendment rights; such constitutional transgression may also arise from "more subtle governmental interference." Bates, 361 U.S. at 523. Indeed, simple "exposure by government" may be sufficient to impinge such rights. Bates, 361 U.S. at 528.

Here, the trial court concluded, and Sueoka presently asserts, that the Does have no right to privacy in having attended a public political rally. The trial court reasoned:

> Whether a person attended a public rally is not the type of intimate detail that courts in Washington have said should remain private. Washington courts have not previously found an inherent right to privacy in attendance at a public political rally. Attending a public rally is not an act that is inherently cloaked in privacy.

In so ruling, the court was clearly referring to Washington law concerning whether an individual has a *statutory right to privacy* pursuant to the PRA.[10] We

---

[10] Because the PRA does not define "right to privacy," our Supreme Court adopted the common law tort definition of the term, which provides, in part, that the privacy right is implicated when the "'intimate details of [a person's] life are spread before the public gaze in a manner highly offensive to the ordinary reasonable [person].'" Hearst Corp. v. Hoppe, 90 Wn.2d 123, 136, 580 P.2d 246 (1978) (quoting RESTATEMENT (SECOND) OF TORTS § 652D, at 386 (AM. LAW INST. 1977)). The trial court referenced this language in ruling that the Does' attendance at the January 6 rally does not implicate a privacy right.

24

do not evaluate, however, whether disclosure of the Does' identities is precluded by a statutory right to privacy.

Rather, we conclude that, pursuant to United States Supreme Court decisional authority, the disclosure by the government of the Does' identities in the requested records would violate their federal constitutional right to anonymity in political belief and association.  See, e.g., Watchtower Bible, 536 U.S. 150; McIntyre, 514 U.S. 334; Brown, 459 U.S. 87; Buckley, 424 U.S. 1; Gibson, 372 U.S. 539; Shelton, 364 U.S. 479; Talley, 362 U.S. 60; Bates, 361 U.S. 516; Uphaus, 360 U.S. 72; NAACP, 357 U.S. 449; Watkins, 354 U.S. 178; Sweezy, 354 U.S. 234; Wieman, 344 U.S. 183.  Such governmental action would expose to the public not only records evidencing the Does' attendance at the January 6 rally, but also the transcripts of interviews in which the Does were compelled to "articulate [their] political views," discuss whether they were "affiliated with any political groups," and describe "[their] impressions of, and reactions to, the content of the Rally."  The requested records thus implicate the Does' personal political views and their affiliations, if any, with political organizations.[11]  "It cannot

Because, at common law, sovereign immunity precluded actions against the government, it comes as little surprise that in this case—wherein the actions of government are directly at issue—the answer is found not in the common law but in the First and Fourteenth Amendments—which are each solely directed at governmental action.

[11] The trial court did not consider whether the Does' statements regarding their political beliefs and associations, compelled to be disclosed during the OPA investigation, implicated either a statutory or constitutional right to privacy.  Instead, the court found that there was "no evidence . . . indicating whether the requested records sought contain explicit information about the Does' political beliefs or associations."

The record does not support this finding.  The Does' declarations state that each was "ordered to answer all questions asked, truthfully and completely, and that failure to do so may result in discipline up to and including termination."  These questions included "why [they] attended" the rally, whether they attended "to articulate [their] political views," whether they were "showing support for a political group" or were "affiliated with any political groups," and what were their "impressions of, and reactions to, the content" of the rally.  In their declarations, each of the Does stated: "Because I believed I was under a standing order to answer these personal

25

No. 83700-1-I/26

require argument," the United States Supreme Court has stated, "that inquiry would be barred to ascertain whether a citizen had voted for one or the other of the two major parties either in a state or national election." Sweezy, 354 U.S. at 266. If such direct governmental action would impinge the Does' constitutional privacy interests, then so, too, does exposure by the government of that same information pursuant to a records request. See Bates, 361 U.S. at 523; NAACP, 357 U.S. at 461.

Sueoka nevertheless contends that our Supreme Court's decision in Spokane Police Guild v. Liquor Control Board, 112 Wn.2d 30, 769 P.2d 283 (1989), "puts to rest any claim" that the Does' attendance at the January 6 rally is protected by a constitutional privacy right.[12] In that case, the court considered whether a statutory exemption precluded disclosure of an investigatory report that identified police officers who had attended a party on Spokane Police Guild Club premises. Spokane Police Guild, 112 Wn.2d at 31. The party, "variously referred to as a bachelor party, stag show and strip show," had been determined to violate regulations of the liquor board. Spokane Police Guild, 112 Wn.2d at 31. Our Supreme Court held that disclosure of the report would not violate the statutory right to privacy conferred by the statutory predecessor of the PRA. Spokane Police Guild, 112 Wn.2d at 37-38. Recognizing that this privacy right pertains "only to the intimate details of one's personal and private life," the court reasoned that there was "no personal intimacy involved in one's presence or

---

questions, I did so truthfully and as completely as possible." These declarations are themselves evidence that the requested records contain statements regarding the Does' political beliefs and affiliations.

[12] Br. of Resp't/Cross Appellant at 31.

26

No. 83700-1-I/27

conduct at such a well attended and staged event which would be either lost or diminished by being made public." Spokane Police Guild, 112 Wn.2d at 38.

According to Sueoka, this holding compels the conclusion herein that the Does' attendance at the January 6 rally—occurring, as it did, in a public location[13]—does not implicate a right to privacy. However, in so asserting, Sueoka confuses the *statutory privacy right* bestowed by the PRA with the *constitutional privacy right* deriving from the First Amendment. In Spokane Police Guild, the disclosure of the officers' political beliefs and associations was not at issue; accordingly, the court considered only whether a statutory exemption prohibited disclosure of the investigative report. 112 Wn.2d at 37-38. Moreover, in focusing solely on the Does' attendance at a public event, Sueoka disregards that disclosure of the requested records would additionally expose the Does' statements regarding their political beliefs and associations, which the Does were compelled to disclose during the OPA investigation. In short, Sueoka asserts that Washington Supreme Court decisional authority concerning a statutory right to privacy stemming from the common law of torts precludes a determination that a federal constitutional right prohibits disclosure by a government. This contention is wholly unavailing.

Sueoka additionally contends that the United States Supreme Court's decisional authority regarding the First Amendment right to political anonymity is

---

[13] The Capitol Police issued six permits authorizing gatherings on January 6, 2021 on property under its control. Jason Leopold, *The Capitol Police Granted Permits For Jan. 6 Protests Despite Signs That Organizers Weren't Who They Said They Were*, BUZZFEED NEWS (Sept. 17, 2021), https://www.buzzfeednews.com/article/jasonleopold/the-capitol-police-said-jan-6-unrest-on-capitol-grounds [https://perma.cc/LWM5-P3MN].

27

inapposite because, he argues, the Does "cannot be compared to members of small and powerless political or religious groups," and are not "seeking anonymity from the government itself."[14] Again, we disagree.

Contrary to Sueoka's assertion, the United States Supreme Court has not limited the applicability of the First Amendment's privacy right to members of "small and powerless political or religious groups." To the contrary, the Court has recognized that "the deterrent and 'chilling' effect on the free exercise of constitutionally enshrined rights of free speech, expression, and association" is "the more immediate and substantial" when "the challenged privacy is that of persons espousing beliefs already unpopular with their neighbors." Gibson, 372 U.S. at 556-57. Nevertheless, the Court was clear that, "of course, all legitimate organizations are the beneficiaries of these protections." Gibson, 372 U.S. at 556.[15] Moreover, the question is not whether an individual is a member of a "small and powerless" group, as Sueoka asserts, but whether the individual "espous[es] beliefs . . . unpopular with their neighbors," Gibson, 372 U.S. at 557, such that exposure of those beliefs could discourage the exercise of constitutional rights.

Thus, it is the opprobrium that the community has for the individual's beliefs that is material to any "chilling effect" on constitutional rights.[16] We are

---

[14] Br. of Resp't/Cross Appellant at 32.

[15] In Gibson, a Florida legislative committee sought to subpoena NAACP membership lists, 372 U.S. at 540-41, hence the Court's reference to "organizations." However, it was the constitutional rights of the individuals whose identities would be disclosed in the membership lists that was at issue. In any event, we see no reason to distinguish between "organizations" and individuals on this point.

[16] As discussed infra, case law does not support Sueoka's assertion that the Does were required to demonstrate a more substantial "chilling effect" to establish a First Amendment privacy right in the requested records.

No. 83700-1-I/29

cognizant that, in the Seattle community, the Does would likely face opprobrium were their identities disclosed.[17] This is likely notwithstanding the fact that the OPA investigation determined that any allegations of unlawful or unprofessional conduct against the Does were unsustained. We reach this conclusion with an awareness of the events of recent years, including the Department of Justice finding of the systemic use of excessive force by SPD officers (necessitating the federal district court's imposition of a consent decree), the horrific killing of George Floyd and other unarmed Black individuals throughout our country, and the eruption of protests, including in Seattle, in response to those incidents.[18] Whether correctly or not, as Sueoka's briefing demonstrates, the Seattle community is likely to presume that the Does' attendance at the January 6 rally indicates that they are white supremacists who sought to undermine our nation's democracy. But whatever various individuals might infer, it remains true that all

---

[17] In 2016, Donald Trump received 8 percent of the vote in Seattle precincts. *Here's How Seattle Voters' Support for Trump Compared to Other Cities'*, SEATTLE TIMES (Nov. 17, 2016), https://www.seattletimes.com/seattle-news/politics/heres-how-seattle-voters-support-for-trump-stacks-up-to-other-u-s-cities/ [https://perma.cc/4PNL-G68W]. In 2020, he again received 8 percent of the vote in Seattle. Danny Westneat, *Don't Look Now, but Trump Did Better in Blue King County Than He Did the Last Time*, SEATTLE TIMES (Nov. 11, 2020), https://www.seattletimes.com/seattle-news/politics/dont-look-now-but-trump-did-better-in-blue-king-county-than-he-did-the-last-time/ [https://perma.cc/N8F8-TFHL].

[18] Whether records are subject to disclosure must be determined without regard to the motivation of the records requestor. RCW 42.56.080 ("Agencies shall not distinguish among persons requesting records, and such persons shall not be required to provide information as to the purpose for the request except to establish whether inspection and copying would violate RCW 42.56.070(8) or 42.56.240(14), or other statute which exempts or prohibits disclosure of specific information or records to certain persons."); see also Livingston v. Cedeno, 164 Wn.2d 46, 53, 186 P.3d 1055 (2008) (holding that the Department of Corrections, in "its capacity as an agency subject to" the PRA, "must respond to all public disclosure requests without regard to the status or motivation of the requester"). However, when the impingement of constitutional protections for speech and association are at issue, it is clear that courts may consider the pertinent political and cultural atmosphere in determining whether exposure could discourage the exercise of First Amendment rights.

29

No. 83700-1-I/30

citizens, including public employees, may benefit from the constitutional right to privacy in their political beliefs espoused by our nation's highest court.[19]

As the Court has held, the mere compelling of an individual to disclose "beliefs, expressions or associations is a measure of governmental interference." Watkins, 354 U.S. at 197. When these "forced revelations concern matters that are unorthodox, unpopular, or even hateful to the general public, the reaction in the life of [that individual] may be disastrous." Watkins, 354 U.S. at 197; see also Uphaus, 360 U.S. at 84 (Brennan, J., dissenting) ("[E]xposure and group identification by the state of those holding unpopular and dissident views are fraught with such serious consequences for the individual as to inevitably inhibit seriously the expression of views which the Constitution intended to make free."). While we have no sympathy for those who sought to undermine our democracy on January 6, 2021, the fact here is that the allegations that the Does were engaged in unlawful or unprofessional conduct were not sustained. They did not forfeit their First Amendment rights.

As our nation's highest court long-ago made clear,

> [a] final observation is in order. Because our disposition is rested on the First Amendment as absorbed in the Fourteenth . . . our decisions in the First Amendment area make[] plain that its protections would apply as fully to those who would arouse our society against the objectives of the petitioner. See, e.g., Near v. Minnesota, 283 U.S. 697[, 51 S. Ct. 625, 75 L. Ed. 1357 (1931)]; Terminiello v. Chicago, 337 U.S. 1[, 69 S. Ct. 894, 93 L. Ed. 1131

---

[19] Concurring in Wieman, 344 U.S. at 193, Justice Black recognized the importance of ensuring that First Amendment protections are secured for all individuals:
> Our own free society should never forget that laws which stigmatize and penalize thought and speech of the unorthodox have a way of reaching, ensnaring and silencing many more people than at first intended. We must have freedom of speech for all or we will in the long run have it for none but the cringing and the craven. And I cannot too often repeat my belief that the right to speak on matters of public concern must be wholly free or eventually be wholly lost.

No. 83700-1-I/31

> (1949)]; <u>Kunz v. New York</u>, 340 U.S. 290[, 71 S. Ct. 312, 95 L. Ed. 280 (1951)]. For the Constitution protects expression and association without regard to the race, creed, or political or religious affiliation of the members of the group which invokes its shield, or to the truth, popularity, or social utility of the ideas and beliefs which are offered.

<u>Button</u>, 371 U.S. at 444-45.

Returning to Sueoka's contentions, we are similarly unpersuaded by his assertion that the Does cannot establish a First Amendment right to privacy because, according to him, they are not "seeking anonymity from the government itself."[20] In fact, as Sueoka notes, the Does have already been compelled to disclose their political beliefs and associations to SPD and the City. However, the government need not take "direct action" in order to unlawfully impinge an individual's constitutional privacy right. <u>NAACP</u>, 357 U.S. at 461. Rather, "abridgement of such rights, even though unintended, may inevitably follow from varied forms of governmental action," including action that "may appear to be wholly unrelated to protected liberties." <u>NAACP</u>, 357 U.S. at 461.

Indeed, the United States Supreme Court has held that "First Amendment rights are beyond abridgement either by legislation that directly restrains their exercise or by suppression or impairment through harassment, humiliation, or *exposure by government*." <u>Bates</u>, 361 U.S. at 528 (Black & Douglas, JJ., concurring) (emphasis added); <u>see also</u> <u>Shelton</u>, 364 U.S. at 486-87 ("Public exposure, bringing with it the possibility of public pressures upon school boards to discharge teachers who belong to unpopular or minority organizations, would simply operate to widen and aggravate the impairment of constitutional liberty.").

---

[20] Br. of Resp't/Cross Appellant at 32.

31

Here, the state action challenged is the government's exposure, pursuant to state statute, of the Does' identities in the requested records, which implicate their political beliefs and associations. Sueoka's insinuation that the City's disclosure of the Does' identities would not constitute governmental action is simply wrong.

(b)

Sueoka additionally asserts that, even if disclosure of the Does' identities would impinge their constitutional rights, the Does willingly relinquished their right to privacy. This is so, Sueoka contends, because the Does "had a right to keep their political opinions private," knew that their employer was subject to the PRA, but nevertheless attended the January 6 rally and "then informed their employer of their activities."[21] We disagree. Contrary to Sueoka's assertion, the Does did not relinquish their constitutional rights.

The facts are these. The Does submitted to interviews during an investigation in which they were alleged to have violated the law or SPD policies during their attendance at the January 6 rally. They were "ordered to answer all questions asked, truthfully and completely." They were informed that "failure to do so may result in discipline up to and including termination." They were then questioned regarding their reasons for attending the January 6 rally, their political beliefs and affiliations with political groups, if any, and their impressions of the content of the rally. The Does answered these questions "truthfully and as completely as possible" because they were under standing orders to do so.

---

[21] Br. of Resp't/Cross Appellant at 27-28.

32

In other words, the Does did not "ha[ve] a right to keep their political opinions private." Nor, contrary to Sueoka's assertion, did the Does voluntarily "inform[] their employer of their activities." Rather, the Does were placed in the untenable position of either refusing to answer investigators' questions, thus risking their livelihoods, or cooperating with the investigation, thereby compromising their constitutional rights.[22]

Nearly a century ago, the United States Supreme Court rejected the notion that an indirect assault on constitutional protections due to a purported "choice" is less insidious than is direct impingement of such rights. Frost v. RR Comm'n of State of Cal., 271 U.S. 583, 593, 46 S. Ct. 605, 70 L. Ed. 2d 1101 (1926). There, a California statute precluded private carriers from the privilege of using public highways for "transacting private business thereon" unless they submitted to regulation lawfully imposed on common carriers. Frost, 271 U.S. at 591. The Supreme Court struck down the statute, which, it concluded, was intended to protect the business of common carriers by controlling competition. Frost, 271 U.S. at 591, 593. In so doing, the Court held that a state may not require the relinquishment of a constitutional right as the basis to confer a privilege. Frost, 271 U.S. at 593. Were it otherwise, "constitutional guaranties, so carefully safeguarded against direct assault, [would be] open to destruction by the indirect but no less effective process of requiring a surrender, which, though in form voluntary, in fact lacks none of the elements of compulsion." Frost, 271

---

[22] Adopting Sueoka's assertion that the Does' cooperation in the investigation was voluntary would also lead to the problematic conclusion that police officers need not cooperate in such investigations. Little public good would flow from such a holding.

33

No. 83700-1-I/34

U.S. at 593.  To be given only "a choice between the rock and the whirlpool," wherein the option is to forego one's livelihood or "submit to a requirement which may constitute an intolerable burden," is in reality, the Court announced, no choice at all.  Frost, 271 U.S. at 593.

Four decades later, the Supreme Court explicitly rejected the proposition advanced by Sueoka herein—that statements obtained from police officers as a result of those officers cooperating (in compliance with a lawful request to do so) in investigations conducted by their employer or at their employer's direction are deemed voluntary.  Garrity, 385 U.S. 493.  In Garrity, police officers were ordered to cooperate in an investigation by the New Jersey Attorney General regarding "alleged irregularities in handling cases in the municipal courts" of certain New Jersey boroughs.  385 U.S. at 494.  Prior to questioning, each officer was warned "(1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office."  Garrity, 385 U.S. at 494.  After cooperating in the investigation, the officers were convicted of conspiracy to obstruct the administration of the traffic laws, and "their convictions were sustained over their protests that their statements were coerced, by reason of the fact that, if they refused to answer, they could lose their positions with the police department."  Garrity, 385 U.S. at 495 (footnote omitted).

No. 83700-1-I/35

The Supreme Court held that, where the officers were given the choice between self-incrimination and losing their livelihoods, their statements were not voluntary:

> The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice, like interrogation practices we reviewed in Miranda v. Arizona, 384 U.S. 436, 464-65[, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)], is "likely to exert such pressure upon an individual as to disable him from making a free and rational choice." We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions.

Garrity, 385 U.S. at 497-98 (footnote omitted). Police officers, the Court concluded, "are not relegated to a watered-down version of constitutional rights." Garrity, 385 U.S. at 500. Moreover, the Court therein confirmed that the rights secured by the First Amendment are among those "rights of constitutional stature whose exercise a State may not condition by the exaction of a price." Garrity, 385 U.S. at 500.

As in Garrity, the Does here were informed by SPD, their employer, that their continued employment could be contingent on their cooperation with the investigation. The answers elicited from the Does during interviews directly implicate speech protected by the First Amendment. The Does, as with the police officers in Garrity, were afforded a choice "'between the rock and the whirlpool,'" 385 U.S. at 496 (quoting Stevens v. Marks, 383 U.S. 234, 243, 86 S. Ct. 788, 15 L. Ed. 2d 724 (1966)), whereby only by relinquishing their constitutional privacy interests could the Does ensure their continued

35

employment. "[D]uress is inherent" when statements are thusly obtained. Garrity, 385 U.S. at 498.

As the precedent of our nation's highest court makes clear, the Does' statements to investigators were not voluntary. We reject Sueoka's assertion that the Does relinquished their constitutional rights by cooperating with the OPA's investigation.

(c)

Sueoka next contends that the Does have not set forth sufficient evidence that harm would result from disclosure of their identities in the requested records, such that they should be entitled to an injunction precluding such disclosure. He asserts that the Does must demonstrate that disclosure would create a "chilling effect" on their constitutional rights and that they have not done so. Again, we disagree. Adhering to precedent from our Supreme Court, and cognizant that federal courts have determined that a "chilling effect" may, at times, be assumed, we hold that the evidence submitted by the Does is sufficient to meet the necessary showing of potential harm.

In Doe v. Reed, the United States Supreme Court considered whether, pursuant to Washington's PRA, the disclosure of referendum petitions, and thereby of the identities of the petition signers, would violate the First Amendment. 561 U.S. 186. The Court therein concluded that disclosure would not violate the First Amendment with respect to referendum petitions in general. Reed, 561 U.S. at 202. However, the Court articulated the standard it had applied "in related contexts," that "those resisting disclosure can prevail under the

First Amendment if they can show 'a reasonable probability that the compelled disclosure [of personal information] will subject them to threats, harassment, or reprisals from either Government officials or private parties.'" Reed, 561 U.S. at 200 (alteration in original) (quoting Buckley, 424 U.S. at 74).

Our Supreme Court applied this standard in evaluating the constitutionality of a discovery order compelling the disclosure of meeting minutes of the Freedom Socialist Party. See Snedigar v. Hoddersen, 114 Wn.2d 153, 156, 786 P.2d 781 (1990). In that case, the court reversed a decision of this court, in which we had held that the party resisting the discovery order was required to make "an initial showing of *actual* infringement on First Amendment rights." Snedigar, 114 Wn.2d at 158. This was wrong, our Supreme Court explained, because "[t]he party asserting the First Amendment associational privilege is only required to show *some probability* that the requested disclosure will harm its First Amendment rights." Snedigar, 114 Wn.2d at 158. And, indeed, in that case, the Party's national secretary submitted affidavits stating that (1) "Party members and supporters had been subjected to acts of reprisal and harassment in the past," and (2) that "the expectation of confidentiality in internal discussions [was] essential to the Party's survival." Snedigar, 114 Wn.2d at 163. These affidavits, our Supreme Court held, were sufficient to demonstrate that disclosure would "chill" the Party's constitutional rights. Snedigar, 114 Wn.2d at 164.

In evaluating whether sufficient probability of harm was shown, our Supreme Court in Snedigar recognized that some courts have explicitly held that "a concrete showing of 'chill' is unnecessary" to determine that disclosure would

37

No. 83700-1-I/38

impinge First Amendment rights. 114 Wn.2d at 162 (citing Black Panther Party v. Smith, 661 F.2d 1243, 1267-68, (D.C. Cir. 1981); Britt v. Superior Court, 20 Cal. 3d 844, 855, 574 P.2d 766, 143 Cal. Rptr. 695 (1978)). Indeed, the court noted, some courts "have overlooked the absence of a factual record of past harassment and . . . assumed that disclosure of information" would chill such rights. Snedigar, 114 Wn.2d at 162 (citing Shelton, 364 U.S. at 485-86; Talley, 362 U.S. at 64; Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. Waterfront Comm'n of New York, 667 F.2d 267, 272 (2d Cir.1981); Pollard v. Roberts, 283 F. Supp. 248, 258 (E.D. Ark. 1968), aff'd, 393 U.S. 14, 89 S. Ct. 47, 21 L. Ed. 2d 14 (1968)).

Moreover, as the Second Circuit has recognized, "a factual record of past harassment is not the only situation in which courts have upheld a First Amendment right of non-disclosure." Int'l Longshoremen's Ass'n, 667 F.2d at 271. Rather,

> [t]he underlying inquiry must always be whether a compelling governmental interest justifies any governmental action that has "the practical effect 'of discouraging' the exercise of constitutionally protected political rights," "even if any deterrent effect . . . arises . . . as an unintended but inevitable result of the government's conduct in requiring disclosure."

Int'l Longshoremen's Ass'n, 667 F.2d at 271 (citation omitted) (quoting NAACP, 357 U.S. at 461; Buckley, 424 U.S. at 65). Based on this principle, courts, including the United States Supreme Court, have in various circumstances "adopted a commonsense approach [that] recognized that a chilling effect was

inevitable."  Int'l Longshoremen's Ass'n, 667 F.2d at 272 (citing Shelton, 364 U.S. at 486; Pollard, 283 F. Supp. at 258).[23]

Here, the Does' declarations state that they have "a significant fear that disclosure of [their] attendance at the January 6 Rally would result in significant jeopardy to [their] personal safety and [their] ability to provide effective law enforcement to the community."  Two of the Does described their fears for the safety and well-being of their families were their identities disclosed, one noting "the extreme volatility that has gone hand in hand with politics in this region over the last year regarding law enforcement."  The Does additionally submitted the declarations of other SPD officers who stated that they had endured harassment and threats made against them and their families from members of the public.

---

[23] Such a "commonsense approach"—which assumes a "chilling effect" on speech and associational rights—has been utilized when disclosure was required to be made to a public employer and when the individuals seeking anonymity espoused beliefs unpopular in their communities.

For instance, in Shelton, the Supreme Court recognized that impingement of teachers' rights to free association "is conspicuously accented when the teacher serves at the absolute will of those to whom the disclosure must be made."  364 U.S. at 486.  "[T]he pressure upon a teacher to avoid any ties which might displease those who control his professional destiny would be constant and heavy."  Shelton, 364 U.S. at 486; see also Int'l Longshoremen's Ass'n, 667 F.2d at 272 (recognizing that the investigatory body had "pervasive control over the economic livelihood" of those seeking anonymity).

Likewise, in Pollard, there was "no evidence" that the individuals seeking anonymity had "been subjected to reprisals on account of" their contributions to the Arkansas Republican Party. 283 F. Supp. at 258.  Nevertheless, given the unpopularity of the party in the state at that time, the court held that "it would be naïve not to recognize" that disclosure would subject the contributors to "potential economic or political reprisals," thus discouraging the exercise of constitutional rights.  Pollard, 283 F. Supp. at 258.  The court described the constitutional injury thereby inflicted thusly:

> To the extent that a public agency or officer unreasonably inhibits or discourages the exercise by individuals of their right to associate with others of the same political persuasion in the advocacy of principles and candidates of which and of whom they approve, and to support those principles and candidates with their money if they choose to do so, that agency or officer violates private rights protected by the First Amendment.

Pollard, 283 F. Supp. at 258.

39

Consistent with the cases cited above, we conclude that the Does have submitted sufficient evidence that disclosure of their identities would discourage the exercise of political speech and associational rights.[24]  In so holding, we are mindful that it is not only the Does' constitutional rights that may be "chilled" by disclosure here, but also those of other public employees whose employers are subject to the PRA.  Indeed, as the United States Supreme Court has recognized, in addition to the impact on the exercise of rights by those seeking anonymity, there is a "more subtle and immeasurable effect upon those who tend to adhere to the most orthodox and uncontroversial views and associations in order to avoid a similar fate at some future time."  Watkins, 354 U.S. at 197-98.

We conclude that disclosure of the Does' identities in the requested records constitutes governmental action that would impinge their First Amendment rights.  This is so despite the public nature of the January 6 rally.  We find unmeritorious Sueoka's contentions that the Does relinquished their constitutional rights by cooperating with the OPA's investigation or that they failed to demonstrate that disclosure would discourage the exercise of such rights.  Having so concluded, we must determine whether the State's interest in impinging those rights is sufficient to nevertheless mandate disclosure.

---

[24] We reach this conclusion notwithstanding Sueoka's assertion, in supplemental briefing, that the identities of the Does are already publicly known.  As our Supreme Court has held, an individual's statutory right to privacy is not nullified because some members of the public may already know that individual's identity.  Bainbridge Island Police Guild, 172 Wn.2d at 414 ("[J]ust because some members of the public may already know the identity of the person in the report does not mean that an agency does not violate the person's right to privacy by confirming that knowledge through its production.").  The same is certainly true of the right to privacy inhering in the First Amendment to the United States Constitution.

No. 83700-1-I/41

(d)

Before we do so, however, we must address a related contention. In a statement of additional authorities submitted following oral argument, Sueoka asserts that, because the Does did not notify the attorney general of any intent to challenge the constitutionality of the PRA, we cannot consider whether the PRA violates the federal constitution if it is construed so as to require disclosure of unredacted records in this case.

This ground has been previously trod. Indeed, the District Court of the Western District of Washington considered this very issue in Roe v. Anderson, 2015 WL 4724739 (W.D. Wash. 2015), which we cite as evidence of our state attorney general's official position on this aspect of PRA analysis. In the cited case, certain erotic dancers and managers of an erotic dance studio sought to enjoin the disclosure of their personal information pursuant to a PRA request. Anderson, 2015 WL 4724739, at *1. They asserted that disclosure would violate their constitutional rights to privacy and free expression and sought a declaration that the PRA, as applied to them, was unconstitutional. Anderson, 2015 WL 4724739, at *1.

At the court's invitation, the Washington attorney general filed an amicus brief asserting that the PRA "does not require the disclosure of information protected from disclosure by the Constitution" because "*its exemptions incorporate any constitutionally-required limitation on such disclosures*." Anderson, 2015 WL 4724739, at *1 (emphasis added). The "other statute[s]" provision, RCW 42.56.070(1), the attorney general explained, is a "'catch all'

41

No. 83700-1-I/42

saving clause" that "*does not require a disclosure that would violate the Constitution.*" Anderson, 2015 WL 4724739, at *2 (emphasis added). Citing decisional authority from our Supreme Court, the attorney general clarified that

> "[i]f the requested records are constitutionally protected from public disclosure, *that protection exists without any need of statutory permission*, and may constitute an exemption under the PRA even if not implemented through an explicit statutory exemption."
> "In other words, it is not necessary to read the PRA in conflict with the Constitution when the Act itself recognizes and respects other laws (including constitutional provisions) that mandate privacy or confidentiality."

Anderson, 2015 WL 4724739, at *2-3 (emphasis added).

The district court held that "[t]he State is correct." Anderson, 2015 WL 4724739, at *3. "The PRA, by design, cannot violate the Constitution, and constitutional protections (such as freedom of expression) are necessarily incorporated as exemptions, just like any other express exemption enumerated in the PRA." Anderson, 2015 WL 4724739, at *3.

We agree with and adopt this analysis. Thus, once the constitutional right is established and the constitutional injury that disclosure would cause is shown, it is entirely unnecessary for the citizen to establish an *additional* entitlement to an injunction in order to preclude disclosure. The law is clear and the principle simple—the government may not violate a person's First Amendment rights, even in the absence of an injunction specifically forbidding it from doing so.[25]

## 2

The United States Supreme Court has repeatedly affirmed that

---

[25] See discussion infra § III C.

No. 83700-1-I/43

> [t]he right to privacy in one's political associations and beliefs will yield only to a "'subordinating interest of the State [that is] compelling,'" NAACP[, 357 U.S.] at 463 (quoting Sweezy, 354 U.S. [at 265] (opinion concurring in result)), and then only if there is a "substantial relation between the information sought and [an] overriding and compelling state interest." Gibson[, 372 U.S. at 546].

Brown, 459 U.S. at 91-92 (some alterations in original). Thus, having concluded that disclosure of the Does' identities in the requested records would impinge their First Amendment rights, we must determine whether an overriding and compelling state interest nevertheless requires such disclosure.

For its part, the City contends that a less stringent standard should apply because, according to the City, "public employees have diminished First Amendment rights, even for purely private speech."[26] Not so. Police officers, such as the Does, "are not relegated to a watered-down version of constitutional rights." Garrity, 385 U.S. at 500. The City's assertion to the contrary, reliant as it is on inapposite decisional authority, is unpersuasive.

We conclude that the State has no compelling interest in disclosing the Does' identities in the requested records. The state interest in disclosing the entirety of a particular public record is illuminated by the purpose of the PRA and its scope, as determined by our legislature and Supreme Court. Such considerations demonstrate that the state interest here falls short of the standard required to impinge the Does' First Amendment rights. We thus hold that the State has no compelling interest in disclosing the Does' identities in the requested records.

---

[26] City of Seattle, Suppl. Mem. at 2.

43

No. 83700-1-I/44

(a)

We first address the City's argument, set forth in supplemental briefing, that the state actor need not demonstrate a compelling interest in order to impinge the Does' constitutional rights.  The City, itself an employer of vast numbers of public employees, asserts that "public employees have diminished First Amendment rights, even for purely private speech."[27]  Hence, the City contends, the constitutional rights of public employees, unlike those of other citizens, can be impinged absent the demonstration of a compelling state interest.  We disagree.

When the State seeks to compel disclosure of an individual's political beliefs and associations, it can do so only by demonstrating a compelling state interest with sufficient relation to the information sought to be disclosed.  See, e.g., Brown, 459 U.S. at 91-92; Gibson, 372 U.S. at 546; NAACP, 357 U.S. at 463; Sweezy, 354 U.S. at 265.  That the State's interest must be compelling reflects the United States Supreme Court's recognition that "political freedom of the individual" is a "fundamental principle of a democratic society," Sweezy, 354 U.S. at 250, and that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."  Buckley, 424 U.S. at 64.

Moreover, as we have discussed, our nation's highest Court has rejected the notion that public employees are not entitled to the same stature of constitutional rights as are other citizens.  In 1967, the Court in Garrity

---

[27] City of Seattle, Suppl. Mem. at 2.

44

considered whether police officers, by virtue of being compelled to cooperate in an investigation by the New Jersey Attorney General, relinquished the constitutional right against self-incrimination. 385 U.S. at 494-98. The Court determined that the statements of the police officers, who were given the choice between self-incrimination and losing their livelihoods, were not voluntary. Garrity, 385 U.S. at 497-98. In so holding, the Court "conclude[d] that policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." Garrity, 385 U.S. at 500.

In asserting to the contrary—that the Does are, indeed, condemned to a diluted version of First Amendment rights—the City urges us to apply the "balancing test" set forth by the Supreme Court in Pickering v. Board of Education of Township High School District 205, Will County, Ill., 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968).[28] The City's reliance on Pickering is misplaced.

In Pickering, a public school teacher submitted to a local newspaper a letter regarding a proposed tax increase that was critical of the manner in which the school board and superintendent had "handled past proposals to raise new revenue for the schools." 391 U.S. at 564. The teacher was dismissed from his position pursuant to an Illinois statute that permitted such dismissal for actions detrimental to the interests of the school system. Pickering, 391 U.S. at 564-65. He thereafter filed suit, asserting that the Illinois statute was unconstitutional as

---

[28] See City of Seattle, Suppl. Mem. at 6 ("It is this balancing test, not strict scrutiny, that applies to disclosure of the public records containing employees' speech.").

applied pursuant to the First and Fourteenth Amendments. Pickering, 391 U.S. at 565.

In considering the constitutionality of the Illinois statute, the Court recognized that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Pickering, 391 U.S. at 568. Thus, the Court announced what has come to be known as the "Pickering balancing test,"[29] which seeks to "arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568.

However, the teacher's statements in Pickering were "neither shown nor [could] be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally." 391 U.S. at 572-73 (footnote omitted). The Court held that, in such circumstances, "the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public." Pickering, 391 U.S. at 573. In other words, the "Pickering balancing test," which the City urges us to apply here, is applicable

---

[29] See, e.g., Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006) (describing the "two inquiries to guide interpretation of the constitutional protections accorded to public employee speech" as set forth in "Pickering and the cases decided in its wake"); Moser v. Las Vegas Metro. Police Dep't, 984 F.3d 900, 904-05 (9th Cir. 2021) (describing the "Pickering balancing test"). Neither of these opinions, both of which are cited by the City, is apposite to the circumstances presented in this case.

46

No. 83700-1-I/47

only when a public employee's speech may affect the employer's operations.

See also Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006) ("A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes *must be directed at speech that has some potential to affect the entity's operations*." (emphasis added)).  Only then may a government employer have "an adequate justification for treating the employee differently from any other member of the general public," thus permitting it to restrict the public employee's speech.  Garcetti, 547 U.S. at 418.

Indeed, in Pickering, the United States Supreme Court explicitly rejected the proposition that public employees are entitled to lesser constitutional protections simply by virtue of their public employment:

> To the extent that the Illinois Supreme Court's opinion may be read to suggest that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work, it proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court.  E.g., Wieman v. Updegraff, 344 U.S. 183[, 73 S. Ct. 215, 97 L. Ed. 2d 216] (1952); Shelton v. Tucker, 364 U.S. 479[, 81 S. Ct. 247, 5 L. Ed. 2d 231] (1960); Keyishian v. Board of Regents, 385 U.S. 589[, 87 S. Ct. 675, 17 L. Ed. 2d 629] (1967).  "[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." Keyishian[, 385 U.S.] at 605-06.

391 U.S. at 568 (some alterations in original).

Put simply, the notion that the Does, as public employees, "have curtailed First Amendment rights," as the City brazenly asserts,[30] is directly contradicted

---

[30] City of Seattle. Suppl. Mem. at 5.

47

No. 83700-1-I/48

by United States Supreme Court decisional authority.  Unlike this case, each of the cases cited by the City involves an adverse employment action based on a speech restriction that precluded public employees from engaging in speech alleged to injuriously impact their employer's operations.[31]  Indeed, it is only when a public employee's speech "has some potential to affect [the employer's] operations" that the employer may have "an adequate justification for treating the employee differently from any other member of the general public."  Garcetti, 547 U.S. at 418.  This rule is premised on the recognition that the government possesses a "legitimate purpose in 'promot[ing] efficiency and integrity in the discharge of official duties, and . . . maintain[ing] proper discipline in the public service.'"  Connick v. Myers, 461 U.S. 138, 150-51, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983) (some alterations in original) (quoting Ex parte Curtis, 106 U.S. 371, 373, 1 S. Ct. 381, 27 L. Ed. 232 (1882)).[32]  Such principles do not apply to the facts of this case.[33]

---

[31] See Progressive Democrats for Soc. Just. v. Bonta, 588 F. Supp. 3d 960 (N.D. Cal. 2022); Garcetti, 547 U.S. 410; City of San Diego, Cal. v. Roe, 543 U.S. 77, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004); Waters v. Churchill, 511 U.S. 661, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (1994); Pickering, 391 U.S. 563; Hernandez v. City of Phoenix, 43 F. 4th 966 (9th Cir. 2022); Moser, 984 F.3d 900; Berry v. Dep'. of Soc. Servs., 447 F.3d 642 (9th Cir. 2006).  For the reasons described above, each of these cases is inapposite here.

[32] In Connick, Justice Brennan disagreed with the majority's balancing of the competing considerations set forth in Pickering.  461 U.S. at 157-58 (Brennan, J., dissenting).  However, as pertinent here, he adeptly explained that the government, as a public employer, has an interest in regulating employee speech only when such speech may impact the government's ability to perform its duties.  He wrote:

> The balancing test articulated in Pickering comes into play only when a public employee's speech implicates the government's interests as an employer. When public employees engage in expression unrelated to their employment while away from the workplace, their First Amendment rights are, of course, no different from those of the general public.

Connick, 461 U.S. at 157 (Brennan, J., dissenting) (citing Pickering, 391 U.S. at 574).

[33] The City also asserts that our Supreme Court's decision in Service Employees International Union Local 925 v. University of Washington, 193 Wn.2d 860, 447 P.3d 534 (2019) (SEIU), indicates that "disclosure of public records is mandated by the PRA notwithstanding any speech rights or a chilling effect thhereon."  City of Seattle, Suppl. Mem. at 3.  We disagree.

48

Here, the Does' employer, SPD, did not impose a restriction on the Does' speech. Nor does the speech at issue—the Does' attendance at a political rally and their statements regarding their political views and affiliations—have any impact on their employer's operations. Indeed, any allegation that the Does engaged in conduct contrary to their employer's policies was found to be unsustained.

We decline the City's invitation to contravene United States Supreme Court decisional authority in order to restrict public employee speech in circumstances beyond those in which such speech may interfere with the public employer's operations. Instead, we take the United States Supreme Court at its word that police officers "are not relegated to a watered-down version of constitutional rights." Garrity, 385 U.S. at 500; see also Pickering, 391 U.S. at 568. Similarly, we recognize the Supreme Court's repeated affirmations that "[t]he right to privacy in one's political associations and beliefs will yield only to a 'subordinating interest of the State [that is] compelling,' and then only if there is a 'substantial relation between the information sought and [an] overriding and compelling state interest.'" Brown, 459 U.S. at 91-92 (second and third

---

In that decision, our Supreme Court addressed only whether particular faculty e-mails relating to union organizing constitute "public records" pursuant to the PRA. SEIU, 193 Wn.2d at 867-76. Although the labor union seeking to enjoin disclosure of the requested e-mails asserted that "their release would chill union organizing efforts, restrain speech, and violate individuals' privacy rights," SEIU, 193 Wn.2d at 865, our Supreme Court explicitly stated that its "holding on the 'scope of employment' test does not dispose of" the labor union's other arguments, including "assertions of statutory and constitutional exemptions from PRA coverage." SEIU, 193 Wn.2d at 876.

Contrary to the City's assertion, our Supreme Court did not suggest in that decision that the constitutional rights of our state's citizens can be summarily dismissed on the basis of a legislative enactment. While we agree with the City that the PRA is an important statute, it nevertheless remains merely a statute. See Freedom Found., 178 Wn.2d at 695.

49

alterations in original) (citation and internal quotations marks omitted) (quoting

Sweezy, 354 U.S. at 265; Gibson, 372 U.S. at 546).  Accordingly, only if an

overriding and compelling state interest exists to impinge the Does' constitutional

rights may their identities be disclosed in the requested records.  As discussed

below, we determine that no such compelling interest exists.

(b)

The scope of the State's interest in public record disclosure—and, thus,

whether the City, as a state actor, has a compelling interest in disclosing the

Does' identities—is illuminated by the purpose of the PRA's disclosure mandate.

"The basic purpose of the [PRA] is to provide a mechanism by which the public

can be assured that its public officials are honest and impartial in the conduct of

their public offices."  Cowles Publ'g Co., 109 Wn.2d at 719.  The statute "ensures

the sovereignty of the people and the accountability of the governmental

agencies that serve them by providing full access to information concerning the

conduct of government."  Predisik, 182 Wn.2d at 903.  Similarly, our legislature

has defined the policy of the PRA as such: "That, mindful of the right of

individuals to privacy and of the desirability of the efficient administration of

government, full access to information concerning the conduct of government on

every level must be assured as a fundamental and necessary precondition to the

sound governance of a free society."  RCW 42.17A.001(11); see also In re

Request of Rosier, 105 Wn.2d 606, 611, 717 P.2d 1353 (1986) (recognizing the

policy underlying the statute as "allow[ing] public scrutiny of government, rather

No. 83700-1-I/51

than . . . promot[ing] scrutiny of particular individuals who are unrelated to any governmental operation").

To this end, while the PRA contains a broad mandate for disclosure, our legislature also included in the statute an exemption whereby "[p]ersonal information in files maintained for employees . . . of any public agency" are not subject to disclosure "to the extent that disclosure would violate their right to privacy." RCW 42.56.230(3). This "right to privacy" is "invaded or violated," such that the statutory exemption applies, when disclosure of the information would be "highly offensive to a reasonable person" and is "not of legitimate concern to the public."[34] RCW 42.56.050.

The PRA does not define the "right to privacy." Our Supreme Court thus sought to "'fill [this] definitional void'" by adopting the common law tort definition set forth in the Restatement. Cowles Publ'g Co., 109 Wn.2d at 721 (quoting Hearst Corp. v. Hoppe, 90 Wn.2d 123, 136, 580 P.2d 246 (1978)); see RESTATEMENT (SECOND) OF TORTS §652D (AM. LAW INST. 1977). Employing this definition, and consistent with the purpose of the PRA, our Supreme Court has deemed significant to the question of privacy whether a public employee's conduct "occurred in the course of public service." Cowles Publ'g Co., 109 Wn.2d at 726. "Instances of misconduct of a police officer while on the job are not private, intimate, personal details of the officer's life," but rather, "are matters

_____

[34] We do not hold that the personal information exemption, RCW 42.56.230(3), a statutory exemption set forth within the PRA, precludes disclosure of the Does' identities in the requested records. Rather, as discussed supra, it is the First Amendment to the United States Constitution that precludes such disclosure, absent an overriding and compelling state interest. Nevertheless, the purpose of the PRA and the scope of its disclosure mandate, as set forth by our legislature and decisional authority interpreting the act, illuminates the state interest here at issue.

with which the public has a right to concern itself." Cowles Publ'g Co., 109 Wn.2d at 726. Premised on this principle, the court held that "a law enforcement officer's actions while performing his public duties or improper off duty actions in public which bear upon his ability to perform his public office" are not within the ambit of conduct exempt from disclosure due to statutory "personal privacy." Cowles Publ'g Co., 109 Wn.2d at 727.

In addition, in determining whether a public employee's statutory right to privacy is implicated, the court has distinguished between "substantiated" and "unsubstantiated" allegations. "[W]hen a complaint regarding misconduct during the course of public employment is substantiated or results in some sort of discipline, an employee does not have a right to privacy in the complaint." Bellevue John Does 1-11 v. Bellevue Sch. Dist. No. 405, 164 Wn.2d 199, 215, 189 P.3d 139 (2008). However, the court has held that public employees have a statutory right to privacy in their identities in connection with unsubstantiated allegations of sexual misconduct, "because the unsubstantiated allegations are matters concerning [the employees'] private lives." Bainbridge Island Police Guild, 172 Wn.2d at 413; see also Bellevue John Does, 164 Wn.2d at 215-16. "An unsubstantiated or false accusation," the court reasoned, "is not an action taken by an employee in the course of performing public duties." Bellevue John Does, 164 Wn.2d at 215.

Similarly, our Supreme Court has concluded that whether allegations against a public employee are substantiated bears on whether disclosure of the employee's identity is a matter of "legitimate" public concern. Bainbridge Island

52

No. 83700-1-I/53

<u>Police Guild</u>, 172 Wn.2d at 416; <u>Bellevue John Does</u>, 164 Wn.2d at 221. Thus, consistent with the PRA's purpose to enable the public to oversee governmental agencies, the court determined that the public has no legitimate interest in the identities of public employees against whom unsubstantiated allegations of misconduct were asserted. <u>Bellevue John Does</u>, 164 Wn.2d at 220. This is because, when the allegations are unsubstantiated, precluding disclosure of the employee's identity would "not impede the public's ability to oversee" government investigations into alleged employee misconduct. <u>Bellevue John Does</u>, 164 Wn.2d at 220. Rather, disclosure in such circumstances, the court reasoned, "'serve[s] no interest other than gossip and sensation.'" <u>Bellevue John Does</u>, 164 Wn.2d at 221 (quoting <u>Bellevue John Does 1-11 v. Bellevue Sch. Dist. No. 405</u>, 129 Wn. App. 832, 854, 120 P.3d 616 (2005)).

The state interest in disclosure pursuant to the PRA is to uphold the purpose of the statute—that is, to enable the public to ensure "that its public officials are honest and impartial *in the conduct of their public offices*." <u>Cowles Publ'g Co.</u>, 109 Wn.2d at 719 (emphasis added); <u>see also</u> RCW 42.56.030 ("The people insist on remaining informed so that they may maintain control over the instruments that they have created."). To that end, in the context of defining the scope of statutory exemptions to disclosure, our Supreme Court has determined that disclosure of the identities of public employees is not permitted when (1) the allegations asserted against the employees are unsubstantiated and (2) the conduct did not occur in the course of public service or occur off-duty and impact the performance of public duties. <u>Bainbridge Island Police Guild</u>, 172 Wn.2d at

53

No. 83700-1-I/54

413; <u>Bellevue John Does</u>, 164 Wn.2d at 213-16, 221; <u>Cowles Publ'g Co.</u>, 109 Wn.2d at 726. In other words, in such circumstances, the State does not have an interest in disclosing the employees' identities.

Significantly, in those cases, whether disclosure of the public officials' identities was precluded was determined pursuant to statutory exemptions, not premised upon the disclosure's impingement on constitutional First Amendment rights. Thus, the public officials' interests at issue in those cases, not being of constitutional import, were less significant than those presented here, where the Does' First Amendment rights are implicated. Nevertheless, here, as in those cases, the Does' alleged misconduct did not occur in the course of their public duties, and the allegations against the Does were determined to be unsustained.[35] Even when constitutional rights were not implicated by disclosure, those same circumstances have been deemed by our legislature and Supreme Court to fall outside the ambit of the state interest in such disclosure. Thus, here, where the Does' constitutional rights would be impinged by disclosure, the state interest cannot be said to be compelling, such that disclosure would nevertheless be permitted.[36]

---

[35] We note that, while some of the OPA's findings were "not sustained" because the allegations were determined to be "unfounded," others were unsustained because the investigation as to those findings was deemed to be "inconclusive." However, an "inconclusive" finding remains a finding that the allegations were unsustained; it neither constitutes a finding against the officer nor authorizes disciplinary action. Accordingly, we treat the "inconclusive" unsustained findings in the same manner as the "unfounded" unsustained findings.

[36] Sueoka asserts that the trial court properly determined that the public has a legitimate interest in disclosure of the Does' identities in the requested records because OPA Director Andrew Myerberg may have previously represented one of the Does in a civil rights case. This purported conflict, Sueoka contends, may have undermined the investigation.

However, even when only a statutory privacy interest is implicated, Washington courts have held that complete records need not be disclosed for the public interest of government oversight to be achieved. <u>See</u>, <u>e.g.</u>, <u>Bainbridge Island Police Guild</u>, 172 Wn.2d at 416 ("Although lacking a legitimate interest in the name of a police officer who is the subject of an

54

No. 83700-1-I/55

The United States Supreme Court has recognized that "[t]he public is, of course, entitled to be informed concerning the workings of its government. That cannot be inflated into a general power to expose where the predominant result can only be an invasion of the private rights of individuals." Watkins, 354 U.S. at 200 (footnote omitted). Here, disclosure of the Does' identities would fulfill only the "impermissible [objective] of exposure for exposure's sake." Uphaus, 360 U.S. at 82 (Brennan, J., dissenting).

Based on our legislature's and Supreme Court's delineation of the purpose of the PRA's disclosure mandate, we conclude that the State has no compelling interest in disclosure of the Does' identities in the requested records. Accordingly, because the Does have established a constitutional privacy right that would be impinged by disclosure, the superior court erred by denying the Does' motion for a preliminary injunction precluding such disclosure.[37]

---

unsubstantiated allegation of sexual misconduct, the public does have a legitimate interest in how a police department responds to and investigates such an allegation against an officer."); Bellevue John Does, 164 Wn.2d at 220 ("Precluding disclosure of the identities of teachers who are subjects of unsubstantiated allegations will not impede the public's ability to oversee school districts' investigations of alleged teacher misconduct."). Indeed, our Supreme Court has made plain that a public employee's "right to privacy does not depend on the quality of the [public employer's] investigations." Bellevue John Does, 164 Wn.2d at 223. Here, given the constitutional right at stake, we hold that the State has no compelling interest in disclosure of the Does' identities for this purpose.

Moreover, "[a]n agency should look to the contents of the document and not the knowledge of third parties when deciding if the subject of a report has a right to privacy in their identity." Bainbridge Island Police Guild, 172 Wn.2d at 414. In Bainbridge Island Police Guild, our Supreme Court held that notwithstanding the fact that some members of the public might know the identity of the individual identified in the records, the agency must nevertheless refuse to disclose those records if an exemption exists. 172 Wn.2d at 414. Otherwise, agencies would be required to "engage in an analysis of not just the contents of the report" but also of outside knowledge regarding the incident described therein. Bainbridge Island Police Guild, 172 Wn.2d at 414. The same logic applies here. Additionally, the City, in evaluating a records request, cannot be charged with presuming the need to disclose individuals' identities in investigative records on the chance of potential conflict of interest of the investigator that is not established in the records themselves. Such a presumption would gut the disclosure exemptions of the PRA.

[37] The Does sought a preliminary injunction precluding the disclosure of their identities in the requested records. They did not seek to prevent disclosure of redacted versions of those

55

No. 83700-1-I/56

(c)

We recognize that much of the United States Supreme Court's

jurisprudence establishing a constitutional privacy right to anonymity in political

belief and association, which is grounded in the First Amendment to the United

States Constitution, predates the Court's modern formulation of the strict scrutiny

standard applicable to governmental action impinging such rights.  See Reed v.

Town of Gilbert, Ariz., 576 U.S. 155, 167, 135 S. Ct. 2218, 192 L. Ed. 2d 236

(2015) (recognizing that the Court's decision in Button, 371 U.S. 415, "predated

[its] more recent formulations of strict scrutiny").[38]  However, even applying these

"more recent formulations" of the standard, Town of Gilbert, 576 U.S. at 167, the

result herein remains unchanged.

---

records.  Thus, we do not consider whether the redacted records are subject to disclosure pursuant to the PRA.  We do note, however, that once the Does' identities and other identifying information are redacted from the requested records, their constitutional rights are no longer implicated.  Accordingly, it is the PRA, not federal constitutional principles, that dictate whether the redacted records may be disclosed.  As no party seeks to preclude such disclosure, that issue is not before us.

However, we note that, when a constitutional right would not thereby be infringed, the State has an interest in permitting disclosure of public records to enable government oversight, thus fulfilling the purpose of the PRA.  See, e.g., Bainbridge Island Police Guild, 172 Wn.2d at 416 ("Although lacking a legitimate interest in the name of a police officer who is the subject of an unsubstantiated allegation of sexual misconduct, the public does have a legitimate interest in how a police department responds to and investigates such an allegation against an officer."); Bellevue John Does, 164 Wn.2d at 220 ("Precluding disclosure of the identities of teachers who are subjects of unsubstantiated allegations will not impede the public's ability to oversee school districts' investigations of alleged teacher misconduct.").  See also RCW 42.56.210 (requiring disclosure of records when exempted information can be redacted therefrom).

"[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved."  Shelton, 364 U.S. at 488.  Here, the purposes of the PRA are achieved through disclosure of the redacted records.

[38] The Court in Button held that a Virginia state law purporting to regulate the legal profession unconstitutionally infringed on "the [First Amendment] right of the NAACP and its members and lawyers to associate for the purpose of assisting persons who seek legal redress for infringements of their constitutionally guaranteed and other rights."  371 U.S. at 428.  This decision is among those cited by the Court for the proposition that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."  Buckley, 424 U.S. at 64 (citing Gibson, 372 U.S. 539; Button, 371 U.S. 415; Bates, 361 U.S. 516; Shelton, 364 U.S. 479; NAACP, 357 U.S. 449).

No. 83700-1-I/57

As demonstrated by the profusion of legislatively enacted exceptions to our state's public records law, there is no compelling government interest in disclosure of the unredacted requested records. Rather, the constitutionally mandated narrow tailoring here requires precisely the remedy sought by the Does—the redaction of their names and personal identifying information from the requested records prior to disclosure. Thus, we hold that, applying the United States Supreme Court's modern formulation of the strict scrutiny standard, disclosure of the requested records in redacted form serves to protect the First Amendment interests at stake while allowing for the attainment of the government's legitimate interest in disclosure.

The Supreme Court's modern formulation of the strict scrutiny standard, as pertinent here, is articulated in Citizens United v. Federal Election Commission, 558 U.S. 310, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010), in which the Court pronounced:

> Speech is an essential mechanism for democracy, for it is the means to hold officials accountable to the people. The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it. . . .
> For these reasons, political speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are "subject to strict scrutiny," which requires the Government to prove that the restriction "furthers a compelling interest and is narrowly tailored to achieve that interest."

Citizens United, 558 U.S. at 339-40 (citation omitted) (quoting Fed. Election Comm'n v. Wisconsin Right to Life, Inc., 551 U.S. 449, 464, 127 S. Ct. 2652, 168

57

L. Ed. 2d 329 (2007)).[39]  Thus, the Supreme Court's more recent formulations of the strict scrutiny standard require that government restrictions on protected speech be "narrowly tailored" to achieving the government's compelling interest, a mandate that was not explicitly articulated in the Court's previous jurisprudence establishing a First Amendment privacy right in political belief and association. See, e.g., Brown, 459 U.S. 87; Gibson, 372 U.S. 539; Bates, 361 U.S. 516; Shelton, 364 U.S. 479; NAACP, 357 U.S. 449.

The Citizens United explication of the modern formulation is grounded in the Court's historical jurisprudence and finds its genesis in the Court's statement in McIntyre that "[w]hen a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest."  514 U.S. at 347.

As discussed above, our Supreme Court's decisional authority and the policies animating the PRA lead to the inexorable conclusion that, here, the government has no compelling interest in disclosure of the Does' identities in the requested records.  Rather, the government's interest in the disclosure of public records is to uphold the PRA's purpose of enabling the public to ensure "that its public officials are honest and impartial in the conduct of their public offices." Cowles Publ'g Co., 109 Wn.2d at 719.  Further evidencing the absence of a

---

[39] We acknowledge that differing levels of scrutiny apply to various claims of infringement on federal constitutional rights.  See, e.g., Town of Gilbert, 576 U.S. at 172 (in the context of federal free speech guarantees, distinguishing between those laws subject to strict scrutiny analysis and those "subject to lesser scrutiny"); Progressive Democrats for Soc. Just., 588 F. Supp. 3d at 975-76 (describing differing levels of scrutiny in the context of the First and Fourteenth Amendments, including rational basis review and strict scrutiny).  However, no party credibly seeks to establish that other such constructs are applicable in this case.  We take the United States Supreme Court at its word in Citizens United, 558 U.S. at 340, that the strict scrutiny standard applies in cases such as this.

compelling state interest in total disclosure of all records, our legislature has enacted a plethora of exceptions to the PRA's disclosure mandate—in fact, as of March 2022, there were *632* such legislatively enacted exceptions.[40] Without question, this proliferation of exceptions to the PRA's disclosure mandate renders implausible any argument that a compelling state interest in disclosure of the Does' identities exists here. Rather, the government's interest in disclosure of the requested records inheres only in making public a redacted version of those records.

When applying the modern strict scrutiny standard, we must ensure that the government's application of the PRA—the state action at issue here—is narrowly tailored to serve its legitimate interest in the disclosure of public records. See Citizens United, 558 U.S. at 340. Such narrow tailoring compels us to identify the "least restrictive alternative" that will achieve the pertinent state interest. Ashcroft v. Am. Civ. Liberties Union, 542 U.S. 656, 666, 124 S. Ct. 2783, 159 L. Ed. 2d 690 (2004). "The purpose of [this] test is to ensure that speech is restricted no further than necessary to achieve the [government's] goal, for it is important to ensure that legitimate speech is not chilled or punished." Ashcroft, 542 U.S. at 666.

Here, the very remedy sought by the Does—redaction of their names and identifying information from the requested records—is precisely the narrow

---

[40] See Appendix A ("Public Records Exemptions Accountability Committee – Sunshine Committee," Schedule of Review, updated March 2022). Original available at https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Schedule%20of%20Review%20Update%20March%202022.pdf.

No. 83700-1-I/60

tailoring that serves to protect the First Amendment rights at stake while simultaneously allowing for the attainment of the government's legitimate interest in public records disclosure.  Thus, applying the United States Supreme Court's more recent formulations of strict scrutiny, which require that governmental action impinging on speech rights be narrowly tailored to serve a compelling state interest, we reach the same conclusion as when applying the Court's earlier jurisprudence.  In both circumstances, we conclude that disclosure of the unredacted requested records would unconstitutionally impinge on the Does' federal privacy rights—rights that are grounded in First Amendment guarantees.  The government's sole legitimate interest in disclosure here is in making public a redacted version of the requested records that excludes the Does' names and other identifying information.[41]

C

Sueoka and the City next assert that, even if the requested records are exempt from disclosure, the Does are nevertheless entitled to a preliminary injunction only if they can additionally demonstrate that they are likely to succeed on the merits of meeting the statutory injunction standard set forth in the PRA.  We disagree.

When the disclosure of an individual's identity in public records would impinge a First Amendment right to privacy, the State may not place on that individual an additional burden to vindicate that right.  In such a circumstance,

---

[41] An appropriate grant of such relief, as articulated by the Ninth Circuit Court of Appeals, would preclude the disclosure of "'all personally identifying information or information from which a person's identity could be derived with reasonable certainty.'"  Does 1-10 v. Univ. of Wash., 798 F. App'x 1009, 1010 (9th Cir. 2020).

the establishment of the right itself mandates the issuance of an injunction. This is consistent with our Supreme Court's jurisprudence establishing that, when a statutory right precludes disclosure, the individual seeking to vindicate that right must demonstrate not only that an exemption to disclosure applies, but also that the PRA's injunctive relief standard is satisfied. Mindful as we are that we must, when possible, read statutes to avoid constitutional infirmity, we hold that the PRA does not require that its statutory injunctive relief standard be met when a First Amendment right to privacy precludes the disclosure of public records.

The PRA provides that "[t]he examination of any specific public record may be enjoined if . . . the superior court . . . finds that such examination would clearly not be in the public interest and would substantially and irreparably damage any person, or would substantially and irreparably damage vital governmental functions." RCW 42.56.540. This two-part injunctive relief provision "'governs access to a remedy' when records are found to fall within an exemption" to the PRA's disclosure mandate. Lyft, 190 Wn.2d at 789 (quoting PAWS, 125 Wn.2d at 258). Thus, when a statutory exemption to disclosure is asserted, the trial court may impose an injunction pursuant to RCW 42.56.540 only if the court finds that "a specific exemption applies *and* that disclosure would not be in the public interest and would substantially and irreparably damage a person or a vital government interest." Soter, 162 Wn.2d at 757.

Our Supreme Court so held in Lyft, 190 Wn.2d 769, wherein the court addressed whether the disclosure of certain public records could be enjoined pursuant to a statutory exemption to the PRA's disclosure mandate. There, the

No. 83700-1-I/62

parties seeking to enjoin disclosure asserted that the records at issue contained trade secrets protected by the federal Uniform Trade Secrets Act (UTSA), chapter 19.108 RCW. Lyft, 190 Wn.2d at 773. Our Supreme Court determined that portions of the public records likely met "the definition of 'trade secrets' under the UTSA." Lyft, 190 Wn.2d at 777, 780-84. The court nevertheless held that disclosure of the records could be enjoined only if the PRA's injunctive relief standard, set forth in RCW 42.56.540, was also satisfied. Lyft, 190 Wn.2d at 773. Thus, our Supreme Court held that "finding an exemption applies under the PRA does not ipso facto support issuing an injunction." Lyft, 190 Wn.2d at 786.

It is on the basis of this decisional authority that Sueoka and the City contend that, in order to obtain the relief that they seek, the Does must demonstrate that they are likely to succeed on the merits of meeting the PRA's two-part *statutory* injunctive relief standard. However, because disclosure of the Does' identities in the requested records would impinge their First Amendment right to privacy, the argument advanced by Sueoka and the City is untenable. Requiring that parties seeking to vindicate such rights establish not only the First Amendment right itself, but also the requirements of the PRA's injunctive relief standard, would run afoul of the Supremacy Clause of our federal constitution, which mandates that courts "'shall' regard the 'Constitution,' and all laws 'made in Pursuance thereof,' as 'the supreme Law of the Land.'" Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 324, 135 S. Ct. 1378, 191 L. Ed. 2d 471 (2015) (quoting U.S. CONST. art. VI, cl. 2).[42] We cannot interpret the PRA in a manner

---

[42] The Supremacy Clause provides:

62

No. 83700-1-I/63

that would render it unconstitutional. <u>Utter ex rel. State v. Bldg. Indus. Ass'n of Wash.</u>, 182 Wn.2d 398, 434, 341 P.3d 953 (2015) ("We construe statutes to avoid constitutional doubt."). Nor does this resolution of the issue do so.

Rather, we read the PRA as consistent with the federal constitution simply by recognizing the distinction between a legislatively created statutory right and a federal constitutional right. When the state legislature creates a right, such as a statutory exemption from the PRA's disclosure mandate, the legislature may impose conditions on the exercise of that right. This is precisely what the legislature has done in enacting the PRA's injunctive relief standard, RCW 42.56.540. Thus, as our Supreme Court has held, when a statutory right is implicated, a finding that an exemption applies "does not ipso facto support issuing an injunction." <u>Lyft</u>, 190 Wn.2d at 786. Rather, the two-part standard set forth in RCW 42.56.540 must also be satisfied, as the legislature has imposed this statutory condition on the exercise of the statutory right against disclosure.

However, here, the Does' claim of right does not depend upon a statutory exemption, and the disclosure of the unredacted records would not merely impinge a statutory right. Rather, the Does' First Amendment right to privacy in their political beliefs and associations would be impinged. The significance of this distinction is readily apparent. Our state legislature can impose a condition on the exercise of a right created by the legislature itself. However, the

---

> This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding.

U.S. CONST. art. VI, cl. 2.

63

legislature, having created neither the First nor Fourteenth Amendments, cannot condition the exercise of this federal constitutional right on whether the Does can satisfy the statutory injunctive relief standard. Put simply, such a requirement would authorize a state or local government to violate citizens' constitutional rights when they establish the impingement of such rights but are unable to also demonstrate satisfaction of an additional statutory requirement to obtain injunctive relief.[43] The PRA injunction standard cannot serve as a bar to the City's obligation under the Fourteenth Amendment to safeguard the First Amendment rights of Washington citizens in its application of state law. See, e.g., Seattle Times Co., 170 Wn.2d 581 (discussed infra at 9-10).

Again, this analysis does not suggest a constitutional infirmity of the PRA. Rather, recognizing the distinction between legislatively created statutory rights and the First Amendment constitutional right implicated here, we note that the

---

[43] This very absurdity appears to be consistent with the City's understanding of its duty to Washington's citizens. In supplemental briefing, the City asserts that it has no "freestanding obligation to honor" the constitutional rights of our state's citizens. Specifically, the City contends that the third party notice provision set forth in the PRA is the proper means for it to address exceptions to disclosure premised on a constitutional right. The City argues, in other words, that it has no obligation to independently honor the constitutional rights of third parties in response to records requests. We do not so hold.

When, after receiving notice, an individual seeks injunctive relief premised on a constitutional right, and thereafter establishes both that the right would be impinged by disclosure and that no sufficient interest of the state permits disclosure, the City plainly has an obligation under the Fourteenth Amendment not to violate the individual's constitutional right, notwithstanding the PRA's injunction standard. In other words, here, once the constitutional right is established, the City does not have unfettered discretion to either refuse to disclose the records, pursuant to the PRA, or to permit disclosure premised upon the RCW 42.56.540's standard not being met. Such unfettered discretion of government actors to either honor citizens' constitutional rights or refuse to honor such rights is anathema to the constitutional rule of law.

The City need not serve as the lawyer for every individual mentioned in requested public records. However, when the constitutional right implicated by disclosure of particular requested records is clear, the City must refuse to disclose the records (or the relevant portions thereof). The City must then defend against any challenge to the action by the records requestor, unless, following notice, the individual whose rights are implicated does not object to disclosure. The City's supreme obligation is to the federal constitution, not to the state statute. See U.S. CONST. art. VI, cl.2.

64

No. 83700-1-I/65

application of RCW 42.56.540 would necessarily mandate the issuance of an injunction. Given the State's paramount interest in affirming the federal constitutional rights of its citizens, disclosure that would impinge the Does' First Amendment right to privacy "would clearly not be in the public interest." RCW 42.56.540. Moreover, because the Does' constitutional rights would be impinged by disclosure of the unredacted records, such disclosure would of necessity "substantially and irreparably damage" the Does. RCW 42.56.540.

Thus, when disclosure is precluded by a First Amendment right to privacy, rather than a statutory exemption, the establishment of that constitutional right does, indeed, ipso facto mandate the issuance of an injunction. The State has no lawful authority to impose an additional requirement on parties seeking to vindicate their constitutional rights in order to trigger its obligations pursuant to the Fourteenth Amendment. Because disclosure of the unredacted records would impinge their First Amendment rights, the Does cannot be required to additionally demonstrate satisfaction of an injunctive relief standard in order to obtain the relief they seek, unless that standard is one that is ipso facto satisfied by virtue of the establishment of the First Amendment right. Because the PRA standard is one such standard, the Does have met their burden.[44]

IV

In his cross appeal, Sueoka contends that the trial court erred by denying his motion to "change the case title and bar the use of pseudonyms" in this

---

[44] We acknowledge the existence of case law, primarily from lower federal courts, that occasionally applies non-PRA injunctive relief standards. Our Supreme Court has determined that PRA disclosure is regulated by only the PRA injunctive relief standard. Lyft, 190 Wn.2d at 784-85.

65

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

litigation. According to Sueoka, Washington's open courts principles, emanating from article I, section 10 of our state constitution, require that the Does litigate this matter using their actual names. We disagree.

In seeking to preclude the disclosure of their identities in the requested records, the Does assert a First Amendment right. Thus, it is federal open courts jurisprudence, which itself derives from the First Amendment, that here applies. Such jurisprudence permits litigants to proceed pseudonymously when the injury litigated against would be incurred as a result of the disclosure of their identities. Herein, that precise outcome would occur were the Does not permitted to litigate using pseudonyms.

Accordingly, we conclude that the trial court did not err in ruling that the Does could proceed in pseudonym in this litigation. For the same reason, we decline to grant Sueoka's request to preclude the use of pseudonyms on appeal.

A

In these proceedings, both the trial court and our commissioner have repeatedly entertained Sueoka's argument that the Does should not be permitted to litigate pseudonymously. In each instance, they have rejected that argument. First, Sueoka objected to the Does' motion to proceed in pseudonym filed concurrent with their initial complaint for declaratory and injunctive relief. On March 9, 2021, Judge Cahan granted the Does' motion. Prior to so doing, Judge Cahan considered the factors for redaction set forth in Seattle Times Co. v. Ishikawa, 97 Wn.2d 30, 640 P.2d 716 (1982), and made the findings required therein. Judge Cahan also determined that the Does had complied with the

relevant court rules, including General Rule (GR) 15.  Three days later, on March 12, 2021, Judge Widlan denied the Does' complaint for injunctive relief, and the Does sought discretionary review.

Sueoka then filed a "motion to change the case title and bar the use of pseudonyms" in this court.  He subsequently filed a notice of cross appeal, challenging Judge Cahan's order permitting the Does to litigate in pseudonym.  Our commissioner denied Sueoka's motion to change the case title on April 9, 2021.  The commissioner explained that there "appear[ed] to be no dispute that Judge Cahan evaluated the <u>Ishikawa</u> factors in reaching the March 9, 2021 decision and that no party asked Judge Widlan to revisit [that] order."  The commissioner further reasoned that the "substance of Sueoka's motion to change the case title is inextricably tangled up with the merits of his appeal" and concluded that "maintaining the case name adopted by the trial court . . . appears to be necessary to allowing [this court] to reach the merits of this case."

Following transfer of the appeal from Division One to our Supreme Court, and that court's subsequent dismissal of review and remand to the superior court, Sueoka again filed a "motion to change the case title and bar the use of pseudonyms."  Sueoka did not therein challenge Judge Cahan's order granting the Does' motion to proceed in pseudonym.  Judge Widlan denied Sueoka's motion, reasoning that "the purpose of [the Does'] lawsuit is to procure an injunction to prevent disclosure of their names" and, thus, requiring use of their names in court filings "would effectively prevent them from seeking any relief."

67

No. 83700-1-I/68

B

Washington's open courts jurisprudence derives from article I, section 10 of our state constitution, which requires that "[j]ustice in all cases shall be administered openly, and without unnecessary delay." WASH. CONST. art. I, § 10. Because "[t]he openness of our courts 'is of utmost public importance,'" Washington courts begin "with the presumption of openness when determining whether a court record may be sealed from the public." Hundtofte v. Encarnacion, 181 Wn.2d 1, 7, 330 P.3d 168 (2014) (quoting Dreiling v. Jain, 151 Wn.2d 900, 903, 93 P.3d 861 (2004)). Whether redaction implicates article I, section 10's mandate of open access to courts and court documents "depends on application of the experience and logic test." State v. S.J.C., 183 Wn.2d 408, 412, 352 P.3d 749 (2015). When article I, section 10 applies, redaction is permitted only after consideration of the factors set forth in Ishikawa, 97 Wn.2d 30. When our state constitution is not implicated, GR 15 permits the redaction of names in pleadings if the court "enters written findings that the specific sealing or redaction is justified by identified compelling privacy or safety concerns that outweigh the public interest in access to the court record." GR 15(c)(2).

In a recent opinion, our Supreme Court reversed a decision of this court wherein we had determined that allowing the plaintiffs to litigate using pseudonyms did not implicate article I, section 10. John Doe G v. Dep't of Corr., 190 Wn.2d 185, 191, 410 P.3d 1156 (2018) (citing John Doe G v. Dep't of Corr., 197 Wn. App. 609, 627-28, 391 P.3d 496 (2017)). The Supreme Court therein addressed a privacy right arising from a state statute. The questions

68

presented were (1) whether special sex offender sentencing alternative evaluations are exempt from disclosure pursuant to statutory exemptions, and (2) whether "pseudonymous litigation was proper in [that] action." Doe G, 190 Wn.2d at 189.

On appeal before this court, we had looked to federal open courts jurisprudence for "guidance," recognizing the "parallel rights [to those derived from article I, section 10] under the First Amendment." Doe G, 197 Wn. App. at 627. We noted federal court holdings that the use of pseudonyms is appropriate when "'the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity.'" Doe G, 197 Wn. App. at 627 (quoting Doe v. Frank, 951 F.2d 320, 324 (11th Cir. 1992)). Based, in part, on this reasoning, we held that "[e]xperience and logic" demonstrated "that allowing [the] plaintiffs to proceed under pseudonyms [did] not implicate article I, section 10 where the public's interest in the plaintiffs' names is minimal and use of those names would chill their ability to seek relief." Doe G, 197 Wn. App. at 628. Thus, we affirmed the trial court's ruling permitting the plaintiffs to litigate using pseudonyms, notwithstanding that the trial court had not applied the Ishikawa factors. Doe G, 197 Wn. App. at 624.

Our Supreme Court reversed our decision, holding that "pseudonymous litigation was improper . . . because the trial court did not adhere to the requirements of article I, section 10 . . . and [GR] 15." Doe G, 190 Wn.2d at 189. In so holding, the court explained that it had "never used [the] analysis" set forth in the federal appellate court decisions on which we had relied for guidance. Doe

69

No. 83700-1-I/70

G, 190 Wn.2d at 198.  Instead, the court held, Washington courts "rely on GR 15 and Ishikawa."  Doe G, 190 Wn.2d at 198.

C

Citing our Supreme Court's decision in Doe G, 190 Wn.2d 185, Sueoka contends that Judge Widlan "used the wrong legal standard" in denying his motion to preclude the Does from litigating pseudonymously.[45]  However, in so asserting, Sueoka misperceives the issue as one of Washington law.[46]  It is not.  Accordingly, his argument fails.

Unlike in Doe G, in this case, the Does assert that disclosure of their identities would impinge a federal constitutional First Amendment right.  Preventing the Does from proceeding in pseudonym would preclude their ability to obtain the relief that they seek in this action.  In other words, requiring the Does to use their actual names in the case caption would undermine their ability to assert the First Amendment right that they seek to vindicate herein.  Such a result would violate the Supremacy Clause, U.S. CONST. art. VI, cl. 2, which mandates that we must not "give effect to state laws that conflict with federal laws."  Armstrong, 575 U.S. at 324.  When parties who assert that disclosure of their identities would violate a federal constitutional right seek to litigate

---

[45] Br. of Resp't/Cross Appellant at 69-71.

[46] We note that, if Washington law did apply here, Sueoka's contention would nevertheless be unavailing.  As discussed above, Judge Cahan *did* apply GR 15 and the Ishikawa factors in ruling that the Does could proceed in pseudonym.  Sueoka does not challenge Judge Cahan's findings, which are, therefore, verities on appeal.  In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015); see also Doe AA v. King County, 15 Wn. App. 2d 710, 717, 476 P.3d 1055 (2020) (accepting as true the trial court's Ishikawa findings that were unchallenged on appeal).  Following Sueoka's subsequent motion seeking, once again, to preclude the Does from litigating in pseudonym, Judge Widlan simply declined to revisit Judge Cahan's earlier ruling.

70

pseudonymously, it is federal open courts jurisprudence, arising from the First Amendment itself, that we must apply.

This holding is consistent with our Supreme Court's decision in Doe G, 190 Wn.2d 185. There, the litigants seeking to use pseudonyms asserted that disclosure of their identities in the requested records was precluded by *statutory rights* arising from *statutory exemptions*, including an exemption enumerated within the PRA itself. Doe G, 190 Wn.2d at 189. Thus, our Supreme Court properly held that Washington's open courts jurisprudence applied and that we had erred by importing federal case law into Washington law. Doe G, 190 Wn.2d at 189, 198.

Here, however, the Supremacy Clause requires that First Amendment jurisprudence be applied, both as to the constitutional right at issue—whether disclosure of the Does' identities in the requested records would violate a constitutional privacy right—and as to the question of whether the Does may use pseudonyms in seeking to vindicate that right. Accordingly, because the Does assert an exemption from disclosure premised on a federal constitutional right, rather than a statutory exemption, the application of federal open courts jurisprudence does not conflict with our Supreme Court's decision in Doe G but does comport with the requirements of the Supremacy Clause.

Federal courts have made clear that "[p]ublic access [to plaintiffs' names in a lawsuit] is more than a customary procedural formality; First Amendment guarantees are implicated when a court decides to restrict public scrutiny of judicial proceedings." Doe v. Stegall, 653 F.2d 180, 185 (5th Cir. 1981); see also

No. 83700-1-I/72

<u>Roe II v. Aware Woman Ctr. for Choice, Inc.</u>, 253 F.3d 678, 688 (11th Cir. 2001) (Hill, J., concurrence in part). When federal law applies, "[t]he ultimate test for permitting a plaintiff to proceed anonymously is whether the plaintiff has a substantial privacy right which outweighs the 'customary and constitutionally-embedded presumption of openness in judicial proceedings.'" <u>Frank</u>, 951 F.2d at 323 (quoting <u>Stegall</u>, 653 F.2d at 186). "A plaintiff should be permitted to proceed anonymously only in those exceptional cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or *where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity*." <u>Frank</u>, 951 F.2d at 324 (emphasis added).

Thus, the First Amendment both confers privacy rights in political speech and also, in the standard regulating when a party can proceed in pseudonym, provides that these substantive rights cannot be extinguished merely because a party seeks to vindicate them. In other words, it provides that concerns about public access to the courts cannot be applied to the detriment of First Amendment rights under federal law, such that the vindication of constitutional rights would be improperly conditioned on disclosure.[47] In this action, the "injury

---

[47] In <u>NAACP</u>, 357 U.S. at 459-60, the United States Supreme Court relied on this principle—that federal law not be applied in a manner that precludes the vindication of individuals' constitutional rights to privacy—in holding that the plaintiff organization had standing to assert the rights of its members. The Court held that the general principle that parties must assert only those constitutional rights "which are personal to themselves" is "not disrespected where constitutional rights of persons who are not immediately before the Court could not be effectively vindicated except through an appropriate representative before the Court." <u>NAACP</u>, 357 U.S. at 459.

There, the NAACP challenged a court order mandating disclosure of its membership lists to the Alabama Attorney General, asserting that such disclosure would violate its members' constitutional privacy rights. <u>NAACP</u>, 357 U.S. at 451, 458. The Court held that the "right [was] properly assertable by the [NAACP]," reasoning that "[t]o require that [the constitutional right] be claimed by the [NAACP's] members themselves would result in nullification of the right at the very moment of its assertion." <u>NAACP</u>, 357 U.S. at 459. <u>See also</u> <u>Pollard</u>, 283 F. Supp. at 256

72

litigated against" is disclosure of the Does' identities in the requested records.

Were the Does not permitted to litigate pseudonymously, the very injury they

seek to litigate against would be incurred. Pursuant to federal open courts

jurisprudence, in this circumstance, "the almost universal practice of disclosure

must give way . . . to the privacy interests at stake." Stegall, 653 F.2d at 186.

In summary, the Supremacy Clause prohibits the application of state open

courts jurisprudence to a pending First Amendment claim when such application

would cause the injury litigated against to be incurred, as federal open courts

principles, arising as they do from the First Amendment itself, would not mandate

the disclosure of the parties' names in that circumstance. If the Does ultimately

prevail, they would be entitled to full protection of their First Amendment rights

against the government—here, protection against disclosure of their identities

within the requested records. State constitutional open courts provisions cannot

be applied in contravention of First Amendment jurisprudence in a manner that

frustrates protection of the citizen's federal constitutional rights.

Accordingly, we hold that the Does must be permitted to use pseudonyms

in this action. The trial court did not err by so ruling. We additionally deny

Sueoka's request that we change the case title in this appeal to require it to

include the Does' actual names.

---

(recognizing "recent Supreme Court decisions establish[ing] that an organization made up of private individuals has standing to protect those individuals from unwarranted invasions of government of their rights of association and privacy guaranteed by the First and Fourteenth Amendments").

Similarly, here, the Does would be precluded from vindicating their constitutional rights were they unable to litigate pseudonymously. First Amendment open courts jurisprudence prohibits disclosure in such circumstances. Frank, 951 F.2d at 324.

No. 83700-1-I/74

D

The Does seek herein to vindicate rights enshrined in the federal constitution.  Thus, applying the open courts principles arising from article I, section 10 of our state constitution to determine whether the Does may be permitted to litigate in pseudonym would contravene the Supremacy Clause's mandate of state law supersession.  Accordingly, as discussed above, we must apply federal law to this question.  We nevertheless note that application of Washington open courts law would dictate the same resolution of this issue.

Again, this is due to the Supremacy Clause's mandate that we not give effect to state laws that conflict with federal laws.  Precluding the Does from litigating in pseudonym pursuant to article I, section 10 would itself be a state action that would compel the disclosure of the Does' individual political beliefs and associations.  Indeed, application by Washington courts of our state constitution is itself a state action.  Thus, only by demonstrating that the disclosure of the Does' identities "'furthers a compelling interest and is narrowly tailored to achieve that interest,'" Citizens United, 558 U.S. at 340 (quoting Fed. Election Comm'n, 551 U.S. at 464), could a Washington court require such disclosure when a party seeking to litigate in pseudonym asserts a federal First Amendment claim.  Washington courts, too, are subject to the Supremacy Clause's mandate.

Here, as we have discussed, there is no compelling state interest in the disclosure of the Does' identities in the requested records.  Similarly, there is no compelling state interest in requiring that the Does litigate using their actual

74

No. 83700-1-I/75

names. Given the profusion of exceptions to the disclosure mandate, this conclusion is inescapable. Our state law currently includes 632 legislatively created exceptions to the PRA's disclosure mandate. See Appendix A. This proliferation of exceptions undoubtedly demonstrates the absence of a compelling state interest in the disclosure of the Does' identities here.

Moreover, neither our legislature nor our Supreme Court, in permitting broad categories of persons to retain their anonymity in court records, has engaged in the particularized analysis that would be required if the disclosure of those persons' identities implicated a compelling state interest. For instance, our legislature has determined that individuals are automatically entitled to anonymity in certain court records, including records regarding adoptions, RCW 26.33.330; confidential name changes, RCW 4.24.130(5); child victims of sexual assault, RCW 10.52.100; juvenile nonoffender records, such as juvenile dependencies, parental terminations, and truancy, at risk youth, and child in need of services cases, RCW 13.50.100; juvenile offender records, RCW 13.50.050; mental illness commitments, RCW 71.05.620; and mental illness commitments of minors, RCW 71.34.335.

Similarly, by both court rule and order, Washington courts have deemed certain categories of persons to be exempt from the general mandate that court records include the actual names of the litigants. Washington court rule General Rule 15, consistent with article I, section 10 of our state constitution, "preserves a long-established principle that the complete names of parties are to be listed with the actions to which they are parties," subject to "carefully delimited" exceptions.

No. 83700-1-I/76

<u>Hundtofte</u>, 181 Wn.2d at 16 (Madsen, C.J., concurring).  These exceptions, however, are not based on a particularized analysis of each case.  Rather, like the legislative enactments discussed above, they exempt litigants in broad categories of cases from the disclosure mandate.  For instance, in adopting Rule of Appellate Procedure (RAP) 3.4, our Supreme Court has determined that all juvenile offenders are entitled to anonymity in court records.[48]  By order, the Washington Court of Appeals has similarly required that case titles in certain appeals—including those regarding adoption, civil commitment, dependency, termination of parental rights, truancy, at risk youth, child in need of services, and juvenile offender—use the parties' initials rather than their full names.  Gen. Ord. for the Ct. of Appeals, <u>In re Changes to Case Title</u> (Wash. Ct. App. Aug. 22, 2018) (effective Sept. 1, 2018).

Thus, neither our state legislature nor Washington courts, in adopting exceptions to our state open courts law, have deemed it necessary to conduct a particularized case-by-case analysis prior to permitting the redaction of parties' names in court records.  Instead, whether by legislative enactment, court rule, or court order, our state has exempted broad categories of persons from the general disclosure requirement.  Certainly, such broad exemptions do not indicate the narrow tailoring that would be necessary were the state interest in the disclosure of litigants' actual names compelling.  Thus, by exempting broad

---

[48] RAP 3.4 provides:
In a juvenile offender case, the parties shall caption the case using the juvenile's initials.  The parties shall refer to the juvenile by his or her initials throughout all briefing and pleadings filed in the appellate court, and shall refer to any related individuals in such a way as to not disclose the juvenile's identity.  However, the trial court record need not be redacted to eliminate references to the juvenile's identity.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

swaths of persons from article I, section 10's open courts mandate, both the Washington legislature and Washington courts have impliedly indicated that the state interest in disclosure of litigants' actual names is not a compelling one.

The Supremacy Clause prohibits the application of state open courts jurisprudence when, as here, the right asserted is established by the federal First Amendment. Nevertheless, even were we to apply Washington law to the question of whether the Does may litigate in pseudonym, we would reach the same conclusion—that not only "may" they so litigate, but that the federal constitution demands they be permitted to do so. Such a determination by a Washington court is, itself, state action. The broad exemptions to the open courts mandate, both enacted by our legislature and adopted by our courts, demonstrate that the state interest in the disclosure of individuals' actual names in court records is not a compelling one. Absent such an interest, and given the Does' First Amendment right to anonymity in political belief and association, we cannot require the Does to litigate using their actual names here.

V

A

All members of the panel have taken an oath to "'support the Constitution of the United States.'" RCW 2.06.085. Each panel member views the methods of analyses employed herein and the decisions reached as being in accord with this oath.

Nevertheless, we are aware of the cultural and political tenor of our times. This includes an awareness that many Americans despair that judicial decisions

No. 83700-1-I/78

have become result-oriented to achieve political ends.  To disabuse those so inclined from defaulting to such a judgment concerning this opinion, and to assure the general public that its appellate court exists in a reality-based environment, we choose to acknowledge several of the pertinent facts that underlie the dispute at issue.

1

The 2020 Presidential Election

1.  Joseph R. Biden, Jr. won the 2020 presidential election, receiving 81,283,501 popular votes.[49]  Donald J. Trump lost the 2020 presidential election, receiving 74,223,975 popular votes.[50]  Biden received 7,059,526 more votes than did Trump.

2.  Biden's popular vote total was the largest ever received by a candidate for President of the United States.[51]

3.  Biden received 51.3 percent of the popular vote.[52]  This was the highest percentage of the popular vote attained by a challenger to a sitting president since 1932, when Franklin Roosevelt defeated Herbert Hoover.[53]

---

[49] U.S. FED. ELECTION COMM'N, FEDERAL ELECTIONS 2020: ELECTION RESULTS FOR THE U.S. PRESIDENT, THE U.S. SENATE, AND THE U.S. HOUSE OF REPRESENTATIVES 5 (Oct. 2022), at 5, https://www.fec.gov/resources/cms-content/documents/federalelections2020.pdf [https://perma.cc/5XDB-2XJA]

[50] FEDERAL ELECTIONS 2020, supra, at 5.

[51] Domenico Montanaro, *President-Elect Joe Biden Hits 80 Million Votes in Year Of Record Turnout*, NAT'L PUB. RADIO (Nov. 25, 2020), https://www.npr.org/2020/11/25/937248659/president-elect-biden-hits-80-million-votes-in-year-of-record-turnout [https://perma.cc/4FZS-AWKK].

[52] FEDERAL ELECTIONS 2020, supra, at 5.

[53] *Presidential Election Margin of Victory*, AM. PRESIDENCY PROJECT (Mar. 7, 2020), https://www.presidency.ucsb.edu/statistics/data/presidential-election-mandates [https://perma.cc/9MJG-RAHE]; *Share of Electoral College and Popular Votes from Each Winning Candidate, in All United States Presidential Elections from 1789 to 2020*, STATISTA (Dec. 2020), https://www.statista.com/statistics/1034688/share-electoral-popular-votes-each-president-since-1789 [https://perma.cc/B5SE-NLLY].

No. 83700-1-I/79

4. Biden earned 306 electoral votes. Trump earned 232.[54] In 2016, Trump earned 306 electoral votes, while Hillary Clinton earned 232.[55] Thus, Biden defeated Trump by the same Electoral College margin as Trump defeated Clinton.

2

The Rally on January 6, 2021

1. A "Stop the Steal" rally was held on January 6, 2021 on public property in the District of Columbia. Various permits were sought and obtained, authorizing use of the public property.[56]

2. The theme of the rally was that the election had been "stolen" from Donald Trump. Thus, Trump and rally organizers urged, Congress should not finalize Biden's victory by certifying the Electoral College results (as the law required).[57]

3. Trump, the sitting president, spoke at the rally.[58]

3

The Insurrection at the Capitol

1. As the rally ended, a civil disturbance began at the Capitol. Hundreds of persons illegally broke through security lines and eventually into the Capitol

---

[54] FEDERAL ELECTIONS 2020, supra, at 7.
[55] *2016 Presidential Election Results*, N.Y. TIMES (Aug. 19, 2017, 9:00 AM), www.nytimes.com/elections/2016/results/president.
[56] See note 13, *supra*.
[57] H.R. REP. NO. 117-663, at 231-33, 499-502 (2022), https://www.govinfo.gov/content/pkg/GPO-J6-REPORT/pdf/GPO-J6-REPORT.pdf [https://perma.cc/UH8B-ZQ7D].
[58] H.R. REP. NO. 117-663, at 231-33.

No. 83700-1-I/80

Building.[59]

2.  Both the House of Representatives and the Senate were forced to adjourn and flee to safety.[60]

3.  In the riotous melee that ensued over 140 law enforcement officers were injured.[61]  According to a U.S. Senate report, seven deaths were attributed to the violence that took place.[62]

4.  The common goal of the rioters was to keep Congress from performing its lawful function—certification of Biden's presidential election victory.[63]  Some rioters, including those who chanted "Hang Mike Pence," had other goals, such as the killing or kidnapping of members of Congress.[64]

5.  For the first time since the War of 1812, the United States government lost physical control of the Capitol Building to a group of attackers.[65]

---

[59] Audrey Kurth Cronin, *The Capitol Has Been Breached Before: This Time It Was Different*, AM. UNIV. SCH. OF INT'L SERV. (Feb. 9, 2021), https://www.american.edu/sis/centers/security-technology/the-capitol-has-been-attacked-before-this-time-it-was-different.cfm [https://perma.cc/Y4NJ-7GE3].  See discussion H.R. REP. NO. 117-663, at 637-88.

[60] H.R. REP. NO. 117-663, at 664-66.

[61] COMM. ON HOMELAND SEC. & GOVERNMENTAL AFFAIRS & COMM. ON RULES & ADMIN., U.S. SENATE, EXAMINING THE U.S. CAPITOL ATTACK: A REVIEW OF THE SECURITY, PLANNING, AND RESPONSE FAILURES ON JANUARY 6, at 33 (June 2021), https://www.rules.senate.gov/imo/media/doc/Jan%206%20HSGAC%20Rules%20Report.pdf [https://perma.cc/DL5Q-5XT3].

[62] EXAMINING THE U.S. CAPITOL ATTACK, supra, at 1.

[63] EXAMINING THE U.S. CAPITOL ATTACK, supra, at 1.

[64] H.R. REP. NO. 117-663, at 37-39; Cronin, supra.

[65] Cronin, supra; Amanda Holpuch, *US Capitol's Last Breach Was More Than 200 Years Ago*, GUARDIAN (Jan. 6, 2021, 7:59 PM), https://www.theguardian.com/us-news/2021/jan/06/us-capitol-building-washington-history-breach [https://perma.cc/RU25-E3LP]; Amy Sherman, *A History of Breaches and Violence at the US Capitol*, POLITIFACT (Jan. 6, 2021), https://www.politifact.com/article/2021/jan/07/history-breaches-and-violence-us-capitol/ [https://perma.cc/8A7C-5L2H].

No. 83700-1-I/81

6. Over 1,000 persons have been charged with crimes premised on actions occurring at the Capitol on January 6, 2021.[66] Over 630 have, to date, pleaded guilty or been found guilty after trial.[67]

7. Many of the insurrectionists belonged to groups espousing white supremacist views. Others of the rioters, while not group members, were shown to possess such views.[68]

Given all of these facts, it is easy to understand the concerns motivating the City and the requesters. Nevertheless, our duty to the United States Constitution, and the Constitution's embrace and protection of a right to anonymity in political activity, lead us to the decisions we announce today.

B

The trial court's denial of the Does' motion for a preliminary injunction is reversed and remanded.

The trial court's issuance of a temporary restraining order is affirmed.

The trial court's order denying Sueoka's motion to preclude the Does' use of pseudonyms is affirmed.

---

[66] *The Jan. 6 Attack: The Cases Behind the Biggest Criminal Investigation in U.S. History*, NAT'L PUB. RADIO (May 12, 2023, 5:25 PM), https://www.npr.org/2021/02/09/965472049/the-capitol-siege-the-arrested-and-their-stories [https://perma.cc/S38K-B8DK].

[67] *The Jan. 6 Attack: The Cases Behind the Biggest Criminal Investigation in U.S. History*, supra.

[68] See discussion H.R. REP. NO. 117-663, at 499-576; Sabrina Tavernise & Matthew Rosenberg, *These Are the Rioters Who Stormed the Nation's Capitol*, N.Y. TIMES (May 12, 2021), https://www.nytimes.com/2021/01/07/us/names-of-rioters-capitol.html; Deena Zaru, *The Symbols of Hate and Far-Right Extremism on Display in Pro-Trump Capitol Siege*, ABC NEWS (Jan. 14, 2021, 2:01 AM), https://www.abcnewsgo.com/us/symbols-hate-extremism-display-pro-trump-captiol-siege/story?id=75177671 [https://perma.cc/3T4R-2JRL]; Matthew Rosenberg & Ainara Tiefenthäler, *Decoding the Far-Right Symbols at the Capitol Riot*, N.Y. TIMES (Jan. 13, 2021), https://www.nytimes.com/2021/01/13/video/extremist-signs-symbols-capitol-riot.html.

No. 83700-1-I/82

Sueoka's motion to change the case title is denied.

Affirmed in part, reversed in part, and remanded.

Dwyer, J.

WE CONCUR:

Coburn, J.          Smith, C.J.

# APPENDIX A

| | Category | RCW (thru 2012) | Description | Date * Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 1 | Agriculture | 42.56.380(6) | Information on individual American ginseng growers or dealers | 1996 | Oct. 2007 | June 2008 | SB 5295 (Ch. 128, 2010 Laws) |
| 2 | Personal Information - Research Data/Health Care | 42.56.360(1)(f); [now (3)(a)] | Information relating to infant mortality pursuant to RCW 70.05.170 | 1992 | Oct. 2007 | Mar. 2008 | SB 5295 (Ch. 128, 2010 Laws) |
| 3 | Personal Information - Research Data/Health Care | 70.05.170 | Medical records collected by a local department of health in the course of conducting a child mortality review | 1992 | Oct. 2007 | Mar. 2008 | SB 5295 (Ch. 128, 2010 Laws); SB 5049 (2011, 2012) |
| 4 | Legislative Records | 42.56.010(2); [now (3)] | Definition of "public records" for the senate and the house are limited to definition of legislative records in RCW 40.14.100 and budget, personnel, travel records and certain reports. [Definition] | 1995 | Oct. 2007 | Aug. 2009 | |
| 5 | Personal Information - Public Employment | 42.56.250(2) | Applications for public employment, including names, resumes | 1987 | Oct. 2007; March 2008; Sept. 2008; Feb. 2017; May 2017 | Mar. 2008; September 2008; May 2017 | SB 5294 (2009); SB 5049 (2011, 2012); HB 1298 (2013); SB 5169 (2013); HB 1537 (Ch. 229, 2019 Laws); SB 5246 (2019) |
| 6 | Agriculture | 42.56.380(1); 15.86.110 | Business records the department of agriculture obtains regarding organic food products | 1992 | Nov. 2007 Jan. 2008 | June 2008 | |
| 7 | Agriculture | 42.56.380(2); 15.54.362 | Information regarding business operations contained in reports on commercial fertilizer | 1987 | Nov. 2007 Jan. 2008 | June 2008 | |
| 8 | Agriculture | 42.56.380(3) | Production or sales records required to determine payments to various agricultural commodity boards and commissions (Relates to exemptions in 10 commission statutes) | 1996 | Nov. 2007 Jan. 2008 | June 2008 | |
| 9 | Agriculture | 42.56.380(4) | Consignment information contained on phytosanitary certificates issued by the department of agriculture | 1996 | Nov. 2007 Jan. 2008 | June 2008 | |
| 10 | Agriculture | 42.56.380(5) | Financial and commercial information and records held by the department of agriculture for potential establishment of a commodity board or commission regarding domestic or export marketing activities or individual production information | 1996 | Nov. 2007 Jan. 2008 | June 2008; November 2012 | |
| 11 | Agriculture | 42.56.380(7) | Identifiable information collected by department of agriculture regarding packers and shippers of fruits and vegetables for purposes of inspections and certification | 1996 | Nov. 2007 Jan. 2008 | June 2008 | |
| 12 | Agriculture | 42.56.380(8) | Financial statements provided to the department of agriculture for purposes of obtaining public livestock market license | 2003 | Nov. 2007 Jan. 2008 | June 2008 | |
| 13 | Agriculture | 42.56.380(9) | (Voluntary) National animal identification systems - herd inventory mgmt., animal disease | 2006 | Nov. 2007 Jan. 2008 | June 2008 | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 14 | Agriculture | 42.56.380(10);16.36 | Animal disease reporting | 2006 | Nov. 2007 Jan. 2008 | June 2008 | |
| 15 | Agriculture | 42.56.270(17) | Farm plans that are voluntary and developed with conservation district assistance | 2006 | Jan. 2008; *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets | June 2008; November 2012; *See also Oct. 2016 - 42.56.270 & trade secrets | 2017: HB 1160/SB 5418 |
| 16 | Agriculture | 42.56.610 | Livestock nutrient management information: Certain information obtained by state and local agencies from dairies, animal feeding operations not required to apply for a national pollutant discharge elimination system permit disclosable only in ranges that provide meaningful information to public | 2005 (c510s5) | Nov. 2007 Jan. 2008 | June 2008 | ; |
| 17 | Agriculture | 15.49.370(8) | Seeds: operations and production information | 1969 | Nov. 2007 Jan. 2008 | June 2008 | |
| 18 | Agriculture | 15.53.9018 | Commercial Feed required reports | 1975 | Nov. 2007 Jan. 2008 | June 2008 | |
| 19 | Agriculture | 15.58.060(1)(c) | Washington Pesticide Control Act: Business information of a proprietary nature regarding pesticide formulas | 1971 | Nov. 2007 Jan. 2008 | June 2008 | |
| 20 | Agriculture | 15.58.065(2) | Washington Pesticide Control Act: Privileged or confidential commercial or financial information, trade secrets re: pesticides | 1971 | Nov. 2007 Jan. 2008 | June 2008 | |
| 21 | Agriculture | 15.65.510 | Information regarding agricultural marketing agreements (including info from noncompliance hearings) | 1961 | Feb. 2008 | June 2008 | |
| 22 | Agriculture | 15.86.110 | Business related information obtained by the department of agriculture regarding entities certified to handle and process organic or transitional food, or entities applying for such certification | 1992 | Nov. 2007 Jan. 2008 | June 2008 | |
| 23 | Agriculture | 17.24.061(2) | Insect Pests & Plant Diseases (including: trade secrets or commercial or financial information obtained by department of agriculture regarding insect pests, noxious weeds, or organisms affecting plant life | 1991 | Nov. 2007 Jan. 2008 | June 2008 | |
| 24 | Agriculture | 22.09.040(9) | Financial information provided by applicants for a warehouse license to the department of agriculture | 1987 | Feb. 2008 | June 2008 | |
| 25 | Agriculture | 22.09.045(7) | Financial information provided by applicants for a grain dealer license to the department of agriculture | 1987 | Feb. 2008 | June 2008 | |
| 26 | Agriculture | 43.23.270 | Financial and commercial information obtained by the department of agriculture for export market development projects | 1996 | Nov. 2007 Feb. 2008 | June 2008 | |
| 27 | Personal Information | 28C.18.020 | List of nominees for director of work force training & education board [Later eliminated] | 1991 | Feb. 2008 | Sept. 2008 | SB 5295 (Ch. 128 Laws of 2010) |
| 28 | Personal Information | 79A.25.150 | Names of candidates for director of interagency committee for outdoor recreation [Later eliminated] | 1989 | Feb. 2008 | Sept. 2008 | SB 5295 (Ch. 128 Laws of 2010) |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 29 | Personal Information | 43.33A.025(2) | State investment board criminal history record checks of finalists for board positions | 1999 | May 2008 | June 2008 | |
| 30 | Personal Information: Employment and Licensing | 42.56.250(4) | Address, phone numbers, email addresses, SSNs, drivers' license numbers, identicard numbers, payroll deductions, and emergency contact information of public employees or volunteers held by public | 1987; 2020 | May 2008; Feb. 2016; May 2016 | May 2016 | 2017: HB 1160/SB 5418; HB 1538 (2019) |
| 31 | Personal Information | 42.56.230(1)&(2) | Personal information in files for students in public schools, patients or clients of public institutions or public health agencies, or welfare programs (1); children in listed programs (2) | 1973 (I-276); Re (2): 2011 c 173 s 1, 2013 c 220 s 1, 2015 c 47 s 1 | Nov. 2008; May 2014; Feb. 2016; May 2016 | May 2016 (re consent) | 2017: HB 1160/SB 5418. See also HB 1293 (2011); SB 5314 (2011), HB 2646 (2011); HB 1203 (Ch. 220, 2013 Laws); SB 5198 (2013); SB 5098 (Ch. 173, 2011 Laws); HB 1538 (2019); SB 5246 (2019) |
| 32 | Public Utilities & Transportation | 42.56.330(3) | Personal information in vanpool, carpool, ride-share programs | 1997 | May 2008 | Nov. 2008; November 2012 | SB 5294 (2009); SB 5049 (2011, 2012); HB 1298 (2013); SB 5169 (2013); HB 1980 (2015); SB 6020 (2015) HB 1554 (2015) (re (2)) |
| 33 | Public Utilities & Transportation | 42.56.330(4) | Personal information of current or former participants or applicants in transit services operated for those with disabilities or elderly persons | 1999 | May 2008 | Oct. 2008 | |
| 34 | Personal Information | 41.04.364 (repealed) - 41.04.362 - also see 42.56.360(1)(j) (same) | Personally identifiable information in state employee wellness program | 1987; 2010 c. 128 s 3 | May 2008 (2008 law) | July 2008 (2008 law) | SB 5295 (Ch. 128, 2010 Laws) |
| 35 | Public Utilities & Transportation | 42.56.330(5) | Personal information of persons who use transit passes and other fare payment media | 1999; 2012 | May 2008 | Oct. 2008 | SB 5294 (2009); SB 5295 (Ch. 129, 2010 Laws); SB 5049 (2011); SB 2552 (Ch. 68, 2012 Laws); HB 1298 (2013); SB 5169 (2013); HB 1980 (2015); SB 6020 (2015) |
| 36 | Misc. Government Functions | 42.56.290 | Agency records relevant to a controversy but which would not be available to another party under the rules of pretrial discovery for causes pending in the superior courts | 1973 (I-276) | June 2008 | Nov. 2008 | SB 5294 (2009) |
| 37 | Personal Information | 42.56.250(6) | Information that identifies a person who, while an agency employee: (a) Seeks advice, under an informal process established by the employing agency, in order to ascertain his or her rights in connection with a possible unfair practice under chapter 49.60 RCW against the person; and (b) requests his or her identity or any identifying information not be disclosed | 1992 | Sept. 2008 | Oct. 2008 | HB 1538 (2019) |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 38 | Personal Information | 42.56.250(5) | Investigative records compiled by an employing agency conducting a current investigation of a possible unfair practice under chapter 49.60 RCW or of a possible violation of other federal, state, or local laws prohibiting discrimination in employment. | 1994 | Sept. 2008; Feb. 2016; May 2016 | Oct. 2008; May 2016 | SB 5295 (Ch. 128, 2010 Laws) ; see also HB 2761 (2012) (employer investigations); 2017: HB 1160/SB 5418 |
| 39 | Personal Information | 42.56.250(8) | Employee salary and benefit information collected from private employers for salary survey information for marine employees | 1999 | Sept. 2008 | Oct. 2008 | SB 5295 (Ch. 128, 2010 Laws) |
| 40 | Personal Information | 42.56.230(3) (formerly (2)) | Personal information in files on employees, appointees, or elected officials if disclosure would violate their right to privacy | 1973 (I-276) | Nov. 2008; Jan. 2012; March 2012; Feb. 2014; Aug. 2014; Oct. 2014; Feb. 2015; May 2016 (re consent) | Nov. 2012; May 2016 (re consent) | 2017: HB 1160/SB 5418 (re consent) |
| 41 | Court Proceedings | 13.34.100 | Background information regarding a court appointed guardian ad litem. | 1993 | Oct. 2008 | May-10 | SB 5049 (2011); HB 1297 (2013); SB 5170 (2013) HB 1298 (2013), HB 1980 (2015); SB 6020 (2015) |
| 42 | Public Utilities & Transportation | 42.56.330(7) | Personally identifying information of persons who use transponders and other technology to facilitate payment of tolls | 2005 | Mar. 2009 | May 2009 | |
| 43 | Public Utilities & Transportation | 42.56.330(8) | Personally identifying information on an ID card that contains a chip to facilitate border crossing. | 2008 | Mar. 2009 | May 2009 | |
| 44 | Public Utilities & Transportation | 42.56.330(2) | Residential addresses and phone numbers in public utility records | 1987; 2014 c 33 s 1 | Mar. 2009; Nov. 2013 | Oct. 2009; Nov. 2013 | HB 2114 (2014); SB 6007 (Ch. 33, 2014 Laws) |
| 45 | Public Utilities & Transportation | 42.56.330(6) | Information obtained by governmental agencies and collected by the use of a motor carrier intelligent transportation system or comparable information equipment | 1999 | Mar. 2009 | May 2009 | |
| 46 | Public Utilities & Transportation | 42.56.335 | Records of any person belonging to a public utility district or municipality owned electrical utility | 2007 | Mar. 2009 | May 2009 | |
| 47 | Public Utilities & Transportation | 42.56.330(1) | Valuable commercial information, trade secrets, etc. supplied to the utilities and transportation commission | 1987 | Mar. 2009 | Mar. 2009 | |
| 48 | Public Utilities & Transportation | 80.04.095 | Utility records filed with utilities and transportation commission containing valuable commercial information | 1987 | Mar. 2009 | Oct. 2009 | |
| 49 | Insurance & Financial Inst. | 42.56.400(2) | Information obtained and exempted by the health care authority that is transferred to facilitate development, acquisition, or implementation of state purchased health care | 2003 | May 2009; May 2010 | May 2010 | |
| 50 | Insurance & Financial Inst. | 42.56.400(3) | Names of individuals in life insurance policy settlements | 1995 | May 2009; May 2010 | May 2010 | |
| 51 | Insurance & Financial Inst. | 48.102.030 | Insurance viatical settlement broker records which may be required and examined by the insurance commissioner [later repealed] | 1995 | May 2009; May 2010 | May 2010 | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 52 | Insurance & Financial Inst. | 42.56.400(4) | Insurance antifraud plans | 1995 | May 2009; May 2010 | May 2010 | |
| 53 | Insurance & Financial Inst. | 48.30A.060 | Insurance company antifraud plans submitted to the insurance commissioner | 1995 | May 2009; May 2010 | May 2010 | |
| 54 | Insurance & Financial Inst. | 42.56.400(5) | Insurers' reports on material acquisitions and disposition of assets, etc. filed with the insurance commission | 1995 | May 2009; May 2010 | May 2010 | |
| 55 | Insurance & Financial Inst. | 42.56.400(7) | Information provided to the insurance commissioner regarding service contract providers | 1997 | May 2009; May 2010 | May 2010 | |
| 56 | Insurance & Financial Inst. | 48.110.040(3) | Monthly financial reports made by service contract providers to the insurance commissioner | 2005 | May 2009; May 2010 | May 2010 | |
| 57 | Insurance & Financial Inst. | 42.56.400(8) | Information obtained by the insurance commissioner relating to market conduct examinations | 2001 | May 2009; May 2010 | May 2010 | |
| 58 | Insurance & Financial Inst. | 42.56.400(12) | Documents obtained by the insurance commissioner to perform market conduct examinations. Report is disclosable under RCW 48.37.060. | 2007 | May 2009; May 2010 | May 2010 | SB 5049 (2012); HB 1298 (2013); SB 5169 (2013) re RCW 48.37.060 |
| 59 | Insurance & Financial Inst. | 42.56.400(13) | Confidential and privileged documents obtained in market conduct examination | 2007 | May 2009; May 2010 | May 2010 | |
| 60 | Insurance & Financial Inst. | 42.56.400(14) | Information provided to the insurance commissioner by insurance company employees asserting market conduct violations | 2007 | May 2009; May 2010 | May 2010 | |
| 61 | Insurance & Financial Inst. | 48.37.080 | Documents related to insurance commissioner's market conduct examination | 2007 | May 2009; May 2010 | May 2010 | |
| 62 | Insurance & Financial Inst. | 42.56.400(9) | Proprietary information provided to the insurance commissioner regarding health carrier holding companies | 2001; 2015 c 122 ss 13 & 14 | May 2009; May 2010 | May 2010 | |
| 63 | Insurance & Financial Inst. | 42.56.400(10) | Data filed with the insurance commissioner that reveals identity of claimant, provider, or insurer | 2001 | May 2009; Aug. 2010 | | SB 5049 (2012); HB 1299 (2013); SB 5171 (2013) |
| 64 | Insurance & Financial Inst. | 42.56.400(11) | Documents obtained by insurance commissioner relating to insurance fraud | 2006 | May 2009; Aug. 2010 | Aug. 2010 | |
| 65 | Insurance & Financial Inst. | 48.135.060 | Documents obtained by insurance commissioner relating to insurance fraud | 2006 | May 2009; Aug. 2010 | Aug. 2010 | |
| 66 | Insurance & Financial Inst. | 42.56.400(15) | Documents obtained by insurance commissioner regarding misconduct by agent/broker | 2007 Eff. 1/1/09 | May 2009; Aug. 2010 | Aug. 2010 | |
| 67 | Insurance & Financial Inst. | 48.17.595(6) | Information obtained by insurance commissioner in investigation of misconduct by agent/broker | 2007 | May 2009; Aug. 2010 | Aug. 2010 | |
| 68 | Insurance & Financial Inst. | 42.56.403 | Documents that provide background for actuarial opinion filed with insurance commissioner | 2006 | May 2009; Aug. 2010 | Aug. 2010 | |
| 69 | Insurance & Financial Inst. | 48.02.120 | Formulas, statistics, assumptions, etc. used by insurance companies to create rates; such information that is submitted to the insurance commissioner | 1985 | May 2009; Aug. 2010 | Aug. 2010 | |
| 70 | Insurance & Financial Inst. | 48.05.385(2) | Statement of actuarial opinion is a public record. Documents that provide background for statement of actuarial opinion filed with insurance commissioner are exempt | 2006 | May 2009; Aug. 2010 | Aug. 2010 | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 71 | Insurance & Financial Inst. | 48.03.040(6)(a) | Examinations and investigations by state insurance commissioner | 1937 | May 2009; Aug 2010 | Aug. 2010 | |
| 72 | Insurance & Financial Inst. | 48.03.050 | Examinations and investigations by state insurance commissioner | 1937 | May 2009 | Oct. 2009 | SB 5049 (2011) |
| 73 | Insurance & Financial Inst. | 48.05.465 | Insurance companies risk based capital (RBC) reports and plans | 1995 | May 2009; Aug. 2010 | Aug. 2010 | |
| 74 | Insurance & Financial Inst. | 48.43.335(1) | Insurance companies risk based capital (RBC) reports and plans (should not be used to compare insurance companies and are therefore confidential) | 1998 | May 2009; Aug. 2010 | Aug. 2010 | |
| 75 | Insurance & Financial Inst. | 48.20.530 | Proof of nonresident pharmacy licensure used by insurance companies to provide drugs to residents | 1991 | May 2009; Aug. 2010 | Aug. 2010 | |
| 76 | Insurance & Financial Inst. | 48.21.330 | Proof of nonresident pharmacy licensure used by insurance companies to provide drugs to residents | 1991 | May 2009; Aug. 2010 | Aug. 2010 | |
| 77 | Insurance & Financial Inst. | 48.44.470 | Proof of nonresident pharmacy licensure used by insurance companies to provide drugs to residents | 1991 | May 2009; Aug. 2010 | Aug. 2010 | |
| 78 | Insurance & Financial Inst. | 48.46.540 | Proof of nonresident pharmacy licensure used by insurance companies to provide drugs to residents | 1991 | May 2009; Aug. 2010 | Aug. 2010 | |
| 79 | Insurance & Financial Inst. | 48.31B.015(2)(b) | Source of consideration (identity of the lender) for loan associated with acquiring an insurance company | 1993 | May 2009; Aug. 2010 | Aug. 2010 | |
| 80 | Insurance & Financial Inst. | 48.62.101(2) | Local government self-insurance liability reserve funds | 1991 | May 2009; Aug. 2010 | Aug. 2010 | |
| 81 | Placeholder | | | | | | |
| 82 | Insurance & Financial Inst. | 48.94.010(5) | Summary of reasoning for insurance commissioner's refusal to issue reinsurance intermediary license | 1993 | May 2009;  Aug. 2010 | Aug. 2010 | |
| 83 | Insurance & Financial Inst. | 48.130.070 | Records of the interstate insurance product regulation compact involving privacy of individuals and insurers' trade secrets | 2005 | May 2009; Aug. 2010 | Aug. 2010 | |
| 84 | Insurance & Financial Inst. | 70.148.060(1) | Examination and proprietary records of potential insurers obtained by the director of the Washington state pollution liability insurance agency when soliciting bids to provide reinsurance for owners of underground storage tanks | 1989; 2015 c224 s 5 | May 2009; Aug. 2010 | Aug. 2010-modify | SB 5049 (2011, 2012); HB1298 (2013); SB 5169 (2013); HB 1980 (2015); SB 6020 (2015) |
| 85 | Insurance & Financial Inst. | 70.149.090 | Business and proprietary information of insurers obtained by the director of the Washington state pollution liability insurance agency, to provide insurance to owners of heating oil tanks | 1995 | May 2009; Aug. 2010 | Aug. 2010 | |
| 86 | Insurance & Financial Inst. | 42.56.400(6) | Examination reports and information obtained by the department of financial institutions from banking institutions | 1997 | Oct. 2010 | Sept. 2011 | |
| 87 | Insurance & Financial Inst. | 21.20.855 | Reports and information from department of financial services examinations | 1988 | Oct. 2010 | Sept. 2011 | |
| 88 | Insurance & Financial Inst. | 30.04.075(1) | Information obtained by the director of financial institutions when examining banks and trust companies | 1977 | Oct. 2010 | Sept. 2011 | |
| 89 | Insurance & Financial Inst. | 30.04.230(4)(a) | Information obtained during investigations of out of state banks | 1983 | Oct. 2010 | Sept. 2011 | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 90 | Insurance & Financial Inst. | 31.12.565(1) | Examination reports and information obtained by the director of financial institutions while examining credit unions | 1984 | Oct. 2010 | Sept. 2011 | |
| 91 | Insurance & Financial Inst. | 32.04.220(1) | Information from examinations of mutual savings banks | 1977 | Oct. 2010 | Sept. 2011 | |
| 92 | Insurance & Financial Inst. | 33.04.110(1) | Information from examinations of savings and loan associations | 1977 | Oct. 2010 | Sept. 2011 | |
| 93 | Insurance & Financial Inst. | 32.32.228(3) | Findings disapproving conversion from mutual savings bank to capital stock savings bank | 1989 | Oct. 2010 | Sept. 2011 | |
| 94 | Insurance & Financial Inst. | 32.32.275 | Information applicants deem confidential relating to conversion of mutual savings bank to capital stock savings bank | 1981 | Oct. 2010 | Sept. 2011 | |
| 95 | Insurance & Financial Inst. | 7.88.020 | Financial institution compliance review documents | 1997 | Oct. 2010 | Sept. 2011 | |
| 96 | Insurance & Financial Inst. | 9A.82.170 | Information obtained from a financial institution's records pursuant to subpoena under the criminal profiteering act | 1984 | Oct. 2010 | Sept. 2011 | |
| 97 | Insurance & Financial Inst. | 21.30.855 | Reports and information from department of financial services examinations | 1988 | Oct. 2010 | Sept. 2011 | |
| 98 | Insurance & Financial Inst. | 30.04.410(3) | Findings related to disapprovals of bank acquisitions | 1989 | Oct. 2010 | Sept. 2011 | |
| 99 | Insurance & Financial Inst. | 33.24.360(1)(d) | Name of lender financing the acquisition of a savings and loan, if requested by the applicant | 1973 | Oct. 2010 | Sept. 2011 | |
| 100 | Insurance & Financial Inst. | 42.56.450 | Personal information on check cashers and sellers licensing applications and small loan endorsements | 1991; 1995 | Oct. 2010 | Sept. 2011 | |
| 101 | Insurance & Financial Inst. | 31.35.070 | Reports on examinations of agricultural lenders | 1990 | Oct. 2010 | Sept. 2011 | |
| 102 | Insurance & Financial Inst. | 31.45.030(3) | Addresses and phone numbers and trade secrets of applicants of a check casher or seller license | 1991 | Oct. 2010 | Sept. 2011 | |
| 103 | Insurance & Financial Inst. | 31.45.077(2) | Addresses, phone numbers and trade secrets of applicants for a small loan endorsement to a check cashers or sellers license | 1995 | Oct. 2010 | Sept. 2011 | |
| 104 | Insurance & Financial Inst. | 31.45.090 | Trade secrets supplied by licensed check cashers and sellers as part of the annual report to director of financial institutions | 2003 | Oct. 2010 | Sept. 2011 | |
| 105 | L&I-Injured workers | 51.16.070(2) | Information in employer's records obtained by labor & industries under industrial insurance | 1957 | Oct. 2010 | Aug.2011 | |
| 106 | L&I-Injured workers | 51.28.070 | Information and records of injured workers contained in industrial insurance claim files | 1957 | Oct. 2010 | Aug.2011 | |
| 107 | L&I-Injured workers | 51.36.110(1) | Information (including patients' confidential information) obtained in audits of health care providers under industrial insurance | 1994 | Oct. 2010 | Aug. 2011 | |
| 108 | Personal Information | 42.56.230(5) (formerly (3)) | Credit card numbers, debit card numbers, electronic check numbers, and other financial information, except when disclosure is required by other law | | Aug. 2010 | Aug.2010; November 2012 | SB 5049 (2011); HB 1298 (2013); SB 5169 (2013); HB 1980 (2015); HB 1980 (2015) |
| 109 | Personal Information | 42.56.230(4) | Certain taxpayer information if it would violate taxpayers right of privacy | 1973 | Feb., May, Aug. 2016 | May 2016 (re consent) | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 110 | Personal Information | 42.56.230(5) | Personal and financial information related to a small loan or any system of authorizing a small loan in section 6 of this act (RCW 31.45.---) | 2009 | May 2016 (re consent) | May 2016 (re consent) | |
| 111 | Personal Information | 42.56.230(6) | Personal information required to apply for a driver's license or identicard | 2008 | May 2016 (re consent) | May 2016 (re consent) | |
| 112 | L&I-Injured workers | 49.17.080(1) | Name of employee of company seeking industrial safety & health act | 1973 | Aug. 2011 | Aug. 2011 | |
| 113 | L&I-Injured workers | 49.17.200 | Trade secrets reported to labor & industries under Washington industrial safety & health act | 1973 | Aug. 2011 | Aug. 2011 | |
| 114 | L&I-Injured workers | 49.17.210 | Identification of employer or employee in labor & industries studies | 1973 | Aug. 2011 | Aug. 2011 | |
| 115 | L&I-Injured workers | 49.17.250(3) | Info obtained by labor & industries from employer-requested consultation re. industrial safety & health act | 1991 | Aug. 2011 | Aug. 2011 | |
| 116 | L&I-Injured workers | 49.17.260 | Labor & industries investigative reports on industrial catastrophes | 1973 | Aug. 2011 | Aug. 2011 | |
| 117 | L&I-Injured workers | 51.36.120 | Financial or valuable trade info from health care providers | 1989 | Aug. 2011 | Aug. 2011 | |
| 118 | L&I-Injured workers | 42.56.400(1) | Board of industrial insurance records pertaining to appeals of crime victims' compensation claims | | Aug. 2011 | Aug. 2011 | |
| 119 | Fish & Wildlife | 42.56.430 (1) | Commercial fishing catch data provided to the department of fish and wildlife that would result in unfair competitive disadvantage | | May 2017; Aug. 2017; Oct. 2017; Feb. 2018 | | |
| 120 | Fish & Wildlife | 42.56.430 (2) | Sensitive wildlife data obtained by the department of fish and wildlife | | May 2017; Aug. 2017; Oct. 2017; Feb. 2018 | | |
| 121 | Fish & Wildlife | 42.56.430 (3) | Personally identifying information of persons who acquire recreational or commercial licenses | | May 2017; Aug. 2017; Oct. 2017; Feb. 2018 | | |
| 122 | Fish & Wildlife | 42.56.430(4) | Information subject to confidentiality requirements of Magnuson-Stevens fishery conservation and management reauthorization act of 2006 | 2008 c 252 s 1 | May 2017; Aug. 2017; Oct. 2017; Feb. 2018 | | |
| 123 | Employment and Licensing | 42.56.250(1) | Test questions, scoring keys, and other exam information used on licenses, employment or academics | 1973 | May 2021; Aug. 2021; Oct. 2021 | | |
| 124 | Personal Information | 66.16.090 | Records of LCB showing individual purchases of liquor-confidential | 1933 | Jun. 2013 | Jun. 2013 | HB 2764 (2013); HB 2663 (Ch. 182, 2016 Laws) - Repealed |
| 125 | Investigative, law enforcement and crime victims | 42.56.240(9) | Personally identifying information collected by law enforcement agencies pursuant to local security alarm system programs and vacation crime watch programs | 2012 c 288 s 1 | | | |
| 126 | Investigative, law enforcement and crime victims | 42.56.240(11) | Identity of state employee or officer who files a complaint with an ethics board under RCW 42.52.420 or reports improper governmental action to the auditor or other official | 2013 c 190 s 7 | | | |
| 127 | Employment and Licensing | 42.56.250(7) | Criminal history record checks for investment board finalist candidates | 2010 | | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 128 | Employment and Licensing | 42.56.250(7) | Employee salary and benefit information collected from private employers for salary survey information for maritime employees | 1999 | | | |
| 129 | Employment and Licensing | 42.56.250(8) | Photographs, month/year of birth in personnel files of public employees; news media has access | 2010; 2020 | | | HB 2447 (2010); See also HB 2259 (criminal justice agency/employee info) and HB 1317 (Ch. 257, 2010 Laws) (amending .230); |
| 130 | Real estate Appraisals | 42.56.260 | Real estate appraisals for agency acquisition or sale until project or sale abandoned, but no longer than 3 years in all cases | 1973; 2015 c 150 s 1 | Aug. 2014; Oct. 2014 | Oct. 2014 | HB 1431 (Ch. 150, 2015 Laws); SB 5395 |
| 131 | Investigative, law enforcement and crime victims | 42.56.240(1) | Specific intelligence and investigative information completed by investigative, law enforcement, and penology agencies, and state agencies that discipline members of professions, if essential to law enforcement or a person's right to privacy* | 1973 | Jan. 2012; March 2012; May 2012; March 2013; June 2013; Feb. 2014; Oct. 2014; Oct. 2019 | Oct .2019 | Burglar alarm info - HB 2896 (2010); HB 1243 (Ch. 88, 2012 Laws); SB 5244 (2011); SB 5344 (2011).  Traffic stop info - SB 6186 (2009) |
| 132 | Investigative, law enforcement and crime victims | 42.56.240(2) | Identity of witnesses, victims of crime, or persons who file complaints, if they timely request nondisclosure and disclosure would endanger their life, personal safety, or property—does not apply to PDC complaints | | Jan. 2012; March 2012; March 2013; June 2013; Sept. 2013; May 2014; August 2014 | | HB 2764 (2013); see also HB 2610 (2010), SB 6428 (2010) (to amend .230)) |
| 133 | Investigative, law enforcement and crime victims | 42.56.240(3) | Records of investigative reports prepared by any law enforcement agency pertaining to sex offenses or sexually violent offenses which have been transferred to WASPC | | Jan. 2012; March 2012; June 2013 | | |
| 134 | Investigative, law enforcement and crime victims | 42.56.240(4) | Information in applications for concealed pistol licenses | 1988 | May 2011; March 2013 | May, 2011 | |
| 135 | Investigative, law enforcement and crime victims | 42.56.240(5) | Identifying information regarding child victims of sexual assault | 1992 | May 2011; Feb. 2015; May 2015; Aug. 2015; Aug. 2018; Oct. 2018; Feb. 2019; May 2019; Aug. 2019; Oct. 2019 | Sept. 2011; August 2015 | SB 5049 (2012); HB 1299 (2013); SB 5171 (2013); HB 1980 (2015); SB 6020 (2015) |
| 136 | Investigative, law enforcement and crime victims | 42.56.240(6) | Statewide gang database in RCW 43.43.762 | 2008 | May, 2011 | Sept. 2011; November 2012 | SB 5049 (2012); HB 1299 (2013); SB 5171 (2013); HB 1980 (2015); SB 6020 (2015) |
| 137 | Investigative, law enforcement and crime victims | 42.56.240(7) | Data from electronic sales tracking system (pseudoephedrine) | 2010 | May, 2011 | May, 2011 | |
| 138 | Investigative, law enforcement and crime victims | 42.56.240(8) | Person's identifying info submitted to sex offender notification and registration system to receive notice regarding registered sex offenders | 2010 | May, 2011 | May, 2011 | |
| 139 | Personal Information/proprietary and tax information | 82.36.450(3) | Information filed with department of licensing or open to department of licensing inspection under agreement is personal information under RCW 42.56.230(3) (b) and exempt from public inspection and copying | 2007 | Sept. 2011 | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 140 | Personal Information/proprietary and tax information | 82.38.310(3) | Information filed with department of licensing or open to department of licensing inspection under agreement is personal information under RCW 42.56.230(3) (b) and exempt from public inspection and copying | 2007 | Sept. 2011 | | |
| 141 | Lists of Individuals | 42.56.070(9) | Lists of individuals for commercial purposes. | 1973 | Feb. 2017; May 2017 | | |
| 142 | Juries | 2.36.072(4) | Information provided to court for preliminary determination of statutory qualification for jury duty | 1993 | | | |
| 143 | Personal Information | 42.56.230 (7)(a) | Personal information required to apply for a driver's license or identicard | 2008 c 200 s 5 | Nov. 2013; Dec. 2013; May 2016 (re consent) | Feb. 2014; May 2016 (re consent) | 2017: HB 1160/SB 5418 |
| 144 | Personal Information | 42.56.230 (7)(b) | Persons who decline to register for selective service under RCW 46.20.111 | 2011 c 350 s 2 | May 2016 (re consent) | May 2016 (re consent) | 2017: HB 1160/SB 5418 |
| 145 | Financial, Commercial, and Proprietary Information | 42.56.270(1) | Valuable formulae, designs, drawings and research obtained by agency within 5 years of request for disclosure if disclosure would produce private gain and public loss | 1973 (I-276) | *May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | *Oct. 2016 - 42.56.270 & trade secrets/proprietary info | 2017: HB 1160/SB 5418 |
| 146 | Financial, Commercial, and Proprietary Information | 42.56.270(2) | Financial information supplied by a bidder on ferry work or highway construction | 1983 | *May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | *Oct. 2016 - 42.56.270 & trade secrets/proprietary info | 2017: HB 1160/SB 5418 |
| 147 | Financial, Commercial, and Proprietary Information | 42.56.270(3) | Financial information and records filed by persons pertaining to export services | 1986 | *May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | *Oct. 2016 - 42.56.270 & trade secrets/proprietary info | 2017: HB 1160/SB 5418 |
| 148 | Financial, Commercial, and Proprietary Information | 42.56.270(4) | Financial information in economic development loan applications | 1987 | *May 2016; Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | *Oct. 2016 - 42.56.270 & trade secrets/proprietary info | 2017: HB 1160/SB 5418 |
| 149 | Financial, Commercial, and Proprietary Information | 42.56.270(5) | Financial information obtained from business and industrial development corporations | 1989 | *May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | *Oct. 2016 - 42.56.270 & trade secrets/proprietary info | 2017: HB 1160/SB 5418 |
| 150 | Financial, Commercial, and Proprietary Information | 42.56.270(6) | Financial information on investment of retirement moneys and public trust investments | 1989 | May 2015; Aug. 2015; *May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | Aug. 2015; see also *Oct. 2016 - 42.56.270 & trade secrets/proprietary info | SB 6170 (Chap. 8, 2016 Laws 1st Sp. Sess.); 2017: HB 1160/SB 5418 |
| 151 | Financial, Commercial, and Proprietary Information | 42.56.270(7) | Financial and trade information supplied by and under industrial insurance coverage | 1989 | *May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | *Oct. 2016 - 42.56.270 & trade secrets/proprietary info | 2017: HB 1160/SB 5418 |
| 152 | Financial, Commercial, and Proprietary Information | 42.56.270(8) | Financial information obtained by the clean Washington center for services related to marketing recycled products | 1994 | May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | *Oct. 2016 - 42.56.270 & trade secrets/proprietary info | 2017: HB 1160/SB 5418 |
| 153 | Financial, Commercial, and Proprietary Information | 42.56.270(9) | Financial and commercial information requested by public stadium authority from leaser | 1997 | *May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | *Oct. 2016 - 42.56.270 & trade secrets/proprietary info | 2017: HB 1160/SB 5418 |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 154 | Financial, Commercial, and Proprietary Information | 42.56.270(10) | Financial information supplied for application for a liquor, gambling, lottery retail or various marijuana licenses | 2014 c 192 s 6 | *May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | *Oct. 2016 - 42.56.270 & trade secrets/proprietary info | 2017: HB 1160/SB 5418 |
| 155 | Financial, Commercial, and Proprietary Information | 42.56.270(11) | Proprietary data, trade secrets, or other information submitted by any vendor to department of social and health services for purposes of state purchased health care | | *May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | *Oct. 2016 - 42.56.270 & trade secrets/proprietary info | 2017: HB 1160/SB 5418 |
| 156 | Financial, Commercial, and Proprietary Information | 42.56.270(12)(a)(i) | Financial or proprietary information supplied to DCTED in furtherance of the state's economic and community development efforts | 1993, 1989 | *May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | *Oct. 2016 - 42.56.270 & trade secrets/proprietary info | 2017: HB 1160/SB 5418 |
| 157 | Financial, Commercial, and Proprietary Information | 42.56.270(12)(a)(ii) | Financial or proprietary information provided to the DCTED regarding businesses proposing to locate in the state | 1999 | *May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | *Oct. 2016 - 42.56.270 & trade secrets/proprietary info | 2017: HB 1160/SB 5418 |
| 158 | Financial, Commercial, and Proprietary Information | 42.56.270(14) | Financial, commercial, operations, and technical and research information obtained by the life sciences discovery fund authority | 2005 (c424s6)7/25/2006 | May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | *Oct. 2016 - 42.56.270 & trade secrets/proprietary info | 2017: HB 1160/SB 5418 |
| 159 | Financial, Commercial, and Proprietary Information | 42.56.270(20) | Financial and commercial information submitted to or obtained by the University of Washington relating to investments in private funds | 2009 c 384 s 3 | *May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | *Oct. 2016 - 42.56.270 & trade secrets/proprietary info | 2017: HB 1160/SB 5418 |
| 160 | Financial, Commercial, and Proprietary Information | 42.56.270(21) | Market share data submitted by a manufacturer under RCW 70.95N.190(4) | 2013 c 305 s 14 | *May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | *Oct. 2016 - 42.56.270 & trade secrets/proprietary info | 2017: HB 1160/SB 5418 |
| 161 | Preliminary records containing opinions or policy formulations | 42.56.280 | Preliminary drafts, notes, recommendations, and intra-agency memos where opinions are expressed or policies formulated or recommended, unless cited by an agency | 1973 (I-276) | May 2021; Oct. 2021 | | |
| 162 | Archaeological sites | 42.56.300(3) | Information identifying the location of archaeological sites | 1976; 2014 c 165 s 1 | | | |
| 163 | Library records | 42.56.310 | Library records disclosing the identity of a library user | 1982 | | | |
| 164 | Educational Information | 42.56.320(1) | Financial disclosures filed by private vocational schools | 1986 | | | |
| 165 | Educational Information | 42.56.320(2) | Financial and commercial information relating to the purchase or sale of tuition units | | | | |
| 166 | Educational Information | 42.56.320(3) | Individually identifiable information received by the WFTECB for research or evaluation purposes | | | | |
| 167 | Educational Information | 42.56.320(4) | Information on gifts, grants, or bequests to institutions of higher education (1975) | 1975 | May 2021; Oct. 2021 | | |
| 168 | Educational Information | 42.56.320(5) | The annual declaration of intent filed by parents for a child to receive home-based instruction | 2009 c 191 s 1 | | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 169 | Timeshare, condominium owner lists | 42.56.340 | Membership lists and lists of owners of interests in timeshare projects, condominiums, land developments, or common-interest communities, regulated by the department of licensing | 1987 | Feb. 2017; May 2017; Aug.2017 | Aug. 2017 | 2019: HB 1537 (repealed exemption) (Ch. 229, 2019 laws) |
| 170 | Health Professionals | 42.56.350(1) | SSNs of health care professionals maintained in files of the department of health | 1993 | | | |
| 171 | Health Professionals | 42.56.350(2) | Residential address and telephone numbers of health care providers maintained in files of the department of health | 1993 | | | |
| 172 | Investigative, law enforcement and crime victims | 42.56.230(7)(c) | Records pertaining to license plates, drivers' licenses or identicards that may reveal undercover work, confidential public health work, public assistance fraud, or child support investigations | 2013 c 336 s 3 | | | |
| 173 | Employment and Licensing | 42.56.240(13) | Criminal justice agency employee/worker residence GPS data | 2015 c 91 s 1 | | | |
| 174 | Health Care | 42.56.360(1)(c) | Information and documents created, collected, and maintained by the health care services quality improvement program and medical malpractice prevention program | 1995 | | | |
| 175 | Health Care | 42.56.360(1)(d) | Proprietary financial and commercial information provided to department of health relating to an antitrust exemption | 1997 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 176 | Health Care | 42.56.360 (1) (e) | Physicians in the impaired physicians program | 1987, 1994, 2001 | | | |
| 177 | Health Care | RCW 70.05.170(3) - see also 42.56.360(3) | Information relating to infant mortality pursuant to former RCW 70.05.170/RCW 42.56.360 - See 184 and 185 | 1992; Amended 2010 c 128 s 3 | 2008 (2008 law) | March 2008 (2008 law) | |
| 178 | Financial, Commercial, and Proprietary Information | 42.56.270(23) | Notice of crude oil transfers | 2015 c 274 s 24 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 179 | Health Care | 42.56.360(1)(f) | Complaints filed under the health care professions uniform disciplinary act | 1997 | | | |
| 180 | Financial, Commercial, and Proprietary Information | 42.56.270(24) | Certain information supplied to the liquor and cannabis board per RCW 69.50.325, 9.50.331, 69.50.342 and 69.50.345 | 2015 c 178 s 2 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 181 | Health Care | 42.56.360(1)(i) | Information collected by the department of health under chapter 70.245 RCW. | 2009 c 1 s 1 | | | |
| 182 | Health Care | 42.56.360(1)(k) | Claims data and information provided to the statewide all-payer health care claims database that is exempt under RCW 43.373.040 | 2014 c 223 s 17 | | | |
| 183 | Health Care | 42.56.360(2) and 70.02 | Health care information disclosed to health care provider without patients permission | 1991 | | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 184 | Financial, Commercial, and Proprietary Information | 42.56.270(24) | Certain information and data submitted to or obtained by the liquor and cannabis board re applications for licenses or reports required under RCW 69.50.372 | 2016 1st sp.s. c 9 s 3 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 185 | Health Care; Marijuana | 42.56.625 | Records in medical marijuana authorization database l RCW 69.51A.230 | 2015 c 70 s 22 | | | |
| 186 | Domestic Violence | 42.56.370 | Client records of community sexual assault program or services for underserved populations [amended 2012] | 1991; 2012 c 29 s 13 | *Check* | *Check* | |
| 187 | Agriculture and Livestock | 42.56.380(10) | Results of animal testing from samples submitted by the animal owner | 2012 c 168 s 1(10) | Aug. 2017; Oct. 2017; May 2018; Aug. 2018 | Aug. 2018 | |
| 188 | Agriculture and Livestock | 42.56.380(11) | Records of international livestock importation that are not disclosable by the U.S.D.A. under federal law. | 2012 c 168 s 1(11) | Aug. 2017; Oct. 2017; May 2018; Aug. 2018 | Aug. 2018 | |
| 189 | Agriculture and Livestock | 42.56.380(12) | Records related to entry of prohibited agricultural products imported into Washington that are not disclosable by the U.S.D.A. under federal law | 2012 c 168 s 1(12) | Aug. 2017; Oct. 2017; May 2018; Aug. 2018 | Aug. 2018 | |
| 190 | Emergency or Transitional Housing | 42.56.390 | Names of individuals residing in emergency or transitional housing furnished to the department of revenue or a county assessor | 1997 | | | |
| 191 | Insurance & Financial Inst. | 42.56.400(16) | Documents, materials, or information obtained by the insurance commissioner under RCW 48.102.-051 (1) and 48.102.-140 (3) and (7)(a)(ii)) | 2009 c 104 s 37 | | | |
| 192 | Insurance & Financial Inst. | 42.52.400(17) | Documents, materials, or information obtained by the insurance commissioner under RCW 48.31.025 and 48.99.025 | 2010 c 97 s 3 | | | |
| 193 | Insurance & Financial Inst. | 42.56.400(18) | Documents, material, or information relating to investment policies obtained by the insurance commissioner under RCW 48.13.151 | 2011 c 188 s 21 | | | |
| 194 | Insurance & Financial Inst. | 42.56.400(19) | Data from (temporary) study on small group health plan market | 2010 c 172 s 2 | | | |
| 195 | Insurance & Financial Inst. | 42.56.400(20); 48.19.040(5)(b) | Information in a filing of usage-based component of the rate pursuant to RCW 48.19.040(5)(b) | 2012 c 222 s 1 | | | |
| 196 | Insurance & Financial Inst. | 42.56.400(21); 42.56.400(22); 42.56.400(23); 42.56.400(24); 42.56.400(25) | Data, information, and documents submitted to or obtained by the insurance commissioner | 2012 2nd sp. s. c 3 s 8; 2013 c 65 s 5; 2013 c 277 s 5; 205 c 17 ss 10 & 11 | | | |
| 197 | Employment Security | 42.56.410 | Most records and information supplied to the employment security department | | | | |
| 198 | Security | 42.56.420(1) | Records relating to criminal terrorist acts | | | | |
| 199 | Security | 42.56.420(2) | Records containing specific and unique vulnerability assessments and emergency and escape response plans – adds civil commitment facilities | 2009 c 67 s 1 | | | |
| 200 | Security | 42.56.420(3) | Comprehensive safe school plans that identify specific vulnerabilities | | | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 201 | Security | 42.56.420(4) | Information regarding infrastructure and security of computer and telecommunications networks to the extent that they identify specific system vulnerabilities | 1999 | Feb. 2014 | Feb. 2014 | |
| 202 | Security | 42.56.420(5) | Security sections of transportation security plans for fixed guideway systems | | | | |
| 203 | Personal Information | 42.56.230(8) | Information regarding individual claim resolution settlement agreements submitted to the board of industrial insurance appeals | 2014 c 142 s 1 | | | |
| 204 | Veterans' discharge papers | 42.56.440 | Veterans' discharge papers | | | | |
| 205 | Fireworks, Explosives | 42.56.460 | Records and reports produced under state fireworks law, chapter 70.77 RCW and the Washington state explosives act, chapter 70.74 RCW | 1995 | | | |
| 206 | Correctional industries workers | 42.56.470 | Records pertaining to correctional industries class I work programs | 2004 | | | |
| 207 | Inactive programs | 42.56.480(1) | Contracts files by railroad companies with the utilities & transportation commission prior to 7/28/91 | 1984 | Jun. 2013 | Jun. 2013 | HB 2764 (2013); HB 2663 (Chap. 282, 2016 Laws) (repealed) |
| 208 | Inactive programs | 42.56.480(2) | Personal information in international contact data base | 1996 c 253 s 502 | Jun. 2013 | Jun. 2013 | HB 2663 (Chap. 282, 2016 Laws) (repealed) |
| 209 | Inactive programs | 42.56.480(3) | Data collected by department of social and health services pertaining to payment systems for licensed boarding homes | 2003 | Jun. 2013 | Jun. 2013 | HB 2764 (2013); HB 2663 (Chap. 282, 2016 Laws) (repealed) |
| 210 | Enumeration Data | 42.56.615 | Enumeration data used by office of financial management for population estimates per RCW 43.43.435 | 2014 c 14 s 1 | | | |
| 211 | Financial, Commercial, and Proprietary Information; Marijuana | 42.56.620 | Reports submitted by marijuana research licensees that contain proprietary information | 2015 c. 71 s 4 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 212 | Mediation Communication | 42.56.600 | Records of mediation communications that are privileged under the uniform mediation act | 2005 c 424 s 16 | | | |
| 213 | Code Reviser | 1.08.027 | Code Reviser drafting services | 1951 | Feb. 2015 | Feb. 2015 | |
| 214 | Judicial - Investigative | 2.64.111 | Judicial conduct commission investigations and initial proceedings | 1989 | | | |
| 215 | Health Care Professions | 4.24.250 | Hospital review committee records on professional staff | 1971 | Sept. 2020; Oct. 2020 | | |
| 216 | Financial, Commercial, and Proprietary Information | 4.24.601 | Trade secrets and confidential research, development or commercial information | 1994 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 217 | Financial, Commercial, and Proprietary Information | 4.24.611 | Trade secrets, confidential research, development or commercial information concerning products or business methods | 1994 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 218 | Claims | 4.92.210 | Information in centralized risk management claim tracking system | 1989 | | | |
| 219 | Privileges | 5.60.060 | General statements of privileged communications between persons & various professionals, e.g., attorneys or physicians – presumably applies to records (see also # 276) | 1954 & later dates | | | |
| 220 | Mediation Communication | 5.60.070 | Materials used in any court ordered mediation | 1991 | Feb. 2017; May 2017; | | |
| 221 | Mediation Communication | 7.07.050(5) | Mediation communications | 2005 | Feb. 2017; May 2017 | | |
| 222 | Mediation Communication | 7.07.070 | Mediation communications | 2005 | Feb. 2017; May 2017 | | |
| 223 | Health Care Records | 7.68.080(9)(a) | The director may examine records of health care provider notwithstanding any statute that makes the records privileged or confidential | 2011 c 346 s 501 | | | |
| 224 | Financial, Commercial, and Proprietary Information | 7.68.080(10) | At the request of health care contractor, department must keep financial and trade information confidential | 2011 c 346 s 501 | See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 225 | Crime Victims and Witnesses | 7.68.140 | Records re. Victims of crimes confidential & not open to inspection | 1973 | May 2021 | | |
| 226 | Crime Victims and Witnesses | 7.69.A.030(4) | Name, address, or photograph of child victim or child witness | 1985 | Feb. 2015; May 2015; Aug. 2015; Aug. 2018; Oct. 2018; Feb. 2019; May 2019; Aug. 2019; Oct. 2019 | Oct. 2019 | HB 2485 (2019) |
| 227 | Mediation Communication | 7.75.050 | County or city dispute resolution center records | 1984 | | | |
| 228 | Financial, Commercial, and Proprietary Information | 7.88.020 & .30 | Financial institution compliance review documents | 1997 | | | |
| 229 | Health Care | 9.02.100 | General statement of fundamental right to reproductive privacy – could apply to records | 1991 | | | |
| 230 | Health Care - Concealed Pistols | 9.41.097(2) | Mental health info provided on persons buying pistols or applying for concealed pistol licenses | 1994 | | | |
| 231 | Concealed Pistols | 9.41.129 | Concealed pistol license applications | 1994 | | | |
| 232 | Crime Victims and Witnesses | 9.73.230 | Name of confidential informants in written report on wire tapping | 1989 | | | |
| 233 | Crime Victims and Witnesses | 72.09.710 (recod eff 8/1/09) (See also # 451) | Names of witnesses notified when drug offenders released (formerly 9.94A.610) | 1991 - Recod 2008 c 231 s 26, 56 (See dispositions table) | | | |
| 234 | Placeholder | | | | | | |
| 235 | Crime Victims and Witnesses | 72.09.712 (recod eff 8/1/09) (See also # 451) | Names of victims, next of kin, or witnesses who are notified when prisoner escapes, on parole, or released (formerly 9.94A.610) | 1985 - Recod 2008 c 231 s 27, 56 (see dispositions table) | | | |
| 236 | Privileges | 5.60.060 | Alcohol or drug addiction sponsor privilege | 2016 st sp. ss. c 24 s 1 | | | |
| 237 | Offender Information | 9.94A.745 | Records of the interstate commission for adult offender supervision that would adversely affect personal privacy rights or proprietary interests | 2002 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 238 | Crime Victims and Witnesses | 9.94A.885 | Information regarding victims, survivors of victims, or witnesses that are sent clemency hearing notices may not be released to offender | 1999 | | | |
| 239 | Offender Information | 9A.44.138 | Sex offender registration information given to high school or institution of higher education regarding an employee or student is confidential | 2011 c 337 s 4 | | | |
| 240 | Criminal Proceedings - Investigative | 10.27.090 | Grand jury testimony | 1971 | Sept. 2020; Oct. 2020 | | |
| 241 | Criminal Proceedings - Investigative | 10.27.160 | Grand jury reports | 1971 | Sept. 2020; Oct. 2020; Feb. 2021; May 2021; Aug. 2021; Oct. 2021 | | |
| 242 | Public Utilities & Transportation | 19.29A.100 | Electric utilities may not disclose private or proprietary customer information | 2015 3rd sp. S. c 21 s 1 | *Check on any prior Committee discussion re utilities* | | |
| 243 | Insurance & Financial Inst. | 48.31B.015(1)(b) | Filing by controlling person of insurer seeking to divest its controlling interest is confidential until conclusion of transaction | 2015 c 122 s 3 | | | |
| 244 | Investigative, law enforcement and crime victims | 42.56.240(14) | Body worn camera recordings | 2016 c 163 s 2 | | | |
| 245 | Investigative, law enforcement and crime victims | 42.56.240(14) | Records and info in the statewide sexual assault kit tracking system under RCW 43.43. | 2016 c. 173 s 8 | | | |
| 246 | Crime Victims and Witnesses | 10.52.100 | Identity of child victims of sexual assault | 1992 | Aug. 2018; Oct. 2018; Feb. 2019; May 2019; Aug. 2019; Oct. 2019 | | |
| 247 | Crime Victims and Witnesses | 10.77.205 | Information about victims, next of kin, or witnesses requesting notice of release of convicted sex or violent offenders | 1990 | | | |
| 248 | Offender Information | 10.77.210 | Records of persons committed for criminal insanity | 1973 | May 2021 | | |
| 249 | Crime Victims and Witnesses | 10.97 | Privacy of criminal records, including criminal history information on arrests, detention, indictment, information, or other formal criminal charges made after 12/31/77 unless dispositions are included | 1977 | | | |
| 250 | Crime Victims and Witnesses | 10.97.130 | Names of victims of sexual assaults who are 18 years of age or younger | 1992 | Aug. 2018; Oct. 2018; Feb. 2019; May 2019; Aug. 2019; Oct. 2019 | 2018 | HB 1505 (Ch.300, 2019 Laws); HB 2484 (2019) |
| 251 | Judicial - Indigent Defense | 10.101.020 | Information given by persons to determine eligibility for indigent defense | 1989 | | | |
| 252 | Crime Victims and Witnesses - Juvenile | 13.40.150 | Sources of confidential information in dispositional hearings on juvenile offenses | 1977 | Aug. 2018; Oct. 2018; Feb. 2019; May 2019; Aug. 2019 | | |
| 253 | Crime Victims and Witnesses - Juvenile | 13.40.215 and .217 | Information about victims, next of kin, or witnesses requesting notice of release of juvenile convicted of violent sex offense or stalking | 1990 | Aug. 2018; Oct. 2018; Feb. 2019; May 2019; Aug. 2019 | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 254 | Juvenile Records | 13.50.010(12) | Electronic research copy of juvenile records maintains same level of confidentiality and anonymity as juvenile records in judicial information system | 2009 c 440 s 1; 2014 c 117 s 5 | | | |
| 255 | Juvenile Records | 13.50.010(13) | Information in records released to the Washington state office of public defense retain confidential nature | 2009 c 440 s 1; 2014 c 117 s 5; 2016 c 72 s 109 | | | |
| 256 | Juvenile Records | 13.50.050(3) | Records on commission of juvenile crimes | 1979; Oct. 2019 | | Oct. 2019 | HB 2484 (2019) |
| 257 | Juvenile Records | 13.50.010(14)(b) | Records of juveniles who receive a pardon are confidential, including the existence or nonexistence of the record | 2011 c 338 s 4 | | | |
| 258 | Juvenile Records | 13.50.100(2) | Juvenile justice or care agency records not relating to commission of juvenile crimes | 1979 | Re 42.56.380(6) - Oct. 2007; May 2019; Aug. 2019; Oct. 2019 | Re. 42.56.380(6) - Jun. 2008 | |
| 259 | Agriculture and Livestock | 15.19.080 | Information on purchases, sales, or production of ginseng by individual growers or dealers (see also 42.56.380 (6)) | 1998 | See # 1 on Schedule of Review; Aug. 2017; Oct. 2017; May 2018; Aug. 2018 | See # 1 on Schedule of Review Aug. 2018 | See # 1 on Schedule of Review |
| 260 | Agriculture and Livestock | 16.65.030(1)(d) | Financial statement info in public livestock market license applications | 2003 | Aug. 2017; Oct. 2017; May 2018; Aug. 2018 | Aug. 2018 | |
| 261 | Health Care Professions | 18.130.095(1)(a) | Complaints filed under uniform disciplinary act for health professionals | 1997 | | | |
| 262 | Health Care Professions | 18.130.172(1) | Summary and stipulations in complaints against health care professionals | 1993 | | | |
| 263 | Health Care Professions | 18.130.175(4) | Voluntary substance abuse records on health care professionals | 1988 | | | |
| 264 | Health Care Professions | 18.130.057 ( c 157 s 1(2)(b) | Disciplining authority may not disclose information in a file that contains confidential or privileged information regarding a patient other than the person making the complaint or report | 2011 c 157 s 1 | | | |
| 265 | Counselors | 18.19.180 | Information counselors acquire and acknowledgement of practice disclosure statements | 1987 | | | |
| 266 | Boarding Homes | 18.20.120 | Identity of individual or name of boarding homes from boarding home licensing records | 1959 | Sept. 2020; Oct. 2020 | | |
| 267 | Health Care Professions | 18.20.390 | Information and documents created, collected and maintained by a quality assurance committee | 2004 | | | |
| 268 | Health Care Professions | 18.32.040 | Implication that information in dentistry registration records is only accessible by the registered person unless disclosure would compromise the examination process | 1937 | Sept. 2020; Oct. 2020; Oct. 2021 | | |
| 269 | Placeholder | | | | | | |
| 270 | Health Care Professions | 18.44.031(2) | Personal information in applications for escrow agent licenses | 1999 | | | |
| 271 | Health Care Professions | 18.46.090 | Information on maternity homes received by department of health identifying individuals or maternity homes | 1951 | Sept. 2020; Oct. 2020; Feb. 2021; May 2021; Aug. 2021 | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 272 | Health Care Professions | 18.53.200 | Information and records of optometrists | 1975 | May 2021; Aug. 2021; Oct. 2021 | | |
| 273 | Health Care Professions | 18.64.420 | Records obtained by department of health regarding various insurance companies | 1991 | | | |
| 274 | Health Care Professions | 18.71.0195 | Contents of physician disciplinary report | 1979 | | | |
| 275 | Health Care Professions | 18.71.340 | Entry records under impaired physician program | 1987 | | | |
| 276 | Privileges | 18.83.110 - also 5.60.060 (# 219) | Communications between client and psychologist—could apply to records | 1955 | Sept. 2020; Oct. 2020 | | |
| 277 | Other Professions - Plumbers | 18.106.320(2) | Info obtained from contractors on plumbing trainee hours | 2002 | | | |
| 278 | Health Care Professions | 18.130.095(1)(a) | Complaints filed under uniform disciplinary act for health professionals | 1997 | | | |
| 279 | Health Care Professions | 18.130.172(1) | Summary and stipulations in complaints against health care professionals | 1993 | | | |
| 280 | Health Care Professions | 18.130.095(1)(a) (Repealed 2019) | Complaint of unprofessional conduct against health profession licensee | 1997 | | | |
| 281 | Health Care Professions | 18.130.175(4) | Voluntary substance abuse records on health care professionals | 1988 | | | |
| 282 | Health Care Professions | 18.130.175(4) | Substance abuse treatment records of licensed health professionals | | | | |
| 283 | Elderly Adults - Referrals | 18.330.050(2)(f) | On referral disclosure statement, must include statement that agency will need client authorization to obtain or disclose confidential information | 2011 c 357 s 6 | | | |
| 284 | Other Professions - Business Licenses | 19.02.115 | Master license service program licensing information is confidential and privileged except as provided in this section | 2011 c 298 s 12 | | | |
| 285 | Financial, Commercial and Proprietary | 19.16.245 | Collection agency financial statements | 1973 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 286 | Other Professions - Electrical | 19.28.171 | Info obtained from electrical contractors on electrical trainee hours | 1996 | | | |
| 287 | Other Professions - Electrical | 19.28.171 | Information obtained from electrical contractor by department of licenses | 1996 | | | |
| 288 | Security - Electronic Keys | 19.34.240 | Private keys under the electronic authentication act | 1996 | | | |
| 289 | Security - Electronic Keys | 19.34.420 | Electronic authentication info | 1998 | | | |
| 290 | Financial, Commercial and Proprietary Information | 19.108 | Trade Secrets Act | 1981 | *May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | *Oct. 2016 - 42.56.270 & trade secrets/proprietary info | 2017: HB 1160/SB 5418 |
| 291 | Juvenile Records | 13.50.010(14) | Records released by the court to the state office of civil legal aid | 2015 c 262 s 1 | | | |
| 292 | Financial, Commercial and Proprietary - Mortgages | 19.146.370(4) | Chapter 42.56 RCW relating to supervisory information or information subject to subsection (1) of this section is superseded by this section | 2009 c 528 s 15 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 293 | Other Professions - Money Transfer Co's. | 19.230.190 | Money transfer licensing information | 2003 | | | |
| 294 | Financial, Commercial and Proprietary Information | 19.330.080(5) | Confidential technology information used in manufacturing products sold in state is subject to a protective order | 2011 c 98 s 8 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 295 | Investigative Records | 21.20.480 | Security act investigations | 1959 | Sept. 2020; Oct. 2020; Feb. 2021 | | |
| 296 | Financial, Commercial and Proprietary information - Investigations | 21.30.170 | Some information obtained by the department of financial institutions | 1986 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 297 | Placeholder | | | | | | |
| 298 | Financial, Commercial and Proprietary information - Nonprofits & Mutuals | 24.06.480 | Information in interrogatories of nonprofit miscellaneous and mutual corporations by secretary of state | 1969; Feb 2021 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info; Sept. 2020; Oct. 2020; Feb. 2021; May 2021 | | |
| 299 | Crime Victims and Witnesses | 26.04.175 | Marriage applications and records about participants in address confidentiality program | 1991 | | | |
| 300 | Mediation Communications | 26.09.015 | Divorce mediation proceedings—may apply to records of the proceedings | 1986 | | | |
| 301 | Judicial - Court Files | 26.12.080 | Superior court may order family court files closed to protect privacy | 1949 | Sept. 2020; Oct. 2020; Feb. 2021 | | |
| 302 | Child Support Records | 26.23.120(1) | Records concerning persons owing child support | 1987 | | | |
| 303 | Child Support Records | 26.23.150 | Social security numbers collected by licensing agencies not to be disclosed | 1998 | | | |
| 304 | Adoption Records | 26.33.330 & .340 & .345 | Adoption records (except by order of the court under showing of good cause); adoption contact preference form and parent medical history | 1984; 2013 c 321 s 1 | | | |
| 305 | Archaeological Records | 27.53.070 (42.56.300) | Communications on location of archaeological sites not public records | 1975 | May 2021; Oct. 2021 | | |
| 306 | Financial, Commercial and Proprietary Information | 28B.85.020(2) | Financial disclosures provided to HEC Board by private vocational schools | 1996 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 307 | Financial, Commercial and Proprietary Information | 28C.10.050(2)(a) | Financial disclosures by private vocational schools | 1986 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 308 | Voter and Election Information | 29A.08.710 | Original voter registration forms or their images | 1991 | Oct. 2017; Feb. 2018; May 2018; Aug. 2018; Oct. 2018 | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 309 | Voter and Election Information | 29A.08.720 | The department of licensing office at which any particular individual registers to vote | 1994 | Oct. 2017; Feb. 2018; May 2018; Aug. 2018; Oct. 2018 | | |
| 310 | Voter and Election Information | 29A.20.191; recod to 29A.56.670 | Minor party and independent candidate nominating petitions | 2004; 2013 c 11 s 93(4) | Oct. 2017; Feb. 2018; May 2018; Aug. 2018; Oct. 2018 | | |
| 311 | Voter and Election Information | 29A.32.100 | Argument or statement submitted to secretary of state for voters' pamphlet | 1999 | Oct. 2017; Feb. 2018; May 2018; Aug. 2018; Oct. 2018 | | |
| 312 | Financial, Commercial and Proprietary Information - Mortgages | 31.04.274(4) | Chapter 42.56 RCW relating to disclosure of supervisory information or any information described in subsection (1) of this section is superseded by this section | 2009 c 120 s 26 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 313 | Security | 35.21.228(4) | Rail fixed guideway system security and emergency preparedness plan | 1999 | | | |
| 314 | Security | 35A.21.300(4) | Rail fixed guideway system security and emergency preparedness plan | 1999 | | | |
| 315 | Security | 36.01.210(4) | Rail fixed guideway system security and emergency preparedness plan | 1999 | | | |
| 316 | Placeholder | | | | | | |
| 317 | Security | 36.57.120(4) | Rail fixed guideway system security and emergency preparedness plan | 1999 | | | |
| 318 | Security | 36.57A.170(4) | Rail fixed guideway system security and emergency preparedness plan | 1999 | | | |
| 319 | Financial, Commercial and Proprietary Information | 36.102.200 | Financial info on master tenant, concessioners, team affiliate, or sublease of a public stadium authority's facilities | 1997 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 320 | Financial, Commercial and Proprietary Information | 39.10.100 (2) recod. as 39.10.470 (2); 39.10.470(3) | Trade secrets & proprietary information from contractors under alternative public works; proposals from design-build finalists for alternative public works until selection is made or terminated | 1994 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 321 | Financial, Commercial and Proprietary Information - Bids | 39.26.030(2) | Competitive bids subject to chapter 42.56 RCW except exempt from disclosure until apparent successful bidder announced | 2012 c 224 s 4 | Aug. 2016; Oct. 2016 | Oct. 2016 | 2017: HB 1160/SB 5418 |
| 322 | Archive Records | 40.14.030 (2) | Records transferred to state archives | 2003 | May 2012; August 2012; June 2013 | Aug. 2012 | |
| 323 | Offender Records | 40.14.070 (2)(c ) | Sex offender records transferred to Washington association of sheriffs and police chiefs | 1999 | | | |
| 324 | Bill Drafting Records | 40.14.180 | Bill drafting records of the code reviser's office | 1971 | Feb. 2015 | Feb. 2015 | |
| 325 | Crime Victims and Witnesses | 40.24.070 | Names of persons in domestic violence or sexual assault programs; and records in address confidentiality program | 1999; 1991; 2015 c 190 s 2 | | | |
| 326 | Public Employment Information | 41.06.160 | Salary and fringe benefit info identifying private employer from department of personnel salary survey | 1981 | | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 327 | Public Employment Information | 41.06.167 | Salary and fringe benefit rate info collected from private employers | 1980 | | | |
| 328 | Collective Bargaining | 41.56.029(2) | Collective bargaining authorization cards of adult family home provider workers | 2007 | | | |
| 329 | Personal Information - Research | 42.48.020 & .040 | Personally identifiable public records used in scientific research | 1985 | | | |
| 330 | Health Care Records | 43.01.425 | Crisis referral services communications and information are confidential | 2009 c 19 s 2 | | | |
| 331 | Investigative Records | 43.06A.050 | Investigative records of office of family and children's ombudsman | 1996 | | | |
| 332 | Financial, Proprietary and Commercial Information | 43.07.100 | Info from businesses deemed confidential held by bureau of statistics in secretary of state | 1895 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 333 | Investigative Records - Whistleblower | 43.09.186(4) | Identity of person and documents in report to toll-free efficiency hotline - state auditor | 2007 | | | |
| 334 | Financial, Proprietary and Commercial Information | 42.56.270(22) | Certain financial information supplied to department of financial institutions or a portal to obtain an exemption from state securities registration | 2014 c 144 s 6 | | | |
| 335 | Juvenile Records | 13.50.010(15) | Child welfare records that may assist in meeting the educational needs of foster youth | 2016 c 71 s 2 | May 2019; Aug. 2019 | | |
| 336 | Placeholder | | | | | | |
| 337 | Personal Information - Printing Vendors | 43.19.736 | Print jobs contracted with private vendors must require vendor to enter into a confidentiality agreement if materials contain sensitive or personally identifiable information | 2011 c 43 1st sp. s. s 309 | | | |
| 338 | Claims | 43.41.350 Recod 43.19.781 | Risk management loss history information | 1989; 2011 1st sp. s. c 43 s 535 | | | |
| 339 | Financial, Proprietary and Commercial Information - Marijuana | 42.56.270(25) | Marijuana transport, vehicle and driver ID data and account numbers or unique access identifiers issued for traceability system access per RCW 69.50.325, 9.50.331, 69.50.342, 69.50.345 | 2016 c 178 s 2 | | | |
| 340 | Financial, Commercial and Proprietary Information | 43.21A.160 | Information on unique production processes given to the DOE | 1970 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info; Sept. 2020; Oct. 2020; Feb. 2021 | | |
| 341 | Financial, Commercial and Proprietary Information | 43.21F.060(1) | Proprietary information received by the state energy office | 1976 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 342 | Employer - Labor Statistics | 43.22.290 | Employer labor statistics reports provided to the department of labor & industries | 1901 | Sept. 2020; Oct. 2020 | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 343 | Financial, Commercial and Proprietary Information | 43.22.434 | Info obtained from contractors through an audit | 2002 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 344 | Deliberative Process - Records Provided to Governor | 43.41.100 | Confidential reports made to the governor by director of office of financial management | 1969 | Sept. 2020; Oct. 2020; Feb. 2021; May 2021 | | |
| 345 | Investigative Records | 43.43.710 | Washington state patrol information in records relating to the commission of any crime by any person | 1972 | May 2021; Aug. 2021 | | |
| 346 | Investigative Records | 43.43.762 – referenced in 42.56.240(6) | Information in criminal street gang database | 2008 c 276 s 201 | | | |
| 347 | Investigative Records | 43.43.856 | Washington state patrol organized crime Investigative information | 1973 | May 2021 | | |
| 348 | Financial, Commercial and Proprietary Information | 43.52.612 | Financial information provided to operating agencies in bid forms and experience provided by a contractor to a joint operating agency regarding bids on constructing a nuclear project | 1982 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 349 | Health Care | 43.70.050(2) | Health care related data identifying patients or providers obtained by state agencies | 1989 | | | |
| 350 | Health Care | 43.70.052 | American Indian health data | 1995; 2014 c 220 s 2 | | | |
| 351 | Health Care | 43.70.056(2)(e)(ii) | Hospital reports and information on health care-associated infections | 2007 | | | |
| 352 | Health Care | 42.56.360(4); 70.54 | Info and documents relating to maternal mortality reviews per RCW 70.54 | 2016 c 238 s 2 | | | |
| 353 | Health Care Professions - Whistleblower | 43.70.075 | Identity of whistleblower who makes a complaint to the department of health re: improper care | 1995 | | | |
| 354 | Health Care Professions | 43.70.510 | Information and documents created, collected and maintained by a quality assurance committee | 2005 | | | |
| 355 | Health Care Professions | 43.70.695(5) | Healthcare workforce surveys identifying individual providers | 2006 | | | |
| 356 | Investigative Records | 43.190.110 | Complaint and investigation records of long-term care ombudsman | 1983 | | | |
| 357 | Employment Records, Investigative Records | 43.101.400 | Criminal justice training commission records from initial background investigations | 2001; 2021 | | | |
| 358 | Investigative Records - Fatality Review | 43.235.040(1) | Domestic violence fatality review info | 2000 | | | |
| 359 | Financial, Commercial and Proprietary Information | 43.330.062 | Protocols may not require release of information that associate development organization client company has requested remain confidential | 2011 c 286 s 1 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 360 | Health Care | 43.370.050(2) | Individual identification in released health care data for studies and analysis | 2007 | | | |
| 361 | Motor Vehicle/Driver Records | 46.12.380(1) Recod 46.12.635 | Names and addresses of motor vehicle owners except for "business" & other purposes | 1984; 2016 c 80 s 2 | | | |
| 362 | Placeholder | | *Check codified citation* | 2010 c 161 s 1210 | | | |
| 363 | Motor Vehicle/Driver Records | 46.20.041 | Info on physically or mentally disabled person demonstrating ability to drive | 1965 | Sept. 2020; Oct. 2020; Feb. 2021 | | |
| 364 | Motor Vehicle/Driver Records | 46.20.118 | Photos on drivers' licenses & identicards | 1981 | | | |
| 365 | Motor Vehicle/Driver Records | 46.52.065 | Blood sample analyses done by state toxicology | 1971 | May 2021; Aug. 2021; Oct. 2021 | | |
| 366 | Motor Vehicle/Driver Records | 46.52.080 & .083 | Most info in police accident reports | 1937 | Feb. 2021 | | |
| 367 | Motor Vehicle/Driver Records | 46.52.120 | Individual motor vehicle driver records | 1937 | Feb. 2021; May 2021; Aug. 2021 | | |
| 368 | Motor Vehicle/Driver Records | 46.52.130 | Abstracts of motor vehicle driver records | | | | |
| 369 | Motor Vehicle/Driver Records | 46.70.042 | Application for vehicle dealer licenses, for 3 years | 1967 | Feb. 2021; May 2021; Aug. 2021; Oct. 2021 | | |
| 370 | Motor Vehicle/Driver Records | 46.35.030(1)(a) | Information obtained by a court order pursuant to discovery is not subject to public disclosure | 2009 c 485 s 3 | | | |
| 371 | Financial, Commercial and Proprietary Information | 47.28.075 | Info supplied to department of transportation to qualify contractors for highway construction | 1981 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 372 | Financial, Commercial and Proprietary Information | 47.60.760 | Financial info submitted to qualify to submit bid for ferry construction contracts | 1983 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info; and RCW39.26.030 (bid information) | | |
| 373 | Personal Information | 42.56.420(6) | Personally identifiable info of employees and other security info of a private cloud service provider that has entered into a criminal justice information services agreement | 2016 c 152 s 1 | | | |
| 374 | Insurance Information | 48.02.065(1) | Information provided in the course of an insurance commissioner examination | 2007 | | | |
| 375 | Insurance Information | 48.05.510(4) | Insurer's reports to insurance commissioner | 1995 | | | |
| 376 | Insurance Information | 48.13.151 | Information related to investment policies provided to the insurance commissioner is confidential and not a public record | 2011 c 188 s 16 (eff 7/1/12) | | | |
| 377 | Insurance Information | 48.31.405(1) | Commissioner info relating to supervision of any insurer | 2005 | | | |
| 378 | Insurance Information | 48.74. __(6) | Information obtained in the course of an actuarial examination/investigation | 2016 c 142 s 6 | | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 379 | Insurance Information | 48.32.110(2) | Request for examination into insurer's financial condition | 1971 | May 2021; Oct. 2021 | | |
| 380 | Insurance Information | 48.43.200(4) | Reports of material transactions by certified health plans | 1995 | | | |
| 381 | Insurance Information | 48.44.530(4) | Reports of material transactions by health care service contractors | 1995 | | | |
| 382 | Insurance Information | 48.46.540 | Current licensure of nonresident pharmacies through which an insurer provides coverage | 1991 | | | |
| 383 | Insurance Information | 48.46.600(4) | Reports of material transactions by health maintenance organizations | 1995 | | | |
| 384 | Insurance Information - Investigations | 48.102.140(5)(a) | Documents and evidence provided regarding life settlement act fraud investigations are confidential and not public records | 2009 c 104 s 17 | | | |
| 385 | Insurance Information | 48.104.050(1) | Holocaust insurance company registry records | 1999 | | | |
| 386 | Workers Compensation Records | 49.17.260 | Labor & industries investigative reports on industrial catastrophes | 1973 | May 2021; Aug. 2021; Oct. 2021 | | |
| 387 | Investigative Records | 49.60.240 | Option for human rights commission complaints not to be made public | 1993 | | | |
| 388 | Agriculture and Livestock | 49.70.119(6)(a) | Name of employee seeking records of agricultural pesticide applications | 1973 | Aug. 2017; Oct. 2017; May 2018; Aug. 2018 | Aug. 2018 | |
| 389 | Crime Victims and Witnesses | 49.76.040 | Employee's information regarding domestic violence is confidential | 2008 c 286 s 4 | | | |
| 390 | Crime Victims and Witnesses | 49.76.090 | Domestic violence leave information in files and records of employees is confidential and not open to public inspection | 2008 c 286 s 10 | | | |
| 391 | Employment Security Records | 50.13.060(8) | Welfare reform info in WorkFirst program | 2000 | | | |
| 392 | Financial, Commercial and Proprietary Information | 53.31.050 | Financial & commercial info & records supplied to port district export trading company | 1986 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 393 | Financial, Commercial and Proprietary Information | 63.29.380 | Info relating to unclaimed property that is furnished to the department of revenue | 1983 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 394 | Insurance Information | 48.43.730 | Provider compensation agreements are confidential | 2013 c 277 s 1 | | | |
| 395 | Financial, Commercial and Proprietary Information | 63.29.300(4) | Material obtained during an examination under RCW 63.29 is confidential and may not be disclosed except per RCW 63.29.380 | 2015 3rd sp s c 6 s 2107 | | | |
| 396 | Health Care; Investigative Records | 68.50.105 | Records of autopsies and post mortems | 1953; 2013 c 295 s 1 | | | |
| 397 | Health Care | 68.64.190 | Certain information released to tissue or organ procurement organization is confidential | 2008 c 139 s 21 | | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 398 | Financial, Commercial and Proprietary Information; Health Professions; Health Care | 69.41.044; 42.56.360(1)(a); 42.56.360(1)(b); 69.45.090 | Records and information supplied by drug manufacturers, and pharmaceutical manufacturer info obtained by the pharmacy quality assurance commission | 1987; 1989; 2013 c 19 s 47 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 399 | Health Care | 69.41.280 | Info on legend drugs obtained by the pharmacy quality assurance commission | 1989 | | | |
| 400 | Insurance Information | 48.74.--(1)(a) | Opinion and memo submitted to the insurance commissioner under RCW 48.74.025 | 2016 c 142 s 7 | | | |
| 401 | Health Care | 69.51.050 | Names of persons participating in controlled substances therapeutic research programs | 1979 | | | |
| 402 | Health Care | 70.02.020, .050, et. al. | Health care info disclosed to heath care provider w/o patients permission | 1991 | | | |
| 403 | Health Care | 70.24.022 | Info gathered by health care workers from interviews re. sexually transmitted diseases | 1988 | | | |
| 404 | Placeholder | | | | | | |
| 405 | Health Care | 70.24.034 | Records on hearings on dangerous sexual behavior of sexually transmitted disease carriers | 1988 | | | |
| 406 | Placeholder | | | | | | |
| 407 | Health Care | 70.28.020 | Tuberculosis records | 1899 | Feb. 2021 | | |
| 408 | Health Care | 70.41.150 | Department of health info on inspections of hospitals | 1955 | Feb. 2021; May 2021 | | |
| 409 | Health Care Professions | 70.41.200(3) | Info maintained by a health care services quality improvement committee | 1986 | | | |
| 410 | Health Care Professions | 70.41.220 | Hospital records restricting practitioner's privileges in possession of medical disciplinary board | 1986 | | | |
| 411 | Health Care | 70.42.210 | Identity of person from whom specimens of material were taken at a medical test site | 1989 | | | |
| 412 | Health Care | 70.47.150 | Records of medical treatment | 1990 | | | |
| 413 | Law Enforcement | 70.48.100 | Jail register records | 1977 | | | |
| 414 | Health Care | 70.54.250 | Cancer registry program | 1990 | | | |
| 415 | Health Care | 70.58.055(2) | Info on birth & manner of delivery kept in birth certificate records | 1991 | | | |
| 416 | Fireworks | 70.77.455 | Fireworks license records | 1995 | | | |
| 417 | Financial, Commercial and Proprietary Information | 70.94.205 | Info provided to DOE on processes or if may affect competitive position relating to air quality | 1967 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info; May 2021; Oct. 2021 | | |
| 418 | Financial, Commercial and Proprietary Information | 70.95.280 | Guidelines for proprietary info on solid waste management practices in possession of DOE [Since this addresses guidelines, not clear if it is an exemption.] | 1989 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 419 | Financial, Commercial and Proprietary Information | 70.95C.040(4) | Proprietary info re. waste reduction in possession of DOE | 1988 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 420 | Financial, Commercial and Proprietary Information | 70.95C.220(2) | Waste reduction plans | 1990 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 421 | Financial, Commercial and Proprietary Information | 70.95C.240(1) | Some info in executive summaries of waste reduction efforts | 1990 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 422 | Financial, Commercial and Proprietary Information | 70.95N.140(4) | Proprietary info in electronic product recycling reports | 2006 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 423 | Placeholder | | | | | | |
| 424 | Health Care | 70.104.055 | Reports on pesticide poisoning | 1989 | | | |
| 425 | Financial, Commercial and Proprietary Information | 70.105.170 | Manufacturing or business info re: Hazardous waste management in possession of DOE | 1983 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 426 | Financial, Commercial and Proprietary Information | 70.118.070 | Trade secret info re: On-site sewage disposal in possession of DOE | 1994 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 427 | Investigative Records - Whistleblower | 70.124.100 | Name of whistleblower in nursing home or state hospital | 1997 | | | |
| 428 | Crime Victims and Witnesses | 70.125.065 | By implication records of community sexual assault program or underserved populations provider | 1981; 2012 c 29 s 11 | | | |
| 429 | Placeholder | | | | | | |
| 430 | Health Care | 70.127.190 | Hospice records | 1988 | | | |
| 431 | Health Care | 70.129.050 | Personal and clinical records of long-term care residents | 1994 | | | |
| 432 | Financial, Commercial and Proprietary Information | 70.158.050 | Tobacco product manufacturers' information required to comply with chapter 70.58 RCW is confidential and shall not be disclosed | 2003 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 433 | Health Care | 70.168.070 | Limitations on disclosure of reports made by hospital trauma care on-site review teams | 1990 | | | |
| 434 | Health Care | 70.168.090 | Patient records and quality assurance records associated with trauma care facilities | 1990 | | | |
| 435 | Health Care | 70.170.090 | Charity care information in hospitals | 1989 | | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 436 | Health Care | 70.230.110 | Ambulatory surgical facilities data related to the quality of patient care | 2007 | | | |
| 437 | Health Care | 70.230.170 | Information received by department of health regarding ambulatory surgical facilities | 2007 | | | |
| 438 | Health Care | 71.05.425 | Persons receiving notice and the notice of release or transfer of a person committed following dismissal of offense | 2013 c 289 s 6 | | | |
| 439 | Health Care | 71.05.620 | Records on mental health treatment | 1989; 2013 c 200 s 34 | | | |
| 440 | Investigative Records; Attorney Client Privilege | 74.34.035(10); 74.34.067 | Investigation relating to vulnerable adult; attorney client privilege | 2013 c 263 s 2 | | | |
| 441 | Crime Victims and Witnesses | 71.09.140(2) | Names of victims, next of kin, or witnesses who are notified when sexually violent predator escapes, on parole, or released | 1995 | | | |
| 442 | Health Care | 71.24.035(5)(g) | Mental retardation records | 1982 | | | |
| 443 | Health Care | 71.34.340 | Records on mental treatment of minors | 1985 | | | |
| 444 | Health Care | 71.34.335 | Mental health court records are confidential | 1985 | | | |
| 445 | Health Care; Investigative Records | 74.66.030; 74.66.120 | Information furnished pursuant to the Medicaid fraud false claims act is exempt until final disposition and all seals are lifted; records and testimony provided under civil investigative demand | 2012 c 241 s 203, 212 | | | |
| 446 | Health Care | 71A.14.070 | Confidential info re. developmentally disabled persons | 1988 | May 2019 | | |
| 447 | Health Care | 72.05.130(1) | Reports regarding children with behavioral problems | 1951 | Feb. 2021; May 2021 | | |
| 448 | Offender Records | 72.09.116 | Info from correctional industries work program participant or applicant | 2004 | | | |
| 449 | Offender Records | 72.09.345(4) | Certain info on sex offenders held in custody | 1997; 2011 c 338 s 5 | | | |
| 450 | Personal Information | 70.39A.-- | Personally identifiable info used to develop quarterly expenditure reports for certain long term care services | 2016 1st sp s. c 30 s 3 | | | |
| 451 | Investigative, law enforcement and crime victims | [Former 9.94A.610(1)(b)] 72.09.710 (recod eff 8/1/09) (see also ## 233 and 235) | Names of witnesses notified when drug offenders released | 1991; Recod 2008 c 231 s 26 9 (see dispositions table) | | | |
| 452 | Placeholder | | | | | | |
| 453 | Investigative, law enforcement and crime victims | [Former 9.94A.612(1)] 72.09.712 (recod eff 8/1/09) | Names of victims, next of kin, or witnesses who are notified when prisoner escapes, on parole, or released | 1995; Recod 2008 c 231 s 27 | | | |
| 454 | Placeholder | | | | | | |
| 455 | Public Assistance | 74.04.060 & .062 | Limited access to information in department of social and health services registry concerning parents of dependent children | 1941 | Feb. 2021 | | |
| 456 | Public Assistance | 74.20.280 | Child support records | 1963 | Feb. 2021 | | |
| 457 | Public Assistance | 74.04.520 | Names of recipients of food stamps | 1969 | Feb. 2021 | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 458 | Health Care | 74.09.290(1) | Medical records of persons on public assistance | 1979 | | | |
| 459 | Juvenile Records | 74.13.075(5) | A juvenile's status as a sexually aggressive youth and related information are confidential and not subject to public disclosure by department of social and health services | 2009 c 250 s 2 | | | |
| 460 | Juvenile Records | 74.13.640 | Child fatality reports are subject to disclosure but confidential information may be redacted | 2011 c 61 s 2 | May 2019; Aug. 2019 | | |
| 461 | Juvenile Records | [Former 74.13.121] 74.13A.045 (recod) | Info from adoptive parents of kids receiving public assistance | 1971; 2009 c 520 s 95 | May 2019; Aug. 2019 | | |
| 462 | Placeholder | | | | | | |
| 463 | Juvenile Records | [Former 74.13.133] 74.13A.065 (recod) | Adoption support records | 1971; 2009 c 520 s 95 | May 2019; Aug. 2019 | | |
| 464 | Placeholder | | | | | | |
| 465 | Juvenile Records | 74.13.280(2) | Info on child in foster care & child's family | 1990 | May 2019; Aug. 2019 | | |
| 466 | Juvenile Records; Public Assistance | 74.13.500 - .525 | Disclosure of child welfare records | 1997 | May 2019; Aug. 2019; Oct. 2019; Feb. 2020 | | |
| 467 | Personal information - clients | 74.18.127(1) | Personal info maintained by the department of services for the blind | 2003 | | | |
| 468 | Juvenile Records; Public Assistance | 74.20A.360 & .370 | Certain records in division of child support | 1997 | May 2019; Aug. 2019 | | |
| 469 | Whistleblower; Investigative, law enforcement and crime victims | 74.34.040 | Identity of person making report on abuse of vulnerable adult | 1984 | | | |
| 470 | Investigative, law enforcement and crime victims | 74.34.090 | Identity of persons in records of abused vulnerable adults | 1984 | | | |
| 471 | Investigative, law enforcement and crime victims | 74.34.095(1) | Info concerning the abuse of vulnerable adults | 1999 | | | |
| 472 | Whistleblower | 74.34.180(1) | Name of whistleblower reporting abuse of vulnerable adults in various facilities | 1997 | | | |
| 473 | Investigative, law enforcement and crime victims | 74.34.300 | Files, etc. used or developed for vulnerable adult fatality reviews | 2008 c 146 s 10 | | | |
| 474 | Health Care | 74.42.080 | Records on nursing home residents | 1979 | | | |
| 475 | Health Professions | 74.42.640 | Information and documents created, collected and maintained by a quality assurance committee | 2005 | | | |
| 476 | Financial, Commercial and Proprietary Information | 78.44.085(5) | Surface mining info | 2006 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 477 | Financial, Commercial and Proprietary Information | 78.52.260 | Well logs on oil capable of being produced from a "wildcat" well | 1951 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info; Feb. 2021; May 2021 | | |
| 478 | Financial, Commercial and Proprietary Information | [Former 79.76.230] - recodified as 78.60.230 | Geothermal records filed w. department of natural resources | 1974 - Recodified 2003 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 479 | Investigative, law enforcement and crime victims | 79A.60.210 | Certain boating accident reports provided to the parks & recreation commission | 1984 | | | |
| 480 | Investigative, law enforcement and crime victims | 79A.60.220 | Boating accident reports/coroner | 1987 | | | |
| 481 | Security | 81.104.115(4) | Rail fixed guideway system security and emergency preparedness plan | 1999; 2016 c 33 s 8 | | | |
| 482 | Security | 81.112.180(4) | Rail fixed guideway system security and emergency preparedness plan | 1999 | | | |
| 483 | Financial, Commercial and Proprietary Information - Tax Info | 82.32.330(2) | Certain tax return and tax information | At least 1935 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info; Feb. 2021; Aug. 2021 | | |
| 484 | Financial, Commercial and Proprietary Information - Tax Info | 82.32.585 | Taxpayer info supplied for survey is not disclosable. Amt of tax deferral is not subject to 82.32.330 confidentiality provisions | 2010 c 114 s 102(4) | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 485 | Placeholder | | | | | | |
| 486 | Financial, Commercial and Proprietary Information - Tax Info | 82.38.310(4) | Info from tribes or tribal retailers received by the state under a special fuel taxes agreement | 2007 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 487 | Financial, Commercial and Proprietary Information - Tax Info | | Taxpayer info supplied for survey is not disclosable. Amt of tax deferral is not subject to 82.32.330 confidentiality provisions | 2008 c 15 s 2 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 488 | Financial, Commercial and Proprietary Information - Tax Info | 82.32.808 | Amounts less than $10,00 claimed in a tax preference; exceptions | 2012 snd sp s. c 13 s 1702 | | | |
| 489 | Financial, Commercial and Proprietary Information - Tax Info | 84.08.210 | Tax info obtained by department of revenue if highly offensive to a reasonable person and not a legitimate concern to public or would result in unfair competitive disadvantage | 1997 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 490 | Financial, Commercial and Proprietary Information - Tax Info | 84.36.389 | Income data for retired or disabled persons seeking property tax exemptions | 1974 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 491 | Financial, Commercial and Proprietary Information - Tax Info | 84.40.020 | Confidential income data in property tax listings | 1973 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 492 | Financial, Commercial and Proprietary Information | 84.40.340 | Utilities & transportation commission records containing commercial info a court determines confidential | 1961 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info; May 2021; Oct. 2021 | | |
| 493 | Agriculture and Livestock | 90.64.190 | Livestock producer info | 2005 | Aug. 2017; Oct. 2017; Feb. 2018; May 2018 | | |
| 494 | Financial, Commercial and Proprietary Information | 2007 c 522 § 149 (3) (uncodified) | Names and identification data from participants in survey to identify factors preventing the widespread availability and use of broadband technologies | 2007 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info | | |
| 495 | Health Care | 70.02.220 - .260 | Health care information | 2013 sp. S c 200 ss 6-10 | | | |
| 496 | Health Care | 42.56.360(1)(f) | Information relating to infant mortality pursuant to RCW 70.05.170 | 1992 | | | |
| 497 | Dairies, Animal Feeding Operations | 42.56.610 | Certain information obtained by state and local agencies from dairies, animal feeding operations not required to apply for a national pollutant discharge elimination system permit disclosable only in ranges that provide meaningful information to public | 2005 (c510s5) | Aug. 2017; Oct. 2017; Feb. 2018; May 2018 | | |
| 498 | Investigative, law enforcement and crime victims | 9.95.260 | Information regarding victims, survivors of victims, or witnesses that are sent pardon hearing notices may not be released to offender | 1999 | | | |
| 499 | Financial, Commercial and Proprietary Information - Trusts | 11.110.075 | Instrument creating a charitable trust, possibly only if the instrument creates a trust for both charitable and non-charitable purposes | 1971 | *See also May 2016, Aug. 2016 & Oct. 2016 - 42.56.270 & trade secrets/proprietary info; Feb. 2021; May 2021 | | |
| 500 | Juvenile Records | 13.04.155; 28A.320.163(5) | Information on juvenile conviction by adult criminal court given to school principal and received by school district staff | 1997; 2020 | | | |
| 501 | Juvenile Records | 13.24.011 | Records of the interstate compact for juveniles that would adversely affect personal privacy rights or proprietary interests | 2003 | | | |
| 502 | Boarding Homes | 13.40.150 | Sources of confidential information in dispositional hearings on juvenile offenses | 1977 | | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 503 | Placeholder | | | | | | |
| 504 | Employment Security | 50.13.015, .020, .040, .050, .100 & .110 | Most info supplied to employment security department | 1977 | | | |
| 505 | Financial, Commercial and Proprietary Information | 51.36.120 | Financial or valuable trade info from health care providers, if request | 1989 | | | |
| 506 | Health Care | 70.05.170 | Medical records re. Child morality review | 1992 | | | |
| 507 | Juvenile Records | 13.34.046 | information regarding a youth subject to RCW 13.34 is confidential except as required under lawful court order | 2013 c 182 s 5 | May 2019; Aug. 2019 | | |
| 508 | Placeholder | | | | | | |
| 509 | Investigative, law enforcement and crime victims | 79A.60.210 79A.60.220 | Certain boating accident reports provided to the parks & recreation commission | 1984 | | | |
| 510 | Investigative, law enforcement and crime victims | 42.56.240(10) | Felony firearm offense conviction database of felony firearm offenders established in RCW 43.43.822 | 2013 c 183 s 1 | | | |
| 511 | Investigative, law enforcement and crime victims | 42.56.240(12) | Security threat group information collected and maintained by department of corrections | 2013 c 315 s. 2 | | | |
| 512 | Legal proceedings; Privilege | 7.77.140; 7.77.150; 7.77.160; 7.77.170 | Confidentiality of collaborative law proceedings; privilege | 2013 c 119ss 15 - 18 | | | |
| 513 | Emergency Information | 38.32; 42.56.230(9); 38.52.575; 38.52.577 | Enhanced 911 Call information | 2015 c 224 s 2, 6 | Feb. 2014; Feb. 2015 | Feb. 2015 | SB 1980 (2015); Ch. 224, 2015 Laws |
| 514 | Investigative, law enforcement and crime victims | 42.56.240(16) | Campus sexual assault/domestic violence communications and records | 2017 c 72 s 3 | | | |
| 515 | Investigative, law enforcement and crime victims | 42.56.240(17) | Law enforcement information from firearms dealers | 2016 c 261 s 7 | | | |
| 516 | Employment and Licensing | 42.56.250(3) | Professional growth plans | 2017 c 16 s 1 | | | |
| 517 | Employment and Licensing | 42.56.250(10) | GPS data of public employees or volunteers using GPS system recording device | 2017 c 38 s 1 | | | |
| 518 | Financial, Commercial and Proprietary Information | 42.56.270(28) | Trade secrets etc. re licensed marijuana business, submitted to LCB | 2017 c 317 s 7 | | | |
| 519 | Public Utilities and Transportation | 42.56.330(9) | Personally identifying information in safety complaints submitted under ch. 81-61 RCW | 2017 c 333 s 7 | | | |
| 520 | Insurance & Financial Inst. | 42.56.400(26) | Non public personal health information obtained by, discussed to, or in custody of the insurance commissioner | 2017 c 193 s 2 | | | |
| 521 | Insurance & Financial Inst. | 42.56.400(27) | Data, information, documents obtained by insurance commissioner under RCW 48.02 | 2017 3rd sp. sess. c 30 s 2 | | | |
| 522 | Fish & Wildlife | 42.56.430(3); 77.12.885 | Damage prevention agreement, non lethal preventative/measures to minimize wolf interactions | 2017 c 246 s 1 | May 2017; Aug. 2017; Oct. 2017; May 2018; Aug. 2018; Feb. 2019; Aug. 2020; Feb. 2021; May 2021; Aug. 2021; Oct. 2021; Nov. 2021 | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 523 | Fish & Wildlife | 42.56.430(4); 77.12.885 | Reported depredation by wolves on pets or livestock | 2017 c 246 s 1 | May 2017; Aug. 2017; Oct. 2017; May 2018; Aug. 2018; Feb. 2019; Aug. 2020; Feb. 2021; May 2021; Aug. 2021; Oct. 2021; Nov. 2021 | | |
| 524 | Fish & Wildlife | 42.56.430(7) | Tribal fish & shellfish harvest information - department of fish & wildlife | 2017 c 71 s 1 | May 2017; Aug. 2017; Oct. 2017 | | |
| 525 | Fish & Wildlife | 42.56.430(8) | Commercial shellfish harvest information - department of fish & wildlife | 2017 c 71 s 1 | Aug. 2017; Oct. 2017 | | |
| 526 | Juvenile Records | 13.50.010(16) | Health/safety information from DYF to department of commerce re youth in foster care admitted to CRCs/HOPE centers | 2017 c 272 s 1 | May 2019; Aug. 2019 | | |
| 527 | Juvenile Records | 13.50.010(17) | DYF disclosures re child abuse/neglect, and for health care coordination | 2017 3rd sp. s. c 6 5312 | May 2019; Aug. 2019 | | |
| 528 | Personal Information | 40.26.020 | Biometric identifiers | 2017 c 306 s 2; 2017 2nd sp. s. c 1 s 1 | | | |
| 529 | Insurance Information | 48.02.230 | Information used to develop an individual health insurance market stability program | 2017 3rd sp. s. c 30 s 1 | | | |
| 530 | Health Care | 50A.04.195(4)&(5) | Family/medical leave | 2017 3rd sp. s. c 5 s 29 | | | |
| 531 | Health Care | 50A.04.080(2)(b) | Family/medical leave from employer records | 2017 3rd sp. s. c 5 s 33 | | | |
| 532 | Health Care | 50A.04.205 | Family/medical leave ombuds surveys | 2017 3rd sp. sess. c 5 s 88 | | | |
| 533 | Voter and Election Information - Personal Information | 42.56.230(10) | Personally Identifiable voter registration information for individuals under 18 | 2018 | | | |
| 534 | Religious Beliefs; Personal Information | 42.56.235 | Personal identifying information about an individual's religious beliefs | 2018 | Oct. 2018; Feb. 2019; May 2019; Aug. 2019 | Aug. 2019 | |
| 535 | Investigative, law enforcement, crime victims; Juvenile Records | 42.56.240(18) | Audio and video recordings of child interviews regarding child abuse or neglect | 2018 | | | |
| 536 | Voter and Election Information - Employment and Licensing; Personal Information | 42.56.250(11) | Personally Identifiable voter registration information for individuals under 18 | 2018 | | | |
| 537 | Financial, Commercial and Proprietary Information | 42.56.270(29) | Financial, commercial, operations, technical, and research information submitted to the Andy Hill cancer research endowment program pertaining to grants under chapter 43.348 RCW, that if revealed would result in private loss | 2018 | | | |
| 538 | Financial, Commercial and Proprietary Information; Health Care | 42.56.270(30) | Proprietary information filed with the department of health | 2018 | | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 539 | Agriculture and Livestock | 42.56.380(13) | Information obtained from the federal government if exempt from disclosure under federal law and personal financial information or proprietary data obtained by the department of agriculture | 2018 | | | |
| 540 | Agriculture and Livestock | 42.56.380(14) | Hop grower lot numbers and lab results | 2018 | | | |
| 541 | Insurance & Financial Inst. | 42.56.400(28) | An insurer's corporate governance annual disclosure and related information obtained by the insurance commissioner | 2018 | | | |
| 542 | Insurance & Financial Inst.; Health Care | 42.56.400(28) | Claims, health care, and financial information submitted by school districts to the office of the insurance commissioner and health care authority | 2018 | | | |
| 543 | Firearms | 9.41.350(6) | Records regarding a person's voluntary waiver of firearm rights | 2018 | | | |
| 544 | Agriculture and Livestock | 15.135.100(1) | Information obtained from the federal government if exempt from disclosure under federal law | 2018 | | | |
| 545 | Agriculture and Livestock; Personal Information; Financial, Commercial, and Proprietary Information | 15.135.100(2) | Personal financial information or proprietary data obtained by the department of agriculture | 2018 | | | |
| 546 | Child Abuse; Juvenile Records; Investigative Records | 26.44.187 | Recorded child interviews regarding child abuse or neglect | 2018 | | | |
| 547 | Parentage; Personal Information | 26.26A.050 | Personally identifiable information of the child and others in parentage proceedings | 2018 | | | |
| 548 | Elections; Personal Information | 29A.08.720(2)(b) | The personally identifiable voter registration information of individuals under 18 | 2018 | | | |
| 549 | Elections; Personal Information | 29A.08.770 | The personally identifiable voter registration information of individuals under 18 maintained by the secretary of state and county auditors | 2018 | | | |
| 550 | Elections; Personal Information | 29A.08.359 | Personal information supplied to obtain a driver's license or identicard and used to certify registered voters | 2018 | | | |
| 551 | Elections | 29A.92.100(3) | A plaintiff's filing of an action regarding equal voting rights under the Washington voting rights act of 2018 | 2018 | | | |
| 552 | School District Insurance | 41.05.890(2) | Claims, health care, and financial information submitted by school districts to the office of the insurance commissioner and health care authority | 2018 | | | |
| 553 | State Government | 43.216.015(15) | Oversight board for children, youth, and families records, only the information if otherwise confidential under state or federal law | 2018 | | | |
| 554 | State Government; Investigative Records | 43.06C.060(3) | Information regarding investigations exchange between the office of the corrections ombuds and the department of corrections | 2018 | | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 555 | Insurance Information | 48.195.040(1) | An insurer's corporate governance annual disclosure and related information submitted to the insurance commissioner | 2018 | | | |
| 556 | Unwanted Medication Disposal; Financial, Commercial and Proprietary Information | 69.48.170 | Proprietary information submitted to the department of health regarding unwanted medication disposal | 2018 | | | |
| 557 | Financial, Commercial, and Proprietary Information | 42.56.270(13) | Financial and proprietary information submitted to or obtained by the department of ecology | | | | |
| 558 | Financial, Commercial, and Proprietary Information | 42.56.270(15) | Financial and commercial information provided as evidence to the department of licensing from special fuel licensees or motor vehicle fuel licensees | | | | |
| 559 | Financial, Commercial, and Proprietary Information | 42.56.270(18) | Financial, commercial, operations, and technical and research information submitted to health sciences and services authorities if private loss would result | | | | |
| 560 | Financial, Commercial, and Proprietary Information | 42.56.270(19) | Information that can be identified to a particular business that was gathered as part of agency rule making | | | | |
| 561 | Health Care Professionals; Health Care | 42.56.355 | Information distributed to a health profession board or commission by an interstate health professions licensure compact | 2017 | | | |
| 562 | Marijuana | 42.56.630 | Registration information of members of medical marijuana cooperatives submitted to the liquor and cannabis board | 2015 | | | |
| 563 | Health Professionals; Personal Information | 42.56.640 | Personal identifying information of vulnerable individuals and in-home caregivers | 2017 | | | |
| 564 | Health Care | 71.05.445(4) | Court-ordered mental health treatment records received by the department of corrections | 2000 | | | |
| 565 | Health Care Professionals; Whistleblower | 74.09.315(2) | Identity of whistleblower | | | | |
| 566 | Personal Information; Public Assistance | 43.185C.030 | Personal information collected in homeless census | | | | |
| 567 | Juvenile Records | 26.44.125(6) | Child abuse or neglect review hearings | 2012 | | | |
| 568 | Juvenile Records | 74.13.285(4) | Information on a child in foster care or child's family | 2007 | | | |
| 569 | Health Professionals; Personal Information | 74.39A.275(5) | Personal information of vulnerable adults and in-home care providers | 2016 | | | |
| 570 | Health Professionals; Personal Information | 43.17.410 | Personal information of vulnerable individuals and in-home caregivers | 2017 | | | |
| 571 | Health Care; Personal Information; Investigative Records | 74.39A.060(6) | Personal identifying information of complainant and residents in a complaint against a long-term care facility | | | | |
| 572 | Health Care; Financial, Commercial, and Proprietary Information; Trade Secret | 41.05.026 | Health care contractor proprietary information | | | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 573 | Collective Bargaining | 41.56.510 | Collective bargaining authorization cards of public employees | 2010 | | | |
| 574 | Personal Information | 42.56.230(11) | Information submitted to state regarding people self-excluding themselves from gambling activities under RCW 9.46.071 and 67.70.040 | 2019 | | | |
| 575 | Personal Information; Firearms | 42.56.230(12) | Personal information of individuals who participated in the bump-fire stock buy- back program under RCW 43.43.920 | 2019 | | | |
| 576 | Financial Commercial, and Proprietary Information | 42.56.270(31) | Confidential, valuable, commercial information filed with the Department of Ecology regarding the architectural paint stewardship program | 2019 | | | |
| 577 | Agriculture and Livestock; Financial, Commercial, and Proprietary Information; Trade Secret | 42.56.380(15) | Trade secrets, commercial information, and other confidential information obtained by the federal Food and Drug Administration by contract | 2019 | | | |
| 578 | Agriculture and Livestock; Financial, Commercial, and Proprietary Information; Trade Secret | 15.130.150 | Trade secrets, commercial information, and other confidential information obtained by the federal Food and Drug Administration by contract | 2019 | | | |
| 579 | Insurance & Financial Inst. | 42.56.400(29) | Findings and orders that disapprove the acquisition of a state trust company | 2019 | | | |
| 580 | Personal Information; Employment and Licensing | 42.56.660 (effective 7/1/2020) | Agency employee records if the requester sexually harassed the agency employee | 2019 | | | |
| 581 | Personal Information; Employment and Licensing | 42.56.675 (effective 7/1/2020) | Lists of agency employees compiled by agencies to administer RCW 42.56.660 | 2019 | | | |
| 582 | Health Care | 42.56.650, 41.05.410(3)(b) | Data submitted by health carriers to the Health Benefit Exchange and Health Care Authority | 2019 | | | |
| 583 | Court Proceedings; Guardian | 11.130.300(3) (effective 1/1/21) | Visitor report and professional evaluation regarding appointment of guardian for an adult | 2019 | | | |
| 584 | Court Proceedings; Conservator | 11.130.410(3) (effective 1/1/21) | Visitor report and professional evaluation regarding conservatorship of a minor | 2019 | | | |
| 585 | Health Care | 19.390.070 | Information submitted to the attorney general regarding potential anticompetitive conduct in the health care market | 2019 | | | |
| 586 | Placeholder | | | | | | |
| 587 | Personal Information; Investigative, law enforcement, and crime victims | 26.44.175(5) | Information provided to multidisciplinary child protection team members in the course of a child abuse or neglect investigation | 2019 | | | |
| 588 | Insurance and Financial Institutions; Financial Commercial and Proprietary | 30B.44B.170 | Department of Financial Institutions' records in connection to involuntary liquidation of a state trust company | 2019 | | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 589 | Insurance and Financial Institutions; Financial Commercial and Proprietary | 30B.53.100(3) | Department of Financial Institutions' findings and order on the disapproval of a proposed acquisition of a state trust company | 2019 | | | |
| 590 | State Government; Financial Commercial, and Proprietary Information | 43.155.160(6)(g) | Broadband service provider confidential business and financial information submitted as part of an objection to an application for a grant to expand access to broadband service | 2019 | | | |
| 591 | State Government | 42.17A.120(3) | Modification hearing information on the suspension or modification of campaign finance reporting requirements under 42.17A.710 | 2019 | | | |
| 592 | State Government; Health Care | 43.71C.030(2) | Pharmacy benefit manager information reported to the Health Care Authority | 2019 | | | |
| 593 | State Government; Health Care | 43.71C.050(7); 060(5); 070(3) | Prescription drug manufacturer information reported to the Health Care Authority | 2019 | | | |
| 594 | State Government; Health Care | 43.71C.100 | Health Care Authority prescription drug data | 2019 | | | |
| 595 | Insurance; Health Care; Personal Information | 48.43.505(4) | Nonpublic personal health information held by health carriers and insurers | 2019 | | | |
| 596 | Financial, Commercial, and Proprietary Information; Marijuana | 69.50.561(6) | Licensed marijuana business's financial and proprietary information supplied during consultative services by the Washington State Liquor and Cannabis Board | 2019 | | | |
| 597 | State Government; Health Care | 70.225.040(1) | Information submitted to the prescription monitoring program | 2019 | | | |
| 598 | State Government; Financial Commercial, and Proprietary Information | 70.375.130 | Confidential, valuable, commercial information filed with the Department of Ecology regarding the architectural paint stewardship program | 2019 | | | |
| 599 | State Government; Health Care | 70.58A.400(5) (effective 1/1/21) | Sealed birth records with adoption decrees under chapter 26.33 RCW | 2019 | | | |
| 600 | State Government; Health Care | 70.58A.500(3) (effective 1/1/21) | Sealed live birth records | 2019 | | | |
| 601 | State Government; Health Care | 70.58A.530(15), (16) | Certification of birth or fetal death, including certification of birth resulting in stillbirth, that includes information from the confidential section of the birth or fetal death record | 2019 | | | |
| 602 | State Government; Health Care | 70.58A.540 (effective 1/1/21) | Vital records, reports, statistics, and data | 2019 | | | |
| 603 | Employment and Licensing; Personal Information | 42.56.250(11) | Personal demographic details voluntarily submitted by state employees | 2020 | | | |
| 604 | Financial, Commercial, and Proprietary Information | 42.56.270(32) | Commercial information obtained by the Liquor and Cannabis Board in connection with distiller licensing | 2020 | | | |
| 605 | Educational Information | 42.56.315 | Certain student information received by school districts | 2020 | | | |
| 606 | Health Care | 42.56.360(1)(l); 41.04.830 | Medical information about members of retirement plans | 2020 | | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 607 | Health Care | 70.390.030(7) | Health care information held by the Health Care Cost Transparency Board that could identify a patient | 2020 | | | |
| 608 | Educational Information; Crime Victim and Witnesses | 42.56.375; 28B.112.060(3); 28B.112.070(2); 28B.112.080(5) | Identifying information regarding sexual misconduct complainants and witnesses | 2020 | | | |
| 609 | Insurance and Financial Information; Health Care | 42.56.400(31); 48.200.040; 48.43.731 | Contracts with health care benefit managers filed with the Insurance Commissioner | 2020 | | | |
| 610 | Firearms; Health Care | 9.41.111(1)(c) | Mental health information received in connection with a firearm frame or receiver purchase or transfer application | 2020 | | | |
| 611 | Juvenile Records; Investigative, law enforcement and crime victims | 13.50.260(12) | Confidential information and sealed records accessed through the Washington state identification system by criminal justice agencies | 2020 | | | |
| 612 | Juvenile Records; Public Assistance | 74.13.730(7) | Reports, reviews, and hearings involving certificates of parental improvement | 2020 | | | |
| 613 | Education Information | 28B.96.020(8) | Data collected by the Undocumented Student Support Loan Program | 2020 | | | |
| 614 | Motor Vehicle/Driver Records | 43.59.156(6)(a) | Confidential information obtained by the Cooper Jones Active Transportation Safety Council | 2020 | | | |
| 615 | Motor Vehicle/Driver Records | 46.20.117(6); 46.20.161(6) | Self-attestations and data provided for identicard and driver's license designations | 2020 | | | |
| 616 | Juvenile Records | 28A.300.544(6) | Confidential information received by the work group on students in foster care and/or experiencing homelessness | 2020 | | | |
| 617 | Public Utilities and Transportation | 81.88.160(7) | Gas pipeline company reports submitted to the UTC that contain proprietary data or where disclosure would affect public safety | 2020 | | | |
| 618 | Financial, Commercial, and Proprietary Information | 42.56.270(12)(a)(iii) | Financial and proprietary information provided to the Department of Commerce in connection with the industrial waste coordination program | 2021 | | | |
| 619 | State Government; Public Health | 42.56.380(16) | Certain information obtained from the federal Food and Drug Administration by Department of Health public health laboratories for monitoring food supplies for contaminants | 2021 | | | |
| 620 | Elections | 42.56.420(7) | Certain election security information | 2021 | | | |
| 621 | Personal Information | 42.56.680 | Personal information obtained by the Department of Commerce from residential real property notices of default | 2021 c 151 s 12 | | | |
| 622 | Security | 42.56.422; 43.105.450(7)(d) | State agency information technology security reports and information compiled in connection with the Office of Cybersecurity | 2021 c 291 s 8; 2021 c 291 s 1 | | | |

| | Category | RCW | Description | Date Enacted | Materials Presented | Recommendation | Proposed Legislation & Related Bills |
|---|---|---|---|---|---|---|---|
| 623 | Personal information; Crime Victims | 7.105.105(2) | Confidential party information forms accompanying petitions for civil protection orders | 2021 c 215 s 14 | | | |
| 624 | Financial, Commercial, and Proprietary Information; Trade Secret | 36.32.234(7)(a) | Trade secrets and proprietary information submitted by bidders, offerors, and contractors in connection with electric ferry design and procurement, when requested and county concurs | 2021 c 224 s 1 | | | |
| 625 | State Government; Financial, Commercial, and Proprietary Information | 36.32.234(7)(b) | Electric ferry procurement documents, until notification of finalist made or selection terminated | 2021 c 244 s 1 | | | |
| 626 | Personal Information; Motor Vehicle/Driver Records | 46.22.010 | Information and records containing personal and identity information obtained by the Department of Licensing to administer driver and vehicle records | 2021 c 93 s 4 | | | |
| 627 | Personal Information; Health Care | 49.17.062(3) | During public health emergencies, certain personally identifiable information regarding employees of the Department of Labor and Industries | 2021 c 252 s 2 | | | |
| 628 | Health Care | 70.14.065(4) | Records obtained or created relating to partnership agreements for production, distributing, and purchasing generic prescription drugs and insulin | 2021 c 274 s 1 | | | |
| 629 | Health Care | 71.40.140; 71.40.120(3) | Communications, records, and files of the Office of Behavioral Health Consumer Advocacy, and related organizations and advocates | 2021 c 202 s 12; 2021 c 202 s 14 | | | |
| 630 | State Government | 70A.245.030(2) | Reports and information submitted to the Department of Ecology by producers of certain plastic products, when requested | 2021 c 313 s 4 | | | |
| 631 | Security; State Government | 42.56.422 | The report detailing the Office of Cybersecurity's independent security assessment of state agency information technology security program audits | 2021 | | | |
| 632 | Industrial Insurance; Injured Worker | 51.04.063(13) | Information relating to individual claim resolution settlement agreements submitted to the board of industrial insurance appeals | 2014 | | | |

\*For subsequent legislative history, see statutes online on the state legislative's website; see also Code Reviser's Office list ("Exemptions from Public Records Disclosure and Confidential Records") available on Sunshine Committee web page.